**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| THE NAUGHTYS LLC ) | |
| ) | |
| Plaintiff, ) | Case No. 4:21-cv-00492 |
| ) | |
| v. ) | Judge Reed C. O'Connor |
| ) | |
| DOES 1-580, ) | |
| ) | |
| Defendants. ) | |

**Unreported Opinions Cited in Support of**
**Defendants' Memorandum of Law in Support of**
**Defendants' Motion to Dissolve Preliminary Injunction and Lift Asset Restraint**

1

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 2 of 80   PageID 11876

2016 WL 4944370
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

The JOSEPH PAUL CORPORATION
d/b/a Joseph Paul Homes, Plaintiff,

v.

TRADEMARK CUSTOM HOMES, INC.;
Eric Emil Johnson; Cash McWhorter;
and Kimberly McWhorter, Defendants.

Civil Action No. 3:16-CV-1651-L
|
Signed 09/16/2016

**Attorneys and Law Firms**

Jeffrey M. Goldfarb, Goldfarb PLLC, Dallas, TX, for
Plaintiff.

Timberly Jamal Davis, Bryan Terhune, T.J. Davis Law Firm,
PLLC, Houston, TX, Ryan Andrew Starnes, Keith Bowman
Wilson, Jr., Ferguson, Braswell & Fraser, PC, Plano, TX, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

Sam A. Lindsay, United States District Judge

 **\*1** Before the court is Plaintiff's Motion for Temporary
Restraining Order and Preliminary Injunction ("Motion")
(Doc. 7), filed June 21, 2016; Defendants Trademark Custom
Homes, Inc. and Eric Emil Johnson' Motion to Dismiss
Pursuant to Rule 12(b)(1) and 12(b)(6) (Doc. 19), filed July
19, 2016; Plaintiff's request for a hearing on its Motion for
Preliminary Injunction and request to consolidate the hearing
with the trial on the merits under Rule 65(a)(2) (Docs. 25,
28), filed July 26, 2016;[1] Defendants Cash McWhorter's
and Kimberly McWhorter's (collectively "the McWhorters")
Motion to Strike Plaintiff's Reply Brief and Appendix to its
Reply to McWhorters' Response in Opposition to Request
for Temporary Restraining Order and Preliminary Injunction
and, alternatively, Motion for Leave to File Surreply ("Motion
to Strike") (Doc. 31), filed August 5, 2016; and Plaintiff's
Motion for Hearing (Doc. 41), filed September 8, 2016.

After considering the motions, briefs, evidence, and
applicable law, the court **denies** Defendants Trademark
Custom Homes, Inc. and Eric Emil Johnson' Motion to
Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6) (Doc.
19); **denies** Plaintiff's Motion for Temporary Restraining
Order and Preliminary Injunction (Doc. 7); **denies as moot**
Plaintiff's request for a hearing on its Motion for Preliminary
Injunction and request to consolidate the hearing on the
Motion for Preliminary Injunction with the trial on the
merits before Defendants have had the opportunity to conduct
discovery (Docs. 25, 28); **denies as moot** Defendants
Cash McWhorter's and Kimberly McWhorter's Motion to
Strike Plaintiff's Reply Brief and Appendix to its Reply
to McWhorters' Response in Opposition to Request for
Temporary Restraining Order and Preliminary Injunction and,
alternatively, Motion for Leave to File Surreply (Doc. 31);
and **denies as moot** Plaintiff's Motion for Hearing (Doc. 41).

**I. Factual and Procedural Background**
On June 20, 2016, Plaintiff The Joseph Paul Corporation
d/b/a The Joseph Paul Homes ("JP Homes" or "Plaintiff")
filed this action against Defendants Trademark Custom
Homes, Inc. ("Trademark"), Trademark's principal Eric Emil
Johnson ("Johnson"), and homeowners Cash McWhorter and
Kimberly McWhorter (collectively, "the McWhorters"). The
court refers to all Defendants collectively as "Defendants"
when appropriate. According to Plaintiff's Complaint, JP
Homes designs and builds custom homes and has done so
for approximately eight years in North Texas. Plaintiff alleges
that it owns the copyright to the architectural plans, drawings,
and work for the house design known as "The Martinique,"
and that Defendants copied and improperly appropriated
original elements of JP Homes's copyrighted work in The
Martinique. Pl.'s Compl. ¶¶ 9, 35, 36. JP Homes asserts
claims against all Defendants for copyright infringement,
contributory copyright infringement, and vicarious copyright
infringement. Plaintiff also asserts a claim of false advertising
and unfair competition in violation of the Lanham Act against
Trademark, and a common law fraud claim against the
McWhorters. Plaintiff seeks actual damages, consequential
damages, statutory damages, punitive damages, attorney's
fees, costs of court, as well as preliminary and permanent
injunctive relief against Defendants.

 **\*2** On June 21, 2016, Plaintiff filed a separate Motion for
Temporary Restraining Order and Preliminary Injunction to
enjoin the construction of the McWhorters' house that is
currently being built by Trademark. Plaintiff contends that

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   1

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 3 of 80   PageID 11877

the McWhorters, without JP Homes's permission, provided JP Homes's copyrighted architectural plan for The Martinique to Trademark and Johnson, and Trademark is using the copyrighted plan, or a plan that is substantially similar, to build the McWhorters' house. Plaintiff alleges that Trademark has misled consumers by using photographs of a house designed by JP Homes in advertising its own products in D Home Magazine, Facebook, Houzz, Twitter, Pinterest, Land and Home Magazine, and Trademark's website.[2] In addition to damages, Plaintiff seeks to halt the construction of the McWhorters' house and enjoin the McWhorters from further acts of direct, contributory, and vicarious infringement. Plaintiff contends that Defendants should either be required to alter the McWhorters' house, so it will not infringe Plaintiff's copyright, or they should be required to remove the structure. In its Complaint, Plaintiff requests entry of a temporary restraining order ("TRO") and preliminary injunction that would preclude Trademark and Johnson from infringing JP Homes' registered copyrights and copyrighted architectural plans and drawings in the future as follows:

> This injunctive relief includes, but is not limited to, an order that Defendants, and all those acting in concert with them, cease using all infringing plans, that all infringing copies be destroyed[,] that the sale of all in bringing work he enjoined in the absence of consent from JP Homes, and that the structure built using the infringing plans either be torn down and removed or modified sufficiently so as not to infringe upon JP Homes' copyright.

Pl.'s Compl. ¶ 41. Plaintiff's copyright infringement claim is based on Defendants' conduct in building the McWhorters' house using an allegedly infringing copy of The Martinique plans, whereas, the foregoing requested injunctive relief in Plaintiff's Complaint appears to extend beyond JP Homes's plans for The Martinique. The injunctive relief specified in Plaintiff's Motion appears to similarly extend beyond the McWhorters' house and the allegedly infringing plans being used to build that house, although Plaintiff's Motion is based solely on its copyright claim, which focuses on JP Homes's "The Martinique" plan and the McWhorters' house.[3] *See* Pl.'s Mot. 2.

In support of its Motion, Plaintiff submitted the Declaration of Joseph Vastano ("Vastano"), JP Homes's president. Attached to Vastano's declaration are the following eight exhibits:

(1) Copyright Application No. 1-3092398029, dated February 2, 2016, for The Martinique;

(2) architectural plans for The Martinique;

(3) an automated e-mail, dated February 2, 2016, from the United States Copyright office acknowledging receipt of the application and application fee for The Martinique;

(4) June 7, 2016 Copyright Assignment in which Vastano assigns the copyright, registration, and application for The Martinque, Manchester Plan, The Remington, and The Felton, which are listed in "Schedule A To Copyright Assignment";[4]

**\*3** (5) a photograph of the architectural plans for the "McWhorters' Residence" that reference Johnson and DC Texas Designs;

(6) April 7, 2016 cease and desist letter from Plaintiff's counsel to the McWhorters asserting misapprpropriation and infringement of JP Homes's intellectual property rights in the architectural design of the custom home created by JP Homes for the McWhorters;

(7) April 7, 2016 cease and desist letter from Plaintiff's counsel to Johnson asserting misapprpropriation and infringement of JP Homes's intellectual property rights in the architectural designs of homes created by JP Homes for the McWhorters and Mr. and Mrs. James McAnally; and

(8) April 7 and 8, 2016 e-mails from Johnson responding to Plaintiff's cease and desist letter and disputing JP Homes's claim to intellectual property rights in the plans for the McWhorters' and McAnnallys' homes.

*See* Pl.'s Mot. App. 4-47 (Doc. 9). JP Homes clarifies that it is not seeking ex parte relief but instead is requesting that the court enter a TRO to enjoin Defendants' allegedly infringing activity as soon as they have been served and have a reasonable opportunity to respond to its Motion. By order dated June 22, 2016, the court advised that it would set a deadline for Defendants to respond to Plaintiff's Motion after all summons were served by Plaintiff and Plaintiff informed the court in writing when service had been effected. Plaintiff never informed the court in writing when service of process was effected as to each Defendant. The court, therefore, did not enter a briefing schedule expediting the deadlines for Defendants to respond to Plaintiff's Motion for injunctive relief. Instead, Trademark and Johnson filed their Answer to the Complaint and response to Plaintiff's Motion

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed....

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 4 of 80   PageID 11878

for injunctive relief on July 19, 2016, in accordance with an agreed motion that was granted by the court. Trademark and Johnson also filed a joint motion to dismiss in which Trademark moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiff's Lanham Act claim for lack of subject matter jurisdiction based on lack of standing, and Trademark and Johnson both moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's copyright infringement claims and Lanham Act claims for failure to state a claim upon which relief can be granted.

The McWhorters filed their Answer to Plaintiff's Complaint on July 13, 2016, followed by a response to Plaintiff's Motion for injunctive relief on July 20, 2016. On July 26 and 27, 2016, Plaintiff filed separate reply and reply briefs to Defendants' responses to Plaintiff's Motion for injunctive relief. In support of both replies, JP Homes submitted a supplemental declaration from Vastano, to which six additional exhibits are attached. In addition, Plaintiff submitted declarations from Leslie Owens ("Owens"), a JP Homes sales representative, and Michelle Vastano, Vastano's wife; and corresponding exhibits in support of its reply to the McWhorters' response.

A court must always address a motion to dismiss for lack jurisdiction before considering other challenges or reaching the merits of any case because without jurisdiction, the court has no power to entertain the case. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994); *see also Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985) ("We hold ... that the district court should not have issued the preliminary injunction ... without determining whether it had jurisdiction over the party enjoined."). Thus, before addressing the parties' contentions regarding the injunctive relief sought by Plaintiff and whether Plaintiff 's claims should be dismissed under Rule 12(b)(6), the court must first addresses Trademark's Rule 12(b)(1) motion to dismiss Plaintiff's Lanham Act claim for lack of subject matter jurisdiction based on standing, which became ripe on August 23, 2016.

## II. Motion to Dismiss Plaintiff's Lanham Act Claim for Lack of Standing (Doc. 19)

**\*4**  Plaintiff's Lanham Act claim is against Trademark. Trademark contends that Plaintiff's claim under 28 U.S.C. § 1125(a) of the Lanham Act should be dismissed for lack of

federal subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) because Plaintiff lacks standing to assert the claim. In this regard, Trademark asserts:

> Plaintiff has not met the burden of proof to support that [it has] established elements for standing for this claim. Trademark ... den[ies] each and every allegation which Plaintiff has asserted in its Original Complaint. However, even if taken as true, Plaintiff has failed to plead any facts which meet the high burden that any evidence exists that it has (1) been injured by the purported statements by Trademark ...; or (2) that any injury that Plaintiff may have suffered was caused by those actions of Trademark ... Further Plaintiff's complaints that alleged "misleading statements" have caused them injury are speculative at best and (3) carry no weight of redressability if the trier of fact were to grant it a favorable decision.

Mot. to Dismiss 5 (citation omitted). JP Homes responds that its pleadings satisfy the test for standing set forth in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) for claims under § 1125(a) of the Lanham Act.

### A. Whether the Motion to Dismiss for Lack of Standing Falls Under Rule 12(b)(1) or Rule 12(b)(6)

"Constitutional standing is a jurisdictional question." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 769 (5th Cir. 2011) (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011)). "[C]ourts have only treated constitutional standing as a Rule 12(b)(1) issue pertaining to subject matter jurisdiction." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) (citing *Harold H. Huggins Realty, Inc.*, 634 F.3d at 795 n.2). Statutory standing, on the other hand, "is not indicative of Article III jurisdictional standing" and is more properly addressed under Rule 12(b)(6). *Camsoft Data Sys., Inc. v. Southern Elecs. Supply, Inc.*, 756 F.3d 327, 332 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1162 (2015); *Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 409 (5th Cir. 2008).

Statutory standing involves the merits-based question of whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" under a particular statute, that is, whether the plaintiff has a cause of action under the applicable statute. *Lexmark Int'l, Inc.*, 134 S. Ct. at 1387-88. Such an inquiry "does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." *Id.* at 388 n.4 (citation and internal

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 5 of 80 PageID 11879

quotation marks omitted); *Blanchard 1986, Ltd.*, 553 F.3d at 409 ("This question of whether or not a particular cause of action authorizes an injured plaintiff to sue is a merits question, affecting statutory standing, not a jurisdictional question, affecting constitutional standing. In the words of the Supreme Court, once a plaintiff has suffered sufficient injury to satisfy the 'case and controversy' requirement of Article III, 'jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.' ") (citation and footnotes omitted). Unlike dismissals for lack of jurisdiction, which "are not considered adjudications on the merits and ordinarily do not ... preclude a party from later litigating the same claim" after the jurisdictional defect is corrected, "[d]ismissals with prejudice for failure to state a claim ... are 'decision[s] on the merits and essentially end[ ] the plaintiff's lawsuit.' " *Id.* at 409 n.15 (citations omitted). Thus, consideration under Rule 12(b)(6) of whether a plaintiff has statutory standing to assert a claim may result in the dismissal with prejudice of that claim. *See id.*

**\*5** Trademark's motion to dismiss Plaintiff's Lanham Act claim for lack of standing focuses on whether Plaintiff suffered damages as a result of its conduct. Trademark's motion to dismiss for lack of standing, therefore, raises the issue of whether Plaintiff has statutory standing to assert a claim under section 1125(a) of the Lanham Act, not jurisdictional standing. *See Lexmark Int'l, Inc.*, 134 S. Ct. at 1390. The court, therefore, addresses Trademark's and Johnson's motion to dismiss Plaintiff's Lanham Act claim for lack of standing under Rule 12(b)(6), rather than Rule 12(b)(1).

### B. Standard for Rule 12(b)(6)

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, " '[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.' " *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and " 'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record." ' *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

**\*6** The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed....

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 6 of 80   PageID 11880

allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

### C. Plaintiff's Standing to Seek Relief Under the Lanham Act

Section 1125(a) of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A)-(B). Section 1125(a), thus, "creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc.*, 134 S. Ct. at 1384. Plaintiff does not specifically reference § 1125(a) in its Complaint, but it appears that its Lanham Act claim against Trademark is for false advertising and unfair competition. *See* Pl.'s Compl. 1, 9 ("COUNT III—FALSE ADVERTISING AND UNFAIR

COMPETITION UNDER THE LANHAM ACT").[5] Plaintiff also acknowledges in its response to the motion to dismiss that the Supreme Court's analysis in *Lexmark*, which dealt with a § 1125(a) claim under the Lanham Act, is relevant here in determining whether it has standing to sue under the Lanham Act. As Plaintiff asserts that it seeks relief under § 1125(a) of the Lanham Act, the court will apply the standing test adopted in *Lexmark* for such claims.[6]

**\*7** In *Lexmark*, the Supreme Court set forth a two-part test for standing for false advertising claims under § 1125(a) of the Lanham Act, which requires courts to conduct a "zone-of-interests" and proximate-cause analysis. *See Lexmark Int'l, Inc.*, 134 S. Ct. at 1388-91. For statutory standing, a plaintiff must satisfy the zone-of-interests test *and* proximate causality. *See id.* at 1388-94. The "zone-of-interests test" is used to determine whether a particular plaintiff falls within the class of plaintiffs that § 1125(a) protects and whom Congress authorized to sue. *Id.* at 1388-90 (footnote omitted). To fall within "the zone of interests in a suit ... under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. Consumers or businesses who are misled into purchasing an inferior product are generally not considered to be within the zone of interests protected or regulated by § 1125(a). *Id.* at 1390.

The "proximate-cause requirement" for statutory standing "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* at 1390. To satisfy this requirement, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391. Ordinarily, harms derivative of "misfortunes visited upon a third person" are too remote to have been proximately caused by a defendant; however, because "the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Id.* at 1390-91.

"Diversion of sales to a direct competitor" is considered to "be the paradigmatic direct injury from false advertising." *Id.* at 1393. As explained by the Supreme Court in *Lexmark*, the "classic Lanham Act false-advertising claim" is one in which a competitor induces customers to purchase its products instead of those of the plaintiff by making false statements about its own goods or the competitor's goods. *Id.* (quoting *Harold H. Huggins Realty*, 634 F.3d at 799

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 7 of 80   PageID 11881

n.24) ("The paradigmatic case in which the directness of the plaintiff's asserted injury most clearly supports standing is one in which the defendant's 'literally false advertising about its own goods influenced its customers to buy its products instead of [the plaintiff]'s product.' ") (quoting *Procter & Gamble Co.*, 242 F.3d at 563). The Court in *Lexmark* recognized that "a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation," but it declined to adopt a categorical rule prohibiting all suits under the Lanham Act by noncompetitors because doing so "would read too much into the Act's reference to 'unfair competition.' " *Id.* at 1392 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors.").

**D. Analysis**

Trademark does not dispute that Plaintiff falls within section 1125(a)'s "zone of interests."[7] Trademark instead contends that Plaintiff has failed to properly allege proximate cause because it has failed to plead facts, that if proved, would establish that JP Homes has "(1) been injured by the purported statements by Trademark; or (2) that any injury that [JP Homes] may have suffered was caused by those actions of Trademark." Mot. to Dismiss 5 (citation omitted). Trademark contends that Plaintiff's allegations that it has been injured as a result of allegedly "misleading statements" by Trademark are "speculative at best" and "carry no weight of redressability if the trier of fact were to grant it a favorable decision." *Id.*

 **\*8**  Regarding proximate cause, JP Homes responds as follows, contending that its pleadings satisfy this requirement:

JP Homes alleged sufficient facts to show that it has been, and will continue to be, injured as a proximate result of Trademark['s] ... false advertising. JP Homes'[s] claim closely resembles the "classic Lanham Act false-advertising claim" described in *Lexmark*— Trademark ... [is] trying to divert sales from JP Homes and induce customers to use Trademark based on Trademark's advertisement of JP Homes'[s] house design as Trademark's own. *Lexmark*, 134 S. Ct. at 1393. These damages are not "speculative" as Trademark ... claim[s], but are the "paradigmatic direct injury from false advertising." *Id.* JP Homes has adequately alleged facts that support a plausible claim arising out of this injury. *Id.*

In addition, the fact that JP Homes did not plead a specific monetary amount of damages does not detract from its

standing to assert a Lanham Act claim. If a plaintiff proves that a defendant violated Section 1125(a) of the Lanham Act, the plaintiff is entitled to recover a defendant's profits, any damages sustained by plaintiff, and costs of the action. 15 U.S.C. § 1117(a). The Lanham Act also provides for injunctive relief to prevent future violations of Section 1125(a). 15 U.S.C. § 1116(a). In *Lexmark*, the Supreme Court acknowledged that "[e]ven when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief under § 1116(a) ... or disgorgement of the defendant's ill-gotten profits under § 1117(a)." *Lexmark*, 134 S. Ct. at 1392 (internal citations omitted). JP Homes requested actual damages, consequential damages, statutory damages, and injunctive relief arising out of the claims asserted in its Complaint. *See* Pl.'s Complaint ¶ 68; at 11, Dkt. No. 2. JP Homes adequately pleaded for damages and injunctive relief.

Furthermore, a judgment in JP Homes'[s] favor would redress JP Homes'[s] injuries. If the Court enters an injunction preventing Trademark ... from using photographs of a home designed by JP Homes in its advertising, JP Homes'[s] future injuries will be redressed. If Trademark ... receive[s] profits from customers who were diverted away from JP Homes, an award of profits and disgorgement would also redress JP Home[s]'s injuries. Pl.'s Resp. to Mot. to Dismiss 6-7.

The court concludes that Plaintiff's Complaint includes sufficient allegations to satisfy the proximate cause component of standing under § 1125(a). JP Homes alleges in pertinent part as follows:

8. JP Homes designs and builds custom homes. It has done so for approximately eight years in North Texas. JP Homes has been recognized as one of best homebuilders in the Dallas area by D Home Magazine.

...

29. Trademark advertises and markets itself using photographs of a house that JP Homes designed. This advertising and marketing effort includes on-line advertisements and photographs posted on Facebook, Houzz, Twitter, Pinterest, and Home and Land Magazine. Trademark's advertising and marketing efforts are misleading, as it would lead an ordinary consumer to believe that Trademark designed the house.

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed....

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 8 of 80   PageID 11882

**\*9**  30. On the strength of JP Homes'[s] design, Trademark wrongfully received recognition as one of the best builders in the Dallas area by D Home Magazine. The photograph used in the D Home display ad for Trademark is a house that was designed by JP Homes. Trademark also received recognition as one of the Best of Garland in 2016.

31. Trademark is competing in the same neighborhoods and areas where JP Homes works. Trademark's efforts are likely to lead to consumer confusion.

61. Trademark has made a false or misleading statement of fact and has mislead consumers in a commercial advertisement about its products, including the designation of origin of the house depicted on Trademark's D Home Magazine display advertisement and the first page of Trademark's website.

62. These false and misleading statements were made on Facebook, Houzz, Twitter, Pinterest, and Home and Land Magazine and on the Trademark internet website.

64. The statements either deceived or had the capacity to deceive a substantial segment of potential customers. The statements are likely to mislead potential customers of the origin of the design of the house.

65. The deception is material and was likely to influence the purchasing decision.

67. JP Homes has been or is likely to be injured as a result of the false and misleading statements of ... Trademark.

68. JP Homes seeks actual damages, attorney's fees, and preliminary and permanent injunctive relief against further false statements.

Pl.'s Compl. 2, 5, 6, 9, 10. Based on these allegations, the court agrees with JP Homes that it has pleaded a "classic Lanham Act false-advertising claim." *Lexmark Int'l, Inc.*, 134 S. Ct. at 1393. Because JP Homes alleges that Trademark falsely advertised and promoted its own products and services using a house plan designed by JP Homes, Plaintiff's allegations that it has suffered competitive or reputational injury as a result of Trademark's conduct are not too remote.

Moreover, while JP Homes does not specify an amount of actual losses that it has or will sustain as a result of the competitive advantage allegedly obtained by Trademark in violation of the Lanham Act, this is not enough to deny Plaintiff standing under the Lanham Act. As explained by

the Court in *Lexmark*, "potential difficulty in ascertaining and apportioning damages is not ... an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects."). *Lexmark Int'l, Inc.*, 134 S. Ct. at 1392. The reason for this is because a plaintiff "may still be entitled to injunctive relief under § 1116(a) (assuming it can prove a likelihood of future injury) or disgorgement of the defendant's ill-gotten profits under § 1117(a)" even if it is unable to "quantify its losses with sufficient certainty to recover damages." *Id.* In reaching this conclusion, the Court in *Lexmark* expressly declined to adopt the standing test used by some courts that consider the speculativeness of a plaintiff's damages claim as a relevant factor. *See id.* Plaintiff will of course have the ultimate burden of coming forward with evidence of injury proximately caused by Trademark's conduct. At this stage, however, the court concludes, based on Plaintiff's pleadings, that it has standing to proceed and is entitled to a chance to prove its Lanham Act claim. Accordingly, the court will deny Trademark's motion to dismiss Plaintiff's Lanham Act claim for lack of standing (Doc. 19).

### III. Motion to Dismiss Plaintiff's Copyright Infringement and Lanham Act Claims for Failure to State a Claim Upon Which Relief Can Be Granted

**\*10**  Trademark and Johnson move to dismiss Plaintiff's claims against them for copyright infringement, contributory copyright infringement, vicarious copyright infringement, and violations of the Lanham Act, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim for relief upon which relief can be granted. Specifically, Trademark and Johnson contend that: (1) certain allegations in Plaintiff's Complaint are conclusory; (2) Plaintiff's copyright infringement claim fails under 17 U.S.C. § 412 because it does not allege that it held a valid copyright by January 13, 2016, for the plans that were provided to Trademark and Johnson by DC Texas Construction, LLC on or about October 13, 2015; and (3) Plaintiff's contributory copyright infringement claim fails because Plaintiff's allegations regarding Trademark's and Johnson's knowledge of any infringing activity, which they deny, are insufficient. Plaintiff filed a response in opposition to the motion, contending that the allegations in its Complaint, when considered as a whole, are sufficient to support claims for relief against Trademark and Johnson. Alternatively, Plaintiff requests leave to amend its pleadings with respect to any deficiency found by the court.

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 9 of 80   PageID 11883

The court has already set forth the standard applicable to motions to dismiss under Rule 12(b)(6). The court, therefore, addresses the law applicable to Plaintiff's copyright infringement and Lanham Act claims, which are the subject of Trademark's and Johnson's Rule 12(b)(6) motion to dismiss.

### A. Copyright Infringement

"There are two types of liability for copyright infringement: direct and secondary. As its name suggests, the former applies when an actor personally engages in infringing conduct." *American Broadcasting Cos., Inc. v. Aereo*, 134 S. Ct. 2498, 2512 (2014) (Scalia, J., Thomas, J., Alito, J., dissenting). Direct copyright infringement requires a plaintiff to allege that "(1) [it] owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (quoting *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)). The first element, ownership, is satisfied by allegations that the work is original and can be copyrighted and that the plaintiff has complied with all statutory formalities.[8] *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). The Fifth Circuit has "held that a plaintiff has complied with all statutory formalities [and ownership] when the Copyright office receives the plaintiff's application for registration, fee, and deposit."[9] *See Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000) (citing *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991)). The term "deposit" refers to the material deposited for registration or number of copies of the work that are required by statute to be submitted. *See Geoscan, Inc.*, 226 F.3d at 393 (citing 17 U.S.C. § 408(b)).

**\*11** The copying element is met by: "(1) factual copying and (2) substantial similarity." *Baisden*, 693 F.3d at 499 (quotation marks omitted). Factual copying may be based on direct or circumstantial evidence. *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007). To be substantially similar, "the copyrighted expressions in the two works [must be] sufficiently alike that the copyright to the original work has been infringed." *Id.* In other words, from the prospective of a "layman" or "ordinary observer," "the copy must bear a substantial similarity to the protected aspects of the original." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (quoting *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 398 (5th Cir. 2001)).

Secondary liability applies when defendants are responsible for third-party infringement, even when the defendants themselves have not engaged in the infringing activity. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984). Secondary copyright infringement applies when a defendant contributorily or vicariously infringes on another's copyrights. *See Metro-Goldwyn-Mayer Studios, Inc. v. Groksler, Ltd.*, 545 U.S. 913, 930 (2005). Under a vicarious theory of liability, a defendant is liable when it "profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *See id.* at 931 n.9. "A party is liable for contributory infringement when it, with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (citation and internal quotation marks omitted).

### B. Lanham Act Claim

Plaintiff's Lanham Act claim is for false advertising and unfair competition. "The Lanham Act was enacted to provide protection against the unfair and misleading use of another's trademark." *Procter & Gamble Co.*, 242 F.3d at 563 (citation and footnote omitted). Specifically, the relevant Lanham Act provision, 15 U.S.C. § 1125(a), prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services. *See* 15 U.S.C. § 1125(a). Unlike trademark infringement, section 1125(a) permits "any person who believes that he or she is likely to be damaged" by the proscribed conduct to bring a civil action. *Id.* To state a claim for false advertising under the Lanham Act, a plaintiff must allege:

(1) that the defendant made a false statement of fact about its product in a commercial advertisement; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff[ ] ha[s] been or [is] likely to be injured as a result.

*Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir. 2001) (citation omitted); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

Unfair competition claims under the Lanham Act are governed by the same standard as those for trademark

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 10 of 80 PageID 11884

infringement—the likelihood of confusion. *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir. 2004); *see also Matrix Essentials, Inc. v. Emporium Drug Mart*, 988 F.2d 587, 592 (5th Cir. 1993) ("As with trademark infringement, the touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.' "). Thus, "[a]s a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985).

### C. Analysis

**\*12** After considering Trademark's and Johnson's Rule 12(b)(6) motion to dismiss, Plaintiff's response, Plaintiff's pleadings, and applicable law, the court determines that Plaintiff's pleadings and factual allegations are sufficiently specific at this juncture, and the matters raised by Trademark and Johnson are better suited for a motion for summary judgment or trial in which competent evidence outside the pleadings can be considered by the court. Moreover, Trademark and Johnson do not point to any Fifth Circuit or Supreme Court authority, and the court is aware of none, applying a heightened pleading standard for copyright infringement or Lanham Act claims. *See Tempur-Pedic Int'l Inc. v. Angel Beds LLC*, 902 F. Supp. 2d 958, 965 (S.D. Tex. 2012) ("Although it is true that the [Lanham Act] prohibits material false statements ..., the Court has not found, nor have the parties cited, any decision from the Fifth Circuit subjecting section 43(a) claims to the heightened pleading requirements of Rule 9(b)."); *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 964 (N.D. Tex. 2006) ("Although Federal Rule of Civil Procedure 9 imposes heightened pleading standards for allegations of fraud or mistake, most causes of action, including copyright infringement claims, must satisfy only the minimal notice-pleading requirements of Federal Rule of Civil Procedure 8."); *Healthpoint, Ltd. v. Allen Pharm., LLC*, Case No. SA-07-CA-0526-XR, 2008 WL 728333, at \*2 n.4 (W.D. Tex. Mar. 18, 2008) ("[T]he Fifth Circuit has not held that a heightened pleading standard applies to false advertising claims under § 43(a) of the Lanham Act."). Accordingly, the court will deny Trademark and Johnson's Rule 12(b)(6) motion to dismiss Plaintiff's copyright infringement and Lanham Act claims (Doc. 19).

### IV. Plaintiff's Motion for TRO and Preliminary Injunction and the McWhorters' Motion to Strike

### Plaintiff's Reply Brief and Appendix or, Alternatively, Motion for Leave to File Surreply

Plaintiff's request for a TRO and preliminary injunction is premised on its copyright infringement claim against Defendants with respect to JP Homes's design for The Martinque.

### A. Standard for TRO and Preliminary Injunction

There are four prerequisites for the extraordinary relief of preliminary injunction or TRO. A court may grant such relief only when the movant establishes that:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a TRO or preliminary injunction can be granted. *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the TRO or preliminary injunction.

In considering these four requirements and deciding whether to grant injunctive relief, courts must keep in mind that the granting of a TRO or preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion," and a TRO or preliminary injunction is necessary "to preserve the court's ability to render a meaningful decision on the merits." *Callaway*, 489 F.2d at 573. Thus, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction [or TRO]." *Id.* As the court determines that Plaintiff has not satisfied the irreparable harm requirement for a TRO or preliminary injunction, it focuses on this requirement.

### B. Analysis—Irreparable Harm

In its Motion, Plaintiff contends that a "showing of a reasonable likelihood of success on the merits of a copyright

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 11 of 80 PageID 11885

infringement claim raises a presumption of irreparable harm." Pl.'s Mot. 5.[10] This rule, however, has not been adopted by the Fifth Circuit. *Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987); *see Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 537 (N.D. Tex. 2003) (citing *Plains Cotton* for the proposition that "a finding of copyright infringement does not give rise to a presumption of irreparable harm"); *GTE Card Servs. Inc. v. AT&T Corp.*, Case No. 3:96-CV-1970-D, 1997 WL 74712, at *2 (N.D. Tex.) (discussing *Plains Cotton* and rejecting "contention that a substantial threat of irreparable injury is to be presumed once there has been a showing of a substantial likelihood of success on the merits"), *aff'd*, 124 F.3d 191 (5th Cir. 1997).

**\*13** In *Plains Cotton*, a copyright infringement case involving commercial software, the Fifth Circuit held that the rule of presumed injury applied by the Third Circuit in *Apple Computer Incorporated v. Franklin Computer Corporation* "is not established in this circuit" and explained that it had previously "made it clear" that a TRO or preliminary injunction "will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction." *Id.* (citation omitted). The denial of the preliminary injunction in *Plains Court* was affirmed because the appellant had relied solely on its irreparable injury presumption argument, which was rejected by the court, and had failed to persuade the district court or circuit court that "any harm stemming from the alleged infringement ... is not compensable in damages." *Id.* The Fifth Circuit in *Plains Cotton* also noted that, on the surface, the situation faced by the appellant did "not seem to present many possibilities for the infliction of unquantifiable damages." *Id.*

Like the appellant in *Plains Cotton*, JP Homes and all of the cases it cites rely on *Apple Computer* as support for the rule that irreparable injury is presumed upon a finding of likelihood of success on the merits. Additionally, the cases cited by JP Homes to support its presumed injury argument predate the Fifth Circuit's opinion in *Plains Cotton* and are not binding on this court. The cases cited by Plaintiff are also inapplicable for other reasons. The court in *Worlds of Wonder* determined that, *even without the benefit of the injury presumption*, the plaintiff had demonstrated that it would suffer irreparable harm if a preliminary injunction was not granted. *Worlds of Wonder*, 658 F. Supp. at 356. The court in *Value Group* similarly determined that the plaintiffs had established irreparable harm and were not relying solely on the presumed irreparable injury. *Value Grp., Inc.*, 800 F. Supp.

at 1234. Accordingly, Plaintiff's reliance on these cases is misplaced, to the extent it contends that presumed injury alone is sufficient to satisfy the irreparable harm requirement for injunctive relief. Consistent with *Plains Cotton* and this court's prior opinions, the court rejects Plaintiff's argument that irreparable harm is presumed upon a showing of a reasonable likelihood of success on the merits of its copyright infringement claim. *See, e.g., H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, Case No. 3:09-CV-390-L, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) ("Assuming without holding that Plaintiff established a substantial likelihood of prevailing on the merits..., the court rejects its argument that a substantial threat of irreparable injury is to be presumed in such a case. The Fifth Circuit has not so held, and authority from other district courts is not binding on this court.").

In addition to its presumed injury argument, Plaintiff asserts, based on language in cases outside of the Fifth Circuit, that it will suffer irreparable harm if construction of the McWhorters' house and the alleged infringement continue because "[t]he failure to grant injunctive relief creates the *possibility* of permanent loss of customers to a competitor or the loss of goodwill." Pl.'s Mot. 5 (emphasis added); *see also* Pl.'s Reply 8 (citing *Value Grp., Inc.*, 800 F. Supp. at 1234; and *Palmetto Builders and Designers, Inc. v. UniReal, Inc.*, 342 F. Supp. 2d 468, 473 (D. S. C. 2004), which in turn cites *American Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 664 (5th Cir. 1978)).[11] Plaintiff, however, presented no evidence when it initially filed its Motion to support its conclusory assertion regarding the possibility of permanent loss of customers to a competitor or the loss of goodwill. Plaintiff also made no attempt to explain or address in its Motion why any harm stemming from Defendants' alleged infringement would inflict unquantifiable damages or harm that cannot be adequately compensated by monetary damages.[12]

**\*14** For the first time in its reply brief,[13] JP Homes offers additional reasons why it believes that it will suffer irreparable harm if Trademark is allowed to finish building the McWhorters' house. According to JP Homes: (1) its competitive position and brand will be damaged since the McWhorters' house is being built in a community in which JP Homes is established; (2) JP Homes faces injury to its brand, reputation, and goodwill because Trademark "is building the McWhorter House at a lower price, which will undercut JP Homes'[s] competitive advantage"; and (3) Trademark's "marketing practices rely on its sales, and [it] will *likely* market the McWhorter house as its own, without reference to JP Homes'[s] authorship," and "[t]his again, will cause an

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 12 of 80   PageID 11886

injury that is not readily quantifiable and will likely cause JP Homes to lose *potential* customers." Pl.'s Reply 7-8 (Doc. 26) (emphasis added).

For support, Plaintiff relies on essentially the same case authority from other circuits.[14] In addition, Plaintiff filed a supplemental declaration by Vastano, as well as new declarations by Owens and Michelle Vastano in support of its reply brief.

The new evidence filed by Plaintiff in support of its reply brief was filed without leave and is the subject of the McWhorters' objection and Motion to Strike and alternative request to file a surreply after conducting discovery.[15] Plaintiff maintains in response to the McWhorters' Motion to Strike that it could not have anticipated the affirmative defenses raised by the McWhorters when it filed this lawsuit. Plaintiff, however, fails to explain why it could not have come forward with evidence previously to support its assertion that it will suffer irreparable harm in the form of unquantifiable losses if Defendants are not enjoined from constructing the McWhorters' house or other homes using the designs that are the subject of Plaintiff's copyright infringement action. When "a movant has injected new evidentiary materials in a reply without affording the nonmovant an opportunity for further response," the court may in its discretion decline to consider them. *Springs Indus., Inc. v. American Motorists Ins. Co.*, 137 F.R.D. 238, 239-40 (N.D. Tex. 1991). Alternatively, the court may allow the nonmovant an opportunity to file a response to the new materials, followed by an additional final reply brief by the movant. *See id.*

*15 Here, Plaintiff does not oppose the McWhorters' alternative request to file a surreply to address the matters raised in its reply but opposes their request to conduct discovery before filing a surreply based on its contention that the McWhorters should already have in their possession information pertaining to their affirmative defenses. Plaintiff also opposes further delay in the resolution of their Motion for injunctive relief and requests that the McWhorters should be required to file any surreply on an expedited basis. In addition, Plaintiff requests for the first time in its reply in support of its Motion that the court consolidate the trial on the merits of Defendants' liability for copyright infringement with the preliminary injunction hearing before Defendants have the opportunity to conduct discovery in this case. JP Homes "acknowledges that the record on monetary damages issues has not been developed," but it maintains that "such issues could be bifurcated." Pl.'s Reply 3 (Doc. 25).

Because Plaintiff's new contentions that it will suffer irreparable harm and the evidence filed for the first time in support of its reply could have been presented in the first instance in support of its Motion and was filed without leave of court, the court exercises its discretion and declines to consider the new arguments and evidence filed in support of Plaintiff's reply. Even if the court were to consider Plaintiff's new arguments and supplemental evidence, Plaintiff still not would be entitled to injunctive relief, as its new arguments and evidence do not support a finding of irreparable harm for a number of reasons.

Plaintiff contends, and Vastano asserts in his supplemental declaration, that JP Homes's competitive position in the community where Trademark is building the McWhorters' house, as well as North Texas generally, will be damaged. Plaintiff asserts, based on the Third Circuit's opinion in *Apple Computer*, that such damage is irreparable and incapable of being quantified. The facts of *Apple Computer*, however, are distinguishable from this case. As noted in Plaintiff's reply brief, *Apple Computer* involved a defendant's "*wholesale* copying of *many* of [Apple's] key operating programs." Pl.'s Reply 8 (quoting *Apple Computer, Inc.*, 714 F.2d at 1254) (emphasis added). Plaintiff's copyright infringement claim, on the other hand, is limited to Trademark's alleged copying of a single work, The Martinique, and Plaintiff does not contend that the house being built by Trademark is identical to The Martinique. Moreover, unlike the *Value Group* case cited by Plaintiff, there is no evidence that JP Homes devoted "significant time, effort, and money" in developing the architectural plan for The Martinique. *See Value Grp.*, 800 F. Supp. at 1232. Even assuming that JP Homes's competitive advantage *with respect to The Martinique will be compromised in the community where the McWhorters' house is being built*, Plaintiff's contention and Vastano's statement that this harm will also extend to and affect JP Homes's overall ability to compete using plans other than The Martinique to build homes in the same community or in North Texas generally is purely speculative. This in turn undercuts Plaintiff's contention that monetary damages for Trademark's infringing activity are inadequate or incapable of being quantified, especially when the alleged infringement is limited to Trademark's alleged copying of The Martinique plan to build the McWhorters' house.

Moreover, in its Complaint, JP Homes seeks with respect to its copyright infringement claim "actual damages, the Defendants' profits, direct and indirect profits, statutory

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed....

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 13 of 80 PageID 11887

damages, attorney's fees." Pl.'s Compl. ¶ 40. JP Homes's acknowledgment that the record on monetary damages has not been fully developed also suggests that it will be able to develop a basis to support its request for an award of damages for either actual damages and profits or statutory damages and attorney's fees for its copyright infringement claim. Thus, this acknowledgment by Plaintiff and its request for monetary damages appear to be at odds with its contention that an award of damages would be inadequate or incapable of being quantified. Regardless, Plaintiff has not adequately explained why an award of the types of damages requested would be inadequate, and its contentions and evidence in this regard are conclusory and based on speculation. While courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages and monetary damages would be inadequate. *See Millennium Restaurants Group, Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001).

**\*16** Plaintiff also asserts, and Vastano states, that JP Homes's brand, good will, and reputation as a custom home builder will be harmed and potential customers will not want to use JP Homes's designs or building services "*if* Trademark is building JP Homes'[s] designs at a lower price point by lowering the quality of the construction materials" or "*[i]f* Trademark continues to palm off JP Homes'[s] design as a cheaply made product." Pl.'s Reply App. ¶¶ 17-20 (emphasis added). In addition, Vastano states that JP Homes's reputation for building houses with unique home designs will be damaged if another builder constructs a house that is the same or substantially similar to a house created by JP Homes because potential customers will view JP Homes's designs as "common or run-of-the-mill." *Id.* ¶ 17. This reasoning, however, again conflates the harm that may result from Trademark's alleged use of The Martinique design to build the McWhorters' house with JP Homes's ability to market its designs and building services to potential customers for other architectural plans, and Plaintiff has not established that harm resulting from Trademark's copying of The Martinique cannot be adequately compensated by an award of monetary damages.

Plaintiff's contention that "Trademark's marketing efforts do not reference JP Homes'[s] authorship, which will cause JP Homes to lose potential customers" also appears to conflict with its contention and assumption that JP Homes will lose potential customers if they learn that Trademark is building a house substantially similar to The Martinique using lower

quality materials. Pl.'s Reply 7-8 (citing Vastano Supp. Decl. and Pl.'s Reply App. ¶¶ 17-20). Further, Plaintiff has not presented any evidence to demonstrate that Trademark uses lower quality materials to build houses or has "palmed off" JP Homes's designs as a cheaply made product, and Vastano's statement that JP Homes will be irreparably harmed *if* Trademark engages in such conduct is based on speculation and is insufficient to establish irreparable harm. *See, e.g.*, *Slide Fire Sols., L.P. v. Bump Fire Sys., LLC*, 3:14-CV-3358-M, 2016 WL 3361552, at *2 (N.D. Tex. Apr. 14, 2016) ("Plaintiff ... fails to offer any evidence to support Nichols's assertion that Bump Fire's alleged lower priced products have changed the pricing expectations of Slide Fire's current or potential customers. Even if Plaintiff had established loss of market share or price erosion, such evidence would not be sufficient, without more, to establish irreparable harm.").

Finally, Plaintiff's delay in seeking a TRO and preliminary injunction militates against the issuance of a TRO or preliminary injunction. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief where movant, among other things, delayed three months in making its request); *H.D. Vest, Inc.*, 2009 WL 1766095, at *4 (concluding that unexplained delay of approximately five months was sufficient to undercut claim of irreparable harm). Owens, who was the JP Homes sales representative that worked with the McWhorters, states in her declaration that, as early as December 2015, after she learned that the McWhorters were not going to move forward with JP Homes building their home and had visited a real estate agent who refers customers to builders that often use architectural plans created by others, she warned the McWhorters (through their new real estate agent) to refrain from using any part of the architectural plan created by JP Homes. Pl.'s Reply App. 20. According to Owens, the McWhorters' new real estate agent responded by asking what percentage of the plan designed by JP Homes would have to be changed to not be considered the same plan. *Id.* Thus, JP Homes strongly suspected that the McWhorters planned to use the house plan that is the subject of this action as early as December 2015 but waited until June 2016 before filing suit and seeking injunctive relief, after construction on the McWhorters' house was well underway.[16] In the interim period, JP Homes submitted its registration materials for The Martinique to the United States Copyright Office on February 2, 2016, and threatened to take legal action against Trademark and the McWhorters in April 2016, which reinforces the court's determination that JP Homes was aware of the allegedly infringing activity that it now seeks to

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 14 of 80 PageID 11888

enjoin for a substantial period of time before filing suit and seeking expedited injunctive relief. Based on these facts, the court determines that Plaintiff's unexplained and undue delay of approximately six months strongly undercuts its claim of irreparable harm and contention regarding the need for urgent relief.

 **\*17** Having determined that Plaintiff has failed to satisfy the irreparable harm requirement, the court need not address the other factors for a TRO or preliminary injunction[17] and will deny Plaintiff's Motion for TRO and Motion for Preliminary Injunction for failure to satisfy all four requirements necessary for a TRO and preliminary injunction. The court's denial of Plaintiff's Motion for TRO and Motion for Preliminary Injunction moots JP Homes's request for a hearing and request for expedited consideration of whether Defendants are liable for copyright infringement. Moreover, Defendants are entitled to conduct discovery before a trial or hearing on the merits of Plaintiff's copyright infringement claim against them, and while Plaintiff has not demanded that its claims be decided by a jury, Defendants have demanded a jury trial, and conversion of a preliminary injunction hearing to a trial on the merits cannot be in derogation of a party's right to a jury trial. *See* Fed. R. Civ. P. 65(a)(2). Accordingly, the court will deny as moot Plaintiff's request for a hearing and expedited consideration of its copyright infringement claim. The McWhorters' Motion to Strike will also be denied as moot in light of the court's decision not to consider the new arguments and materials filed in support of Plaintiff's

reply brief without leave of court, and its determination that Plaintiff would not be entitled to a TRO or preliminary injunction even if the court were to consider JP Homes's new evidence and arguments.

## V. Conclusion

For the reasons stated, the court **denies** Defendants Trademark Custom Homes, Inc. and Eric Emil Johnson' Motion to Dismiss Pursuant to Rule 12(b)(1) and 12(b)(6) (Doc. 19); **denies** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7); **denies as moot** Plaintiff's request for a hearing on its Motion for Preliminary Injunction and request to consolidate the hearing on the Motion for Preliminary Injunction with the trial on the merits before Defendants have had the opportunity to conduct discovery (Docs. 25, 28); **denies as moot** Defendants Cash McWhorter's and Kimberly McWhorter's Motion to Strike Plaintiff's Reply Brief and Appendix to its Reply to McWhorters' Response in Opposition to Request for Temporary Restraining Order and Preliminary Injunction and, alternatively, Motion for Leave to File Surreply (Doc. 31); and **denies as moot** Plaintiff's Motion for Hearing (Doc. 41).

**It is so ordered** this 16th day of September, 2016.

### All Citations

Not Reported in Fed. Supp., 2016 WL 4944370

---

Footnotes

1    This request appears in Plaintiff's replies, which were filed in support of its Motion for injunctive relief.

2    Plaintiff's allegation in its pleadings that "Trademark advertises and markets itself using photographs of a house that JP Homes designed" appears to refer to a house, other than the one being built by Trademark for the McWhorters, that was built using architectural plans different from The Martinique.

3    In its Motion, Plaintiff requests injunctive relief that "includes an order that Defendants, and all those acting in concert with them, cease using all infringing plans and drawings, and an order enjoining the continued construction of the infringing house." Pl.'s Mot. 2. Plaintiff further requests "entry of a preliminary injunction that enjoins Defendants, and all those acting in concert with them, from acts of infringement and contributory infringement, including but not limited to (1) using all infringing plans and drawings, (2) constructing or continuing to construct infringing structures, including the house under construction for the McWhorters." *Id.*

4    Plaintiff's Exhibit D also includes a June 13, 2016 letter from Plaintiff's counsel to the Copyright Office, which includes a "Request for recordation of Copyright Assignment," Pl.'s Mot. App. 19, as well as a Copyright Office Receipt acknowledging receipt of "2 DCS" forms, a cover letter from Plaintiff's counsel, and payment with respect to "The Mitchell" on June 14, 2016; however, the relevance in this case of any copyright by JP Homes for "The Mitchell" is unclear. *See id.* at 20.

5    Plaintiff's passing reference to "unfair competition" only appears on the first and ninth pages of its Complaint. The Lanham Act includes a statement of its purposes, which includes "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition," 15 U.S.C. § 1127. According to *Lexmark*, the concept of "unfair competition"

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 15 of 80   PageID 11889

was understood to concern "injuries to business reputation and present and future sales." *Lexmark Int'l, Inc.*, 134 S. Ct. at 1389-90. From this, the court concluded that in a suit for false advertising under § 1125(a), "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.*

**6**   Trademark did not file a reply in support of its motion to dismiss to address whether *Lexmark's* standing analysis applies to Plaintiff's false advertising and unfair competition claim under the Lanham Act. Based on the reasoning in *Lexmark* regarding "unfair competition," Plaintiff's response to the motion to dismiss, and the manner in which Plaintiff pleaded its Lanham Act claim, the court concludes that Plaintiff's claim is one for relief under § 1125(a), even though Plaintiff refers to it as one for false advertising *and* unfair competition. The court makes this clarification because the Court in *Lexmark* made clear that it was only deciding "the appropriate analytical framework for determining a party's standing to maintain an action for false advertising under [ § 1125(a) of] the Lanham Act," not the framework for determining standing for the parties' other claims under federal copyright, patent, and antitrust law, or North Carolina's unfair-competition law. *Lexmark Int'l, Inc.*, 134 S. Ct. at 1385 and n.2.

**7**   Although Trademark's motion does not address the zones of interest test for standing under the Lanham Act, the court determines that Plaintiff's alleged injury—loss of customers and damage to its business reputation—are the type of injuries to commercial interests that the Lanham Act protects. *See Lexmark Int'l, Inc.*, 134 S. Ct. at 1393. JP Homes is suing as a business engaged in commerce that is within the control of Congress and whose position in the marketplace has been allegedly damaged by Trademark's and Johnson's false advertising. *See id.*(quoting 28 U.S.C. § 1127). Accordingly, Plaintiff's Lanham Act claim falls within the zone of interests protected by the statute. *Id.*

**8**   Trademark's and Johnson's motion to dismiss references 17 U.S.C. § 412, which provides as follows regarding registration of a copyright:

> In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a), an action for infringement of the copyright of a work that has been preregistered under section 408(f) before the commencement of the infringement and that has an effective date of registration not later than the earlier of 3 months after the first publication of the work or 1 month after the copyright owner has learned of the infringement, or an action instituted under section 411(c), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—
>
> > (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
> > (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. Even if a plaintiff is precluded under this section from recovering statutory damages or attorney's fees for the defendant's infringement, it may still be entitled to an award of actual damages, the defendant's profits, and injunctive relief. *See* 17 U.S.C. §§ 502, 504. Thus, failure to comply with section 412's registration requirement is not necessarily fatal to a claim for copyright infringement.

**9**   JP Homes has pleaded that it submitted its application, fee, and deposit for "The Martinique" on February 2, 2016. *See* Pl.'s Compl. ¶ 9. The issue raised by Trademark and Johnson concerns the timing of Plaintiff's registration for "The Martinique" in light of their contention that they received the plans from the McWhorters on October 13, 2015, a fact which is outside of the pleadings and cannot be considered by the court in ruling on the motion to dismiss under Rule 12(b)(6).

**10**   For support, Plaintiff relies on the following cases: *Value Grp., Inc. v. Mendham Lake Estates, L.P.*, 800 F. Supp. 1228, 1234 (D. N.J. 1992);*Worlds of Wonder v. Veritel Learning Sys., Inc.*, 658 F. Supp. 351, 356 (N.D. Tex. 1986) (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983)); and *Entertainment & Sports Programming Network, Inc. v. Edinburg Cmty. Hotel, Inc.*, 623 F. Supp. 647, 656 (S.D. Tex. 1985). The *Entertainment & Sports Programming Network* opinion cited by Plaintiff was subsequently amended and superseded by*Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.*, 623 F. Supp. 647 (S.D. Tex. 1985), which also concluded that irreparable harm is presumed when a copyright is infringed.

**11**   Plaintiff actually cited page 1324 of the New Jersey district court's opinion in *Value Group* to support its irreparable harm argument; however, this appears to be a typographical error, as there is no page 1324 in this opinion, and the court's analysis regarding irreparable harm in that case starts on page 1233.

**12**   *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) (concluding that irreparable harm requires a showing that: (1) the harm to Plaintiff is imminent (2) the injury would be irreparable and (3) that Plaintiff has no other adequate legal remedy).

**13**   As previously noted, JP Homes filed separate replies and reply briefs to the separate responses filed by (1) Trademark and Johnson, and (2) the McWhorters. Both reply briefs are substantially the same with respect to Plaintiff's irreparable harm analysis. Accordingly, to avoid duplication, the court's citations to Plaintiff's reply brief herein will be to Plaintiff's

Joseph Paul Corporation v. Trademark Custom Homes, Inc., Not Reported in Fed...

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 16 of 80   PageID 11890

reply brief to the McWhorters' response to Plaintiff's Motion for injunctive relief (Doc. 29), unless otherwise specified. Plaintiff also filed two separate appendices in support of its replies. The two appendices are the same, except that the appendix filed with respect to the McWhorters' response contains Vastano's supplemental declaration and exhibits, in addition to the declarations for Owens and Michelle Vastano. The court's citations to Plaintiff's reply appendix will likewise be to the appendix responsive to the McWhorters' response to Plaintiff's Motion (Doc. 30).

14    Plaintiff cited one additional case in its reply, *Haas Outdoors, Incorporated v. Oak Country Camo., Incorporated,* 957 F. Supp. 835, 838 (N.D. Miss. 1997); however, the finding of irreparable harm in this case was based on the presumption already rejected by this court.

15    The McWhorters contend that the claims and issues in this case involve "heavily disputed factual contentions" that will require "detailed discovery, depositions, [and] expert witnesses." McWhorters' Mot. to Strike 1-2. The McWhorters assert that they are entitled to develop fully their defenses, positions, and theories of law in advance of the trial of this cause. JP Homes responds that it is not opposed to the McWhorters' request to file a surreply but opposes the Motion to Strike. JP Homes also opposes the McWhorters' request to conduct discovery before filing their surreply because they have not indicated what additional discovery is needed to respond to JP Homes's Motion for injunctive relief, and any evidence they seek to support their affirmative defenses in response to JP Homes's Motion should be within their possession, custody, or control. Additionally, JP Homes contends that the liability portion of its claims on the merits is fairly straightforward and can be resolved without the need for discovery. JP Homes further contends that the McWhorters could have raised any concerns by conference after receiving it reply brief and appendix, rather than waiting eight days and then filing a motion to strike, and waiting thirteen days to confer. To avoid further delay, JP Homes requests that the court require the McWhorters to file any surreply within three days of the filing of its August 9, 2016 response to the Motion to Strike.

16    According to Plaintiffs' reply brief, the McWhorters' house is 35% or 40% complete.

17    The court's decision not to address the remaining factors is not a comment on the strength or weaknesses of the parties' contentions.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2011 WL 3678144
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

3M COMPANY, Plaintiff,

v.

CHRISTIAN INVESTMENTS
LLC, d/b/a Protected Domain
Services, et al., Defendants.

No. 1:11cv627.
|
Aug. 19, 2011.

**Attorneys and Law Firms**

Timothy J. McEvoy, Cameron McEvoy, PLLC, Fairfax, VA, for Plaintiff.

Charles Paul Chalmers, Shaun Robert Snader, Wilson Sonsini Goodrich & Rosati PC, Washington, DC, for Defendants.

*MEMORANDUM OPINION*

T.S. ELLIS, III, District Judge.

**\*1** In this trademark infringement dispute, the plaintiff, a large, multi-national company, alleges that numerous defendants, many of which are foreign companies and individuals, are using its famous mark to promote online gambling websites. Soon after filing its complaint, but before completing service of process on all defendants, the plaintiff filed a motion for a preliminary injunction. By Order dated July 29, 2011, a temporary restraining order was issued against only those defendants that had already been served with a copy of the complaint and summons, in accordance with Rule 4, Fed.R.Civ.P. (hereinafter "service of process"). *See 3M Company v. Christian Investments LLC,* No. 1:11cv627 (E.D.Va. July 29, 2011) (Order). At the July 29, 2011 hearing, the plaintiff was invited to submit supplemental briefing on whether it was appropriate, as plaintiffs requested, to convert the temporary restraining order into a preliminary injunction applicable to all non-domain-name defendants, including those that have not yet received service of process. Plaintiff has now submitted supplemental briefing, and the question squarely presented

is whether it is permissible to issue a preliminary injunction addressed to persons and entities that have not yet received service of process.

**I.**

Plaintiff, 3M Company ("3M"), a Delaware corporation with its principal place of business in St. Paul, Minnesota, is a long-established, multi-national company that provides a wide variety of products and services in a number of different fields. For decades, 3M has continuously used the mark and trade name "3M," as well as various other marks and names that include 3M, to indicate the source, affiliation, and sponsorship of its products and services. In this regard, 3M has long maintained and operated an official website at the domain names 3m.com and mmm.com. 3M also operates various other websites accessible via domain names incorporating "3m," such as 3mtechnologies.com, 3mcompany.com, 3mtouchsystems.com, and 3munitek.com.

Defendants in this action, many of which are foreign, fall into three groups. The first group of defendants, the "Registrant Defendants,"[1] consists of eighteen companies and individuals who own and operate online gambling websites. The Registrant Defendants direct customers to their websites by registering and using domain names that, according to 3M, are identical or confusingly similar to 3M's mark. Moreover, 3M alleges that the Registrant Defendants prominently display an identical or highly similar copy of 3M's logo on their websites. In short, 3M alleges that the Registrant Defendants are using 3M's mark to direct customers to their online gambling websites and to give those websites a sense of legitimacy by implying an affiliation with 3M, a reputable multi-national company.

The second group of defendants, the "Hosting Service Defendants,"[2] consists of seven corporate entities that provide internet hosting services to the Registrant Defendants, or otherwise have control over the infringing websites.

**\*2** The final group of defendants, the "Defendant Domain Names,"[3] consists of the fifty-one domain names that, according to 3M, are identical or confusingly similar to 3M's mark. The domain names are all registered to the Registrant Defendants and appear on a registry of domain

names owned and controlled by VeriSign, Inc. ("VeriSign"), which is located in Dulles, Virginia.[4]

On June 10, 2011, 3M filed a nine-count complaint stating claims for (i) trademark infringement, under 15 U.S.C. §§ 1114(1), 1117(a); (ii) trademark dilution, under 15 U.S.C. § 1125(c); (iii) unfair competition, under 15 U.S.C. § 1125(a); (iv) cybersquatting, under 15 U.S.C. § 1125(d)(1); (v) common law trademark and trade name infringement; (vi) common law unfair competition; (vii) common law unjust enrichment; (viii) business conspiracy, under Va.Code § 18.2–499 et seq.; and (ix) contributory liability. A few days after filing its complaint, 3M sent courtesy copies of the complaint to the non-domain-name defendants by email, explaining to them in a cover letter that: (i) 3M had filed a lawsuit against them, (ii) 3M was in the process of formally serving the complaint and summons; and (iii) 3M intended to file a motion for a preliminary injunction.

3M moved for a preliminary injunction against all non-domain-name defendants on June 24, 2011. Three days later, on June 27, 2011, 3M served its motion papers on the non-domain-name defendants by mailing the papers to each non-domain-name defendant's last known address, or, if 3M was aware that a non-domain-name defendant was represented by an attorney, to that attorney's address. 3M also provided the non-domain-name defendants with courtesy copies of its motion papers by email. Because the exhibits were too voluminous to transmit by email, the email did not include copies of the exhibits to the declarations supporting 3M's motion. Instead, 3M set up a webpage with links to these exhibits, as well as the rest of its motion papers, and sent an email to the non-domain-name defendants on June 30, 2011 with a live link to this webpage.

After filing its motion for a preliminary injunction, 3M filed a first amended complaint on July 18, 2011. The first amended complaint dropped some of the defendants named in the original complaint and added a few new defendants.[5] The same day it filed the first amended complaint, 3M served the papers underlying its motion for a preliminary injunction on the new defendants (except for the new Defendant Domain Names) by mailing a copy to each new defendant's last known address. Moreover, over the following two days, 3M sent courtesy emails to the new defendants, attaching copies of their motion papers, except for the voluminous exhibits to the declarations; however, as it did with the original defendants, 3M provided a link to a webpage where the new defendants could (and still may) access and download these documents.

A hearing on 3M's motion for a preliminary injunction was held on July 29, 2011. Following the hearing, a temporary restraining order issued against the three defendants that had already been served with a copy of the summons and complaint, namely: (i) Christian Investments LLC, d/b/a Protected Domain Services, (ii) Domains By Proxy, Inc., and (iii) GoDaddy.com. See 3M Company v. Christian Investments LLC, No. 1:11cv627 (E.D.Va. July 29, 2011) (Order). In essence, the temporary restraining order enjoins these three defendants from using the 3M mark or any other mark that is confusingly similar to the 3M mark. Id. The temporary restraining order also prohibits these three defendants from providing internet hosting services for any websites using 3M's mark. Id. Initially granted for ten days, this temporary restraining order was later modified to run for fourteen days from the date of entry and also renewed, for good cause, for an additional fourteen days so that the temporary restraining order is now effective until August 26, 2011. See 3M Company v. Christian Investments LLC, No. 1:11cv627 (E.D.Va. Aug. 12, 2011) (Order). At the July 29, 2011 hearing, 3M was invited to submit supplemental briefing on whether a preliminary injunction could properly be issued against the remaining non-domain-name defendants who have not yet been served with a copy of the complaint and summons, pursuant to Rule 4, Fed.R.Civ.P.[6] 3M has submitted a supplemental brief, and hence this issue is now ripe for disposition.

## II.

**\*3** Analysis of the question whether service of process is required prior to the issuance of a preliminary injunction properly begins with Rule 65, Fed.R.Civ.P., which governs the issuance of both temporary restraining orders and preliminary injunctions. As it happens, neither the Rule's text nor the advisory committee notes provide a clear answer to this question. Although the Rule's text notes that it binds only those persons "who receive actual notice of it by personal service," see Rule 65(d)(2), Fed.R.Civ.P., the Rule does not specify whether that service must be made pursuant to Rule 4, Rule 4.1, or Rule 5, nor does the Rule specify whether service of the summons and complaint must precede the service of the temporary restraining order or preliminary injunction.

Accordingly, analysis must then proceed to case law, which at it happens, is somewhat sparse and neither clear nor entirely uniform. What is clear is that service of process is

not required prior to the issuance of a temporary restraining order. Indeed, the Fourth Circuit has stated that "the power to enter temporary restraining orders is a power to preserve the status quo for the purposes of the litigation and the power to enter such orders in advance of the service of process is universally recognized." *Internatio–Rottterdam, Inc. v. Thomsen,* 218 F.2d 514, 516 (4th Cir.1955). This sensible result is necessary if temporary restraining orders are to do the work contemplated by Rule 65, namely to preserve the status quo and prevent irreparable harm while service of process is completed and a motion for a preliminary injunction is adjudicated.

Although a temporary restraining order is in the nature of an injunction, it is plainly quite different from a preliminary injunction, as it may last for, at most, only twenty-eight days.[7] Preliminary injunctions, by contrast, may last far longer; indeed, a preliminary injunction may continue in effect until final disposition of the dispute or until vacated, whichever occurs earlier. This significant difference has understandably led some courts to a different conclusion with respect to whether service of process is a required antecedent to the issue of a preliminary injunction.

Although the case law is not entirely uniform, decisions in this circuit and the better reasoned decisions elsewhere point persuasively to the conclusion that service of process is a prerequisite to the issuance of an enforceable preliminary injunction. For example, in *R.M.S. Titanic, Inc. v. Haver,* 171 F.3d 943, 958 (4th Cir.1999), the Fourth Circuit held that a district court's preliminary injunction against a company was unenforceable because the district court did not obtain personal jurisdiction over the company through valid service of process. In *Titanic,* the district court issued a preliminary injunction prohibiting a company from visiting and photographing the wreckage of the Titanic. On appeal, the Fourth Circuit began its analysis of the enforceability of the preliminary injunction by reiterating the settled principle of law that "a party cannot obtain injunctive relief against another without first obtaining *in personam* jurisdiction over that person or someone in legal privity with that person." *Id.* at 957. The Fourth Circuit then concluded that the district court lacked *in personam* jurisdiction because process was neither issued nor served on the company, and, as a result, the preliminary injunction was vacated. *Id.* at 958. *Titanic,* therefore, may be viewed as standing for the principle that service of process on a defendant is a prerequisite to the issuance of a preliminary injunction against that defendant.

**\*4** Similarly, in *Gilchrist v. Gen. Elec. Capital Corp.,* 262 F.3d 295, 301 (4th Cir.2001), the Fourth Circuit confronted the question whether creditors in a bankruptcy action initiated in the Southern District of Georgia had standing to appeal an injunction entered against them in a related debt collection action filed in the District of South Carolina, even though the Georgia creditors were not parties to the debt collection action. In resolving that issue, the Fourth Circuit cited *Titanic* for the proposition that "any injunction entered against individuals is an *in personam* action that may be enforced against individuals only over whom the court has personal jurisdiction." *Id.* The Fourth Circuit then stated that "unless the district court had personal jurisdiction over the Georgia creditors *and they were served with process,* the district court could be without power to enforce an injunction against them, unless, of course, they could be shown to have been 'in active concert or participation with' parties over whom the court had jurisdiction." *Id.* (citation omitted) (emphasis added). Thus, under *Titanic* and *Gilchrist,* the Fourth Circuit has made clear that an injunction, including a preliminary injunction, cannot be enforced against a defendant over whom a district court has not obtained personal jurisdiction through valid service of process.[8]

Courts outside the Fourth Circuit have also concluded that service of process is a prerequisite to the issuance of an enforceable preliminary injunction.[9] The rationale articulated by these courts is largely the same, namely that a district court may not issue an injunction until it has personal jurisdiction over the defendant,[10] and such jurisdiction does not exist until there is valid service of process.[11] Indeed, a review of federal case law reflects that many courts, without analysis, clearly decline to issue preliminary injunctions before there has been service of process.[12]

To be sure, a few courts, relying chiefly on *Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 569 F.2d 300 (5th Cir.1978), have held that service of process is not a prerequisite to the issuance of a preliminary injunction.[13] These cases are not persuasive. In *Corrigan,* an interpleader action brought under 28 U.S.C. § 1335, the district court issued a preliminary injunction requiring delivery of perishable goods held by a warehouseman. On appeal, the Fifth Circuit rejected an argument that the injunction was invalid because one of the parties had not received service of process at the time the injunction was issued:

It is not grounds for reversal that the trial court's interlocutory order was issued prior to the time that appellant was made a party by substitute service of process. *Rule 65(a) does not require service of process.* The Rule does require notice to the adverse party.... The sufficiency of written and actual notice is a matter for the trial court's discretion.

 **\*5**  *Id.* at 302 (emphasis added).

*Corrigan* is neither persuasive nor binding. To begin with, it is an interpleader action which has its own rules for preliminary injunctions. *See* Fed.R.Civ.P. 65(e)(2) (stating that Rule 65 does not modify "28 U.S.C. § 2361, which relates to preliminary injunctions in actions of interpleader or in the nature of interpleader"). But beyond this, *Gilchrist* and *Titanic,* binding authority in this district, point persuasively in the opposite direction, holding that a preliminary injunction is not enforceable against a party that has not received valid service of process. *See Gilchrist,* 262 F.3d 295 at 301; *Titanic,* 171 F .3d at 958. Thus, notwithstanding *Corrigan* and its progeny, it is appropriate to conclude that service of process is a required antecedent to the issuance of an enforceable preliminary injunction.

3M argues that this conclusion will impose a hardship on plaintiffs, like itself, who are suing foreign defendants and must serve process in accordance with the Hague Convention or by Letters Rogatory. Unlike domestic service, which may take a few days or weeks, 3M emphasizes that service in foreign countries may take from three months to more than a year, a delay driven to some extent by the requirement that the pleadings must be translated into the language of each defendant's country of residence. The short answer to the 3M's understandable concern is that 3M, and similarly situated plaintiffs, can name the registrar and registry as defendants, and after serving process, move for a preliminary injunction requiring the registrar or registry to disable the infringing domain names while service of process is perfected

on a foreign defendant. Moreover, 3M can request to serve process on the foreign defendants by alternative means. *See* Fed.R.Civ.P. 4(f)(3) (permitting service of summons "by other means not prohibited by international agreement, as the court orders"); *see also Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1015 (9th Cir.2002) (noting that, pursuant to Rule 4(f)(3), "trial courts have authorized a wide variety of alternative methods of service including publication, ordinary mail, mail to the defendants last known address, delivery to the defendant's attorney, telex, and most recently, email."). 3M has not requested permission to serve process on the foreign defendants by alternative means, and hence the permissibility of doing so in this case is neither reached nor decided here.

In sum, it is premature to convert the temporary restraining order into a preliminary injunction against all defendants because 3M has not completed service of process on all non-domain-name defendants. Moreover, although there is little dispute that there is subject matter jurisdiction over the claims, there is doubt as to whether there is a "reasonable probability" that personal jurisdiction exists over each defendant. *Catalog Mktg. Servs., Ltd .,* 1989 WL 42488, at \*2.[14]

 **\*6**  Nothing prohibits plaintiff from moving for a preliminary injunction against any defendants that have been served with process. However, any such motion must include affidavits or other competent evidence sufficient to establish a "reasonable probability" that personal jurisdiction exists over those defendants. *Id.*

An appropriate Order will issue.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3678144

---

Footnotes

1    *See* First Am. Compl. ¶¶ 2–19.

2    *See* First Am. Compl. ¶¶ 21–27.

3    *See* First Am. Compl. ¶ 29.

4    A "registry" is "the single official entity that maintains all official records regarding registrations in the TLD (top level domain)...." *Fleetboston Fin. Corp. v. Fleetbostonfinancial.com,* 138 F.Supp.2d 121, 123 n.2 (D.Mass.2001) (internal citations and quotations omitted). A "registrar" is "one of several entities, for a given TLD, that is authorized by ICANN [Internet Corporation for Assigned Names and Numbers] to grant registration of domain names to registrants." *Id.*

5    Specifically, 3M added six defendants and dropped three defendants from the Registrant Defendants. 3M also dropped one of the Hosting Service Defendants. Also, 3M added five domain names and dropped one domain name from the Defendant Domain Names.

6    A domain name is not a proper party unless personal jurisdiction cannot be asserted over the registrant, or the registrant cannot be found. In that event, the action may only proceed *in rem* against the domain name under the Anticybersquatting Consumer Protection Act ("ACPA"), which requires sending notice to the registrant's listed email and postal addresses and publishing notice of the action as the court may direct. *See, e.g., Globalsantafe Corp. v. Globalsantafe.com,* 250 F.Supp.2d 610, 615 (E.D.Va.2003) (citing 15 U.S.C. § 1125(d)(2)(A)(ii)(aa) & (bb)).

7    A temporary restraining order may initially last for fourteen days, but may also be extended for a "like period" if good cause is shown, or for a longer period with consent of the adverse party. Fed.R.Civ.P. 65(b)(2).

8    *See also Baines v. City of Danville, Va.,* 337 F.2d 579, 598–99 (4th Cir.1964), *overruled on other grounds by Mitchum v. Foster,* 407 U.S. 225 (1972) ("If, as here, the court refuses [a temporary restraining order], no process of any kind having issued, nothing remains before the court unless and until process is served. *After service of process, the applicant may apply for a temporary injunction, but, if there has been no service, there is no foundation for further proceedings against unserved parties.*") (emphasis added).

It is worth noting, however, that the issue of personal jurisdiction does not need to be fully litigated before a court may issue a preliminary injunction. Even if there is a dispute about whether the facts provide a basis for the court's jurisdiction over the defendant, a court may issue a preliminary injunction binding that defendant as long as there is " 'a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.' " *See Catalog Mktg. Servs., Ltd. v. Savitch,* No. 88–3538, 1989 WL 42488, at *2 (4th Cir. Apr. 24, 1989) (quoting *Visual Scis., Inc. v. Integrated Commc'ns, Inc.,* 660 F.2d 56, 58 (2d Cir.1981)). Of course, a plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing. *See Prod. Group Int'l v. Goldman,* 337 F.Supp.2d 788, 793 n.2 (E.D.Va.2004).

9    *See Schuh v. Michigan Dep't of Corrections,* No. 1:09cv982, 2010 WL 3648876, at *2 (W.D.Mich. July 26, 2010) ("When a preliminary injunction is sought under Rule 65(a), service of the summons and the complaint is required. It is well settled that without service of process, a court has no jurisdiction over defendants named in a lawsuit.") (citations omitted); *Mapping Your Future, Inc. v. Mapping Your Future Servs., Ltd.,* 266 F.R.D. 305, 309 (D.S.D.2009) (holding that motion for preliminary injunction against foreign defendant was premature and could be re-filed after defendant had been served with the summons and complaint); *Sangui Biotech Intern., Inc. v. Kappes,* 179 F.Supp.2d 1240, 1241 (D.Colo.2002) (holding that district court did not have jurisdiction to enter preliminary injunction against foreign defendant because he had not yet been served with process under the provisions of the Hague Convention); *Carty v. R.I. Dept. of Corrections,* 198 F.R.D. 18, 20 (D.R.I.2000) ("When an injunction is sought, service of the summons and the complaint is required. It is well settled that without service of process, this Court has no jurisdiction over the named defendants. Personal jurisdiction is established either by proper service of process, or by the defendant's waiver of any defect in the service of process.") (citations omitted).

10    *See, e.g., Zepeda v. U.S. Immigration & Naturalization Serv.,* 753 F.2d 719, 727 (9th Cir.1985) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court.").

11    The support for the position that a district court may not assert jurisdiction over a defendant until that defendant receives service of process is not insubstantial. *See Omni Capital Int'l, Ltd., v. Rudolf Wolff & Co.* 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Choice Hotels Int'l, Inc. v. Bonham,* No. 96–2717, 1997 WL 600061, at *1 (4th Cir. Sept. 30, 1997) ("Valid service of process is a prerequisite to a district court's assertion of personal jurisdiction.") (internal quotations and citations omitted); *Farm Credit Bank of Baltimore v. Ferrera–Goitia,* 316 F.3d 62, 68 (1st Cir.2003) ("Personal jurisdiction usually is obtained over a defendant by service of process.").

12    *See Universal Licensing Corp. v. Paola del Lungo, S.p.A.,* 293 F.3d 579, 582 (2d Cir.2002) ("The court invited Universal to return to court six days later, after service of process had been properly effected on PDL, at which time the court would entertain a motion for a preliminary injunction."); *Burns v. First. Am. Trustee Servicing Solutions, LLC,* No. 11–0023, 2011 WL 175503, at *2 (N.D.Cal. Jan. 19,2011) ("If Plaintiffs seek a preliminary injunction, they must serve the summons and complaint on any Defendant against whom relief is sought."); *Lakner v. Balke,* No. 08–cv–1791, 2008 WL 4473916, at *2 n.1 (S.D.Cal. Oct. 2, 2008) ("If Plaintiff wants to pursue a motion for a preliminary injunction, he must first serve Defendants with the summons, Complaint and preliminary injunction motion."); *North Face Apparel Corp. v. TC Fashions, Inc.,* No. 05 Civ. 9083, 2006 WL 838993, at *7 (S.D.N.Y. Mar. 30, 2006) ("The Court will grant Plaintiffs'

application to convert the TRO into a preliminary injunction against SDT USA at such time as Plaintiffs submit proof of service of process upon SDT USA."); *Mark v. Shui–Kuen,* No. 86 Civ. 7494, 1986 WL 11567, at *1 (S.D.N.Y. Oct. 8, 1986) ("Plaintiffs may move for a preliminary injunction after the summons and complaint have been served and defendants have served and filed their answers."); *but see Gambone v. Lite Rock Drywall,* 288 F. App'x 9, 14 (3d Cir.2008) (holding that it was not an abuse of discretion for the district court to issue a preliminary injunction prior to formal service of process in anticipation that such service would promptly follow, but also noting that it took no position on whether the injunction was enforceable against a party that violated the injunction prior to service of process).

**13**    *See Diamond Crystal Brands, Inc. v. Wallace,* 531 F.Supp.2d 1366, 1370–71 (N.D.Ga.2008) ("Rule 65 of the Federal Rules of Civil Procedure, however, only requires that a party have notice of the motion and hearing; perfecting service on a defendant is not a prerequisite to the entry of a preliminary injunction order.") (citing *Corrigan* ); *Sochia v. Federal–Republic's Cent. Government,* No. SA–06–CA–1006, 2006 WL 3372509, at *3 (W.D.Tex. Nov. 20, 2006) ("Although Rule 65(a) does not require formal service of process, the sufficiency of written and actual notice to adverse party prior to issuance of preliminary injunction is a matter for trial court's discretion.") (citing *Corrigan* ); *see also S.E.C. v. Kimmes,* 753 F.Supp. 695, 700–01 (N.D.Ill.1990) ("[I]n the context *of preliminary* injunctive relief such as that granted by the Order, [the requirement for personal jurisdiction] must read simply in terms of *notice* to the enjoined party ... rather than as demanding the existence of in personam jurisdiction via service of process. If it were otherwise, the entire structure of Rule 65—with its basic concept of issuing *binding* TROs and preliminary injunctions—would be sapped of strength entirely."); 11A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (2d ed. West 2011) ("The grant of a temporary injunction need not await any procedural steps perfecting the pleadings or any other formality attendant upon a full-blown trial of this case.") (internal quotations and citation omitted); 13 J. Moore et al., *Moore's Federal Practice* § 65.21 (3d ed. Lexis 2011) ("[A]lthough the notice requirement of Rule 65(a)(1) does not explicitly require a subpoena, summons, writ, or other legal process, proper service of the complaint and summons on the adverse party and notice of the time and place at which the hearing on the preliminary injunction will be held are likely to be deemed sufficient notice.").

**14**    Although 3M has now submitted supplemental briefing on the personal jurisdiction issue, this issue has not yet been fully litigated.

---

**End of Document**                                             © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Burch v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 3208803

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 23 of 80   PageID 11897

2019 WL 3208803
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

William Paul BURCH, Plaintiff,

v.

FREEDOM MORTGAGE CORPORATION,
Loan Care Servicing Center, and
JPMorgan Chase Bank, Defendants.

Civil Action No. 3:18-CV-2731-M-BH
|
Signed 06/27/2019

**Attorneys and Law Firms**

William Paul Burch, Arlington, TX, pro se.

S. David Smith, Bradley Arant Boult Cummings LLP, Houston, TX, Andrew R. Stubblefield, Bradley Arant Boult Cummings LLP, Dallas, TX, for Defendant Freedom Mortgage Corporation.

Nathan Frederick Smith, Malcolm & Cisneros ALC, Dallas, TX, for Defendant Loan Care Servicing Center.

Wm. Lance Lewis, R. Kendall Yow, Quilling, Selander, Lownds, Winslett & Moser, P.C., Dallas, TX, for Defendant JPMorgan Chase Bank.

**Referred to U.S. Magistrate Judge**[1]

IRMA CARRILLO RAMIREZ, UNITED STATES MAGISTRATE JUDGE

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

*\*1* Before the Court for recommendation are *Plaintiff's Motion for Stay*, filed October 31, 2018 (doc. 7), and *Plaintiff's Motion to Stay*, filed December 20, 2018 (doc. 46). Based on the relevant filings and applicable law, the motions should be **DENIED**.

**I. BACKGROUND**

This case involves a dispute over property located at 1713 Enchanted Lane, Lancaster, Texas 75146 (the Property). (doc. 6 at 4.)[2] On September 20, 2018, William Paul Burch (Plaintiff) filed this suit against Freedom Mortgage Corporation (Freedom), Loan Care Servicing Center (LCSC), and JP Morgan Chase Bank (Chase) (collectively Defendants). (*See* doc. 1-3 at 8-45.)

On or about November 17, 2006, Plaintiff's wife executed a promissory note (the Note) in the original principal amount of $104,250 (the Loan), payable to the order of Freedom as well as a deed of trust (the Deed of Trust) securing payment of the Note. (docs. 1-3 at 18-36; 6 at 4.) Plaintiff also executed the Deed of Trust. (*See* doc. 1-3 at 35-36.) The Deed of Trust was made for the benefit of Mortgage Electronic Registration Systems, Inc. (MERS), acting solely as nominee for Freedom and its successors and assigns. (doc. 14-1 at 3.) Plaintiff contends that LCSC "was hired to service the Loan, effective November 28, 2006." (doc. 6 at 4.) On April 1, 2007, Chase began servicing the Loan. (docs. 1-3 at 37; 6 at 4.)

On December 1, 2008, Plaintiff and his wife filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. *See In re William Burch and Juanita Burch,* No. 08-45761-rfn11 (Bankr. N.D. Tex.) (the First Bankruptcy). On December 9, 2009, the bankruptcy court entered an order confirming their Third Amended Plan of Reorganization, which reaffirmed Chase's status as the mortgage holder on the Property and required Plaintiff to enter into a new note in the original principal amount of $68,000. (*Id.*, doc. 246 at 13; doc. 6 at 4.) The First Bankruptcy was closed on September 11, 2012.

On November 27, 2012, MERS assigned its interest in the Deed of Trust to Freedom.[3] (docs. 14-1 at 23-24; 54 at 25-26.) On December 28, 2012, Plaintiff filed for bankruptcy under Chapter 13 of the Bankruptcy Code. *See In re William Paul Burch,* No. 12-46959-mxm7 (Bankr. N.D. Tex.) (the Second Bankruptcy). The Second Bankruptcy was converted to Chapter 11 on December 23, 2013 (*id.*, doc. 100), and to Chapter 7 on January 30, 2018 (*id.*, doc. 354). On February 1, 2016, the bankruptcy court entered an order confirming Plaintiff's Plan of Reorganization, which retained Freedom's lien on the Property in the amount of $77,547.51. (*Id.*, doc. 188 at 11; doc. 6 at 6-7.) On June 13, 2018, the bankruptcy

Burch v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2019)
Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 24 of 80   PageID 11898
2019 WL 3208803

court entered an order of discharge under 11 U.S.C. § 727. (Second Bankruptcy, doc. 475.)

 **\*2**  On September 20, 2018, Plaintiff sued Freedom, LCSC, and Chase in state court alleging fraud, gross negligence, violations of § 12.002 of the Texas Civil Practice and Remedies Code, and violations of the Texas Deceptive Trade Practices Act (DTPA). (*See* doc. 1-3 at 8-45.) On September 27, 2018, he filed an amended complaint that added his wife as a plaintiff, abandoned his original claims, removed LCSC and Chase as defendants, and asserted new claims against Freedom for quiet title, slander of title, and breach of contract, and that sought to enjoin it from foreclosing on the Property. (*See* doc. 1-3 at 67-83.) On October 10, 2018, the state district court issued a temporary injunction restraining Freedom from foreclosing on the Property. (*Id.* at 97-98.)

On October 16, 2018, Freedom removed the suit, asserting diversity jurisdiction under 28 U.S.C. § 1332. (*See* doc. 1.) On October 28, 2018, Plaintiff filed a second amended complaint, which added the claims in his original complaint and LCSC and Chase as defendants.[4] (*See* doc. 6.) It asserts claims for fraud, gross negligence, violations of § 12.002 of the Texas Civil Practice and Remedies Code, and violations of the DTPA and seeks "monetary relief of more than $10,000,000," compensatory, punitive, and exemplary damages, court costs, "reasonable attorney's fees pursuant to state statute," and pre- and post-judgment interest. (*Id.* at 2-9.)

On October 31, 2018, Plaintiff filed a "Motion for Stay." (doc. 7.) Freedom and Chase responded on November 15, 2018 (docs. 20, 21), and Plaintiff replied on November 20, 2018 (doc. 25.) On December 20, 2018, Plaintiff filed a "Motion to Stay." (doc. 46 at 1.) Chase responded on January 7, 2019 (doc. 51), and Freedom responded on January 10, 2019 (doc. 58). Plaintiff filed his reply on January 21, 2019. (doc. 59.) Both motions are ripe for consideration.[5]

## II. TEMPORARY RESTRAINING ORDER

Because Plaintiff's motions seek to enjoin Defendants from foreclosing, selling, transferring, or liquidating "assets within the State of Texas," including the Property, they are liberally construed as a motion for a temporary restraining order (TRO) and a request for preliminary injunction.

A party may obtain a TRO without notice to the other side if it satisfies the necessary requirements, which are:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). The party seeking a TRO has the burden to show entitlement to it. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

Plaintiff does not allege he has given notice to Defendants of his request for injunctive relief, nor has he provided a written certification of his efforts to give notice or proffering reasons why notice should not be required. Neither his second amended complaint nor his motions clearly show an immediate, irreparable injury, loss, or damage that will result before Defendants can be heard in opposition. His motions are subject to denial for this reason alone.

In addition, "[t]o obtain a temporary restraining order, [Plaintiff] must show entitlement to a preliminary injunction." *Mktg. Investors Corp. v. New Millennium Bank*, No. 3:11-CV-1696-D, 2011 WL 3157214, at \*1 (N.D. Tex. July 26, 2011) (citations omitted). As discussed below, he has not made this showing.

## III. PRELIMINARY INJUNCTION

 **\*3**  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movant must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Tex. Midstream Gas Servs., LLC. v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) (citation omitted). The party seeking the preliminary injunction bears the burden of persuasion on *all* four requirements. *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (emphasis added).

### A. Likelihood of Success

Burch v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2019)
2019 WL 3208803

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 25 of 80 PageID 11899

To establish the first element of likelihood of success on the merits, a "plaintiff must present a prima facie case but need not show that he is certain to win." *Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir. 2011). The first element is assessed by looking at standards provided by substantive law. *Id.* (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).

### 1. Fraudulent Lien

Chapter 12 of the Texas Civil Practices and Remedies Code provides, in relevant part:

A person may not make, present, or use a document or other record with:

(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer:

(A) physical injury;

(B) financial injury; or

(C) mental anguish or emotional distress.

Tex. Civ. Prac. & Rem. Code § 12.002(a).

Plaintiff claims that under the confirmation plan in the First Bankruptcy, Defendants were required to issue a new mortgage note on the Property; because a new note was not issued, the old note was "invalidated with the confirmation of the Bankruptcy," which means there is "no valid reason for there to be a Deed of Trust." (doc. 6 at 4-6.) He also claims that "Chase sold the voided mortgage note to Freedom, thus committing fraud and putting [him] in a precarious situation as Freedom attempted to collect on the old note." (*Id.* at 6.)

Plaintiff fails to allege any facts showing that Defendants had knowledge that any documents were fraudulent, that they intended that they be given the same legal effect as a valid lien, or that they intended to injure him or cause him mental anguish or emotional distress. He has accordingly failed to establish a likelihood of success on the merits of this claim.

### 2. DTPA

The DTPA's purpose is to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty...." Tex. Bus. & Com. Code Ann. § 17.44 (West 1995). To maintain a cause of action under the DTPA, a plaintiff must establish that "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *see also* Tex. Bus. & Com. Ann. Code § 17.50(a)(1) (West 2005). The DTPA defines "consumer" in relevant part, as "an individual ... who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code Ann. § 17.45(4) (West 2017). To be a consumer, "a person must have sought or acquired goods or services by purchase or lease" and those goods or services "must form the basis of the complaint." *Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp.2d 747, 765 (N.D. Tex. 2012) (citing *Cameron v. Terrell & Garrett*, 618 S.W.2d 535, 539 (Tex. 1981)).

**\*4** Because the lending of money is not a good or service, a borrower whose sole objective is to obtain a loan is not a consumer under the DTPA. *Walker v. Fed. Deposit Ins. Corp.*, 970 F.2d 114, 123 (5th Cir. 1992) (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, (Tex. 1980)). "A mortgagor qualifies as a consumer under the DTPA," however, "if his or her primary objective in obtaining the loan was to acquire a good or service, and that good or service forms the basis of the complaint." *Miller v. BAC Home Loans Serv., L.P.*, 726 F.3d 717, 724-25 (5th Cir. 2013) (citing to *Flennken v. Longview Bank & Trust Co.*, 661 S.W.2d 705 (Tex. 1983) and *Riverside Nat'l Bank*, 603 S.W.2d at 175).

Plaintiff's DTPA claim is premised on Defendants' allegedly deceptive actions concerning the purported servicing of the mortgage, the "non-compliance to the [First Bankruptcy] Plan," and the attempted foreclosure of the Property. (*See* doc. 6 at 4-6.) His claim is not based on their alleged actions related to financing the purchase of the Property, and he has not alleged or shown that the Property is the basis of his DTPA claim. *See Rojas v. Wells Fargo Bank, N.A.*, 571 F. App'x 274, 279 (5th Cir. 2014) ("[Plaintiff] is not a consumer under this definition because the basis of her claim is the subsequent loan servicing and foreclosure activities, rather than the goods or services acquired in the original transaction"); *Gatling v.*

Burch v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 3208803

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 26 of 80   PageID 11900

*CitiMortgage, Inc.*, No. H-11-2879, 2012 WL 3756581, at *13 (S.D. Tex. Aug. 28, 2012) (holding the plaintiff was not a consumer under the DTPA where "her claim [was] based on acts occurring years after the financing transaction with [the defendant]" and finding "how [the plaintiff's] loan was administered–and the problems subsequently attending that administration–'is merely incidental to [her] prior objective to purchase a residence' ") (citing *Woods v. Bank of Am., N.A.*, Civ. A. No. 3:11-CV-1116-B, 2012 WL 1344343, at *7 (N.D. Tex. Apr. 17, 2012)). Because Plaintiff has not shown he is a consumer under the DTPA, he has not shown a likelihood of success on the merits on this claim.

### 3. Common Law Fraud

In Texas, the elements of common law fraud are: (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032-33 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

Rule 9(b) contains a heightened pleading standard and requires a plaintiff to plead the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b); *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out" with respect to a fraud claim. *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (internal quotations omitted).[6]

**\*5** Plaintiff's claim for common law fraud is based on Defendants' purported failure to comply with the First Bankruptcy Plan. (*See* doc. 6 at 6.) He alleges that "one of the companies bought the old, invalid mortgage note, from the insurance company for a fraction of the amount stated on the mortgage note." (*Id.* at 6.) He also alleges that "[p]ayments

were made to Chase under the Bankruptcy Plan beginning in January 2009 but were returned to Plaintiff uncashed." (*Id.*) He contends that "Chase committed fraud by attempting to collect[ ] on an invalid note" and because it "sold the voided mortgage note to Freedom," which placed him "in a precarious situation as Freedom attempted to collect on the old note." (*Id.*)

Plaintiff fails to allege "the who, what, when, where, and how" as required under Rule 9(b). *See Benchmark Electronics*, 343 F.3d at 724. Further, his allegations cannot plausibly entitle him to relief because they do not allege that Defendants made a material false representation to him upon which he relied to his detriment. *See Grisham v. Deutsche Bank Trust Co. Americas*, No. 4:11-cv-3680, 2012 WL 2568178, at *4 (S.D. Tex. June 28, 2012) (dismissing fraud claim for failure to state a claim where the plaintiff alleged that the defendant "committed fraud by manufacturing documentation to support its alleged ownership of the Note" but he did "not contend that [the defendant] made this material representation to *him*") (emphasis added). The second amended complaint also fails to allege any facts that support his claim that Defendants had knowledge or acted recklessly. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) ("[S]imple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b) ... [because] the plaintiffs must set forth *specific facts* supporting an inference of fraud[,] ... such as identify[ing] circumstances that indicate conscious behavior on the part of the defendants.") (citations omitted) (emphasis in *Dorsey*). Plaintiff's conclusory allegations fail to meet the *Iqbal* pleading standards, let alone show that he is likely to succeed on the merits of his fraud claim.

### 4. Gross Negligence

In Texas, "gross negligence is not a separate cause of action apart from negligence."[7] *RLI Ins. Co. v. Union Pac. R Co.*, 463 F. Supp.2d 646, 649-50 (S.D. Tex. 2006) (citing *Prati v. New Prime, Inc.*, 949 S.W.2d 552, 557 (Tex.App.-Amarillo 1997, writ denied)). "Rather, the degree of negligence characterized as gross negligence is relevant only to a recovery of exemplary damages." *Id.* (citing *Riley v. Champion Int'l Corp.*, 973 F. Supp. 634, 641 (E.D. Tex. 1997)). "[A] plaintiff cannot recover exemplary damages," however, "until he or she proves an entitlement to actual damages." *Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, 721-22 (Tex.App.-San Antonio 1994, writ denied) (citing cases); *accord Riley*, 973 F. Supp. at 648 ("Recovery of actual damages in tort

Burch v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 3208803

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 27 of 80   PageID 11901

is necessary to pursue a gross negligence claim"). In other words, a defendant "cannot be grossly negligent without being negligent." *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex.App.–Austin 1990, writ denied).

**\*6** Plaintiff alleges that Defendants "were grossly negligent in that, either by act or omission, they exposed [him] to an extreme degree of risk of harm, considering the probability, magnitude and extent of the harm that would likely impact [him] and which ultimately did." (doc. 6 at 8.) He also alleges that "Defendants had real, subjective awareness of the risks involved, but nevertheless proceeded with callous indifference to the rights, safety, and welfare of [him], physically and psychologically." (*Id.*) These assertions read more like a recitation of the elements of a gross negligence claim than specific allegations of wrongdoing. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief.) (citing *Twombly*, 550 U.S. at 555). Plaintiff has therefore failed to show a likelihood of success on the merits of his purported gross negligence claim.

### B. Irreparable Harm

To satisfy the second element of the preliminary injunction standard, the plaintiff must show "that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey*, 647 F.3d at 600 (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). Injuries are irreparable only when they "cannot be undone through monetary remedies." *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) (citation omitted).

Although Plaintiff does not directly explain why the sale of the Property would cause irreparable harm, the loss of property has been found to cause an irreparable injury. *See Belknap v. Bank of America, N.A.*, G-12-198, 2012 WL 3150271, at \*3 (S.D. Tex. Aug. 1, 2012); *see also U.S. v. Goltz*, SA-06-CA-503-XR, 2007 WL 295558, at \*3 (W.D. Tex. Jan. 25 2007) (loss of property is usually considered an irreparable injury). Irreparable harm alone will not support equitable relief, however, because "the likelihood of success is the 'main bearing wall' " of the test." *Belknap*, 2012 WL 3150271, at \*3 (citation omitted); *see also Goltz*, 2007 WL 295558, at \*3.

### C. Balance of Equities

The third element requires a preliminary injunction applicant to show that the threatened injury outweighs any harm the injunction might cause. *See Winter*, 555 U.S. at 23. Plaintiff does not address this element in his motions or second amended complaint. (*See* docs. 6, 7, 46.) He has therefore also failed to meet his burden with respect to the third element of the preliminary injunction standard, i.e., that the balance of equities weighs in his favor. *See Thompson v. Hughes, Watters & Askanase, LLP*, No. 3:13-CV-429-G-BH, 2013 WL 705123, at \*3 (N.D. Tex. Jan. 31, 2013), *adopted by* 2013 WL 705883 (N.D. Tex. Feb. 27, 2013).

### D. Public Interest

The fourth and final element requires a preliminary injunction applicant to show that the injunction is in the public interest. *Winter*, 555 U.S. at 20. Plaintiff fails to address why enjoining the foreclosure sale of the Property is in the public interest, and other courts have found that this factor is neutral because only the parties to the suit are affected by an impending foreclosure sale. *See Thompson*, 2013 WL 705123, at \*3; *see also Belknap*, 2012 WL 3150271, at \*3.

In conclusion, Plaintiff's unsupported conclusory statements are not sufficient to show entitlement to preliminary injunctive relief. *See Preston v. Seterus, Inc.*, 3:12-CV-2395-L, 2012 WL 3848122, at \*3 (N.D. Tex. Sept. 5, 2012) (citing *Hunt v. Bankers Trust Co.*, 646 F. Supp. 59, 66 (N.D. Tex. 1986)). He has failed to carry his burden to show why a TRO or a preliminary injunction should issue in this case.[8]

### IV. RECOMMENDATION

**\*7** Plaintiff's motions should be **DENIED.**

**SO RECOMMENDED** on this 27th day of June 2019.

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or

Burch v. Freedom Mortgage Corporation, Not Reported in Fed. Supp. (2019)
2019 WL 3208803

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 28 of 80   PageID 11902

recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge

that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3208803

Footnotes

1    By *Special Order 3-251*, this *pro se* case has been referred for full case management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions.

2    Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

3    MERS executed a second assignment of its interest in the Deed of Trust to Freedom on January 13, 2014. (*See* doc. 54 at 28-29.)

4    Plaintiff's wife is not listed as a plaintiff in the second amended complaint, and neither are the claims that were asserted against Freedom in the first amended complaint.

5    LCSC did not file a response to either motion.

6    A dismissal for failure to plead fraud with particularity pursuant to Rule 9(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *McCall v. Genentech, Inc.*, No. 3:10-CV-1747-B, 2011 WL 2312280, at *3 (N.D. Tex. June 9, 2011) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

7    The elements of a "negligence" cause of action under Texas law are: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately caused by that breach. *NetVet Grp. v. Fagin*, No. 3:10-CV-1934-BH, 2011 WL 2601526, at *6 (N.D. Tex. July 1, 2011) (citing *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540-41 (5th Cir. 2005)). "Gross negligence" has two additional elements: "(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed with conscious indifference to the rights, safety, or welfare of others." *Id.* (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 314 (5th Cir. 2002)); *see also* Tex. Civ. Prac. & Rem. Code § 41.001.

8    Plaintiff also seeks to compel a non-party "Title Company" to pay funds purportedly in its possession "into the Court escrow account to be held until the Court determines who get what of the deposited monies." (doc. 46 at 2.) "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *accord Martin v. Wilks*, 490 U.S. 755, 761 (1989). In fact, the Fifth Circuit has held that a "district court has no power to grant an interlocutory or final injunction against a party over whom it has not acquired valid jurisdiction." *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470-71 (5th Cir. 1985). Because the "Title Company" is not a party to this lawsuit, the Court has no power to order it to deposit any funds in the context of this lawsuit.

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4505394
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

James J. CARTER, Plaintiff,

v.

ARCHDALE POLICE DEPARTMENT,
David Jones, City of Archdale,
Garland Yates, and Randolph County
District Attorney's Office, Defendants.

No. 1:13CV613.
|
Aug. 22, 2013.

**Attorneys and Law Firms**

James J. Carter, Archdale, NC, pro se.

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

L. PATRICK AULD, United States Magistrate Judge.

**\*1** This matter comes before the undersigned United States Magistrate Judge for a recommended ruling on Plaintiff's Motion for Emergency Stay and Injunction (Docket Entry 6). (*See* Docket Entry dated Aug. 8, 2013.) For the reasons that follow, the instant Motion should be denied.

## BACKGROUND

Plaintiff, proceeding pro se, brought the instant action complaining of violations of 42 U.S.C. § 1983 based, in part, on his alleged malicious prosecution in a state court criminal proceeding he identifies as case number "12CRS53047" (Docket Entry 1 at 2 (¶ 1(a)). (*See id.* at 2–32.)[1] Plaintiff now asks this Court "to grant an [e]mergency [s]tay of all [p]roceedings and actions in Randolph County Superior Court related to the alleged criminal case # 12CVS53047 and/or any alleged criminal case against [Plaintiff] and to issue an injunction against the Randolph County Superior Court, the Randolph County District Attorney's Office, Garland Yates, the Randolph

County Superior Court Clerk, and W. Scott Harkey barring them from taking any action against [Plaintiff] or in relation to the alleged criminal case against [Plaintiff]." (Docket Entry 6 at 1.)[2] Plaintiff asserts that "Defendants are acting in an illegal manner to violate [ ] Plaintiff's [c]ivil [r]ights under the [c]olor of [s]tate [l]aw and are using proceedings in a case ... to further those illegal actions and to perpetrate a fraud upon this Court and the Plaintiff." (*id.* at 2.) Plaintiff further contends that, should the Court deny the instant Motion, "Plaintiff will suffer irreparable harm by not being able to exercise his [c]onstitutional [r]ights and not being able to present evidence to an unbiased [j]udge who is not part of the conspiracy alleged by Plaintiff in [the] Complaint." (*Id.*)

## DISCUSSION

Because federal court intervention into ongoing state court criminal proceedings offends the principles of state-federal comity, it may occur only in extreme circumstances. *See Younger v. Harris,* 401 U.S. 37, 43–44 (1971). Accordingly, federal courts should abstain from such interference where "[ (1) ] there are ongoing state judicial proceedings; [ (2) ] the proceedings implicate important state interests; and [ (3) ] there is an adequate opportunity to raise any federal claims in the state proceedings." *Martin Marietta Corp. v. Maryland Comm'n on Human Rights,* 38 F.3d 1392, 1396 (4th Cir.1994). To avoid such abstention, a plaintiff must demonstrate that he lacks an adequate remedy in the state courts and that irreparable injury will occur in the absence of equitable relief in federal court. *Younger,* 401 U.S. at 43–44.

Abstention is proper here. As an initial matter, it appears that Plaintiff improperly seeks, at least in part, to enjoin persons and/or entities that are not Parties to this action. (*See* Docket Entry 6.) "[T]he Fourth Circuit has made clear that an injunction, including a preliminary injunction, cannot be enforced against a defendant over whom a district court has not obtained personal jurisdiction through valid service of process." *3M Co. v. Christian Invs. LLC,* No. 1:11cv627, 2011 WL 3678144, at \*4 (E.D.Va. Aug.19, 2011) (unpublished). Moreover, the applicable factors weigh in favor abstention. First, as Plaintiff readily concedes, there is an ongoing state criminal proceeding. (*See* Docket Entry 6 at 1.) Second, "North Carolina has a very important, substantial, and vital interest in preventing violations of its criminal laws." *Nivens v. Gilchrist,* 319 F.3d 151, 154 (4th Cir .2003). Indeed, "the States' interest in administering their criminal justice systems free from federal interference is one of the most powerful of

the considerations that should influence a court considering equitable types of relief." *Kelly v. Robinson,* 479 U.S. 36, 49, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). Finally, Plaintiff has not demonstrated that he lacks the option of presenting his instant concerns in his state court criminal proceeding, particularly where "ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights," *Gilliam v. Foster,* 75 F.3d 881, 904 (4th Cir.1996) (internal quotation marks omitted). (*See* Docket Entries 6, 7.)

 **\*2** Although Plaintiff's Complaint and instant Motion outline a conspiracy allegedly permeating the state criminal justice system and thereby impeding Plaintiff's ability to receive an impartial trial at that level, Plaintiff has offered only his own bare, unsworn assertions to support that contention. (*See* Docket Entries 6, 7.) Accordingly, no basis exists to conclude that the instant action represents one of

those "most narrow and extraordinary of circumstances," *Gilliam,* 75 F.3d at 903, warranting federal interference in state court criminal proceedings.

*CONCLUSION*

Plaintiff has failed to present grounds sufficient to permit this Court's intervention in his pending state court criminal proceedings.

**IT IS THEREFORE RECOMMENDED** that Plaintiff's Motion for Emergency Stay and Injunction (Docket Entry 6) be denied.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4505394

Footnotes

1   Plaintiff subsequently filed a document he entitled "Plaintiff's Harassment Complaint," which the Clerk docketed as an Amended Complaint. (Docket Entry 5.) That filing, however, appears to represent a supplemental complaint in that, in it, Plaintiff seeks to include allegations of harassment based on the filing of his original Complaint (*see id.* at 1), but does not seek to replace the original Complaint (*see id.*).

2   Plaintiff's instant Motion and supporting brief focus in large part on enjoining a hearing scheduled for August 12, 2013. (*See* Docket Entry 6 at 1.) Because that date has now passed, that aspect of the instant Motion is moot. However, fairly read, Plaintiff's instant Motion and supporting brief also ask the Court to enjoin all state court criminal proceedings against him. (*See id.*)

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Cengage Learning, Inc. v. Doe 1, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21    Page 31 of 80   PageID 11905

2018 WL 2244461
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

CENGAGE LEARNING,
INC. et al., Plaintiffs,
v.
DOE 1 d/b/a bargainsofmaine
et al., Defendants.

No. 18-cv-403 (RJS)
|
Signed 01/17/2018

**Attorneys and Law Firms**

Kerry Malloy Mustico, Matthew Jan Oppenheim, Oppenheim + Zebrak, LLP, Washington, DC, for Plaintiffs.

EX PARTE ORDER

RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE

 **\*1** Now before the Court are *ex parte* motions by Plaintiffs for: (1) a Temporary Restraining Order and Temporary Asset Restraining Order, (2) an Expedited Discovery Order, and (3) an Order to Show Cause for a Preliminary Injunction. For the reasons set forth below, Plaintiffs' motions are granted.

I. Background

On January 17, 2018, Plaintiffs filed a complaint alleging that Defendants have violated and are continuing to violate the Copyright Act (17 U.S.C. § 502(a) ) and the Lanham Act (15 U.S.C. § 1116) by importing, distributing, offering for sale, and selling counterfeit copies of Plaintiffs' copyright-protected textbooks that bear Plaintiffs' federally registered trademarks. (Doc. No. 1 ("Compl.").) Specifically, Plaintiffs, who are established textbook publishers that sell educational books and multimedia materials worldwide, allege that Defendants are in the business of selling at least twenty-four different counterfeit textbook titles through online marketplaces eBay.com, Abebooks.com, Alibris.com, and Biblio.com (the "Online Marketplaces"), using the following online storefronts:

1. bargainsofmaine (Seller URL www.ebay.com/usr/bargainsofmaine);

2. laca_888 (Seller URL www.ebay.com/usr/laca_888);

3. COMEDIA (Seller URL www.abebooks.com/gomedia-glendale-ca-u.s.a/51244649/sf);

4. GOMEDIA8 (Seller URL www.alibris.com/stores/booksmedia);

5. pepperack (Seller URL www.ebay.com/usr/pepperack);

6. myfriendsandme02 (Seller URL www.ebay.com/usr/myfriendandme02);

7. sathiel1492 (Seller URL www.ebay.com/usr/sathiel1492);

8. usaokdeals (Seller URL www.ebay.com/usr/usaokdeals);

9. vintagefreakie (Seller URL www.ebay.com/usr/vintagfreakie);

10. warehouse-dealz (Seller URL www.ebay.com/usr/warehouse-dealz); and

11. wolsalenick (Seller URL www.ebay.com/usr/wholsalenick).

(Compl. ¶¶ 13–20.) The complaint asserts that the Defendants may also be operating other, unidentified, online storefronts hosted by the Online Marketplaces and other e-commerce platforms. (*Id.* ¶ 46.) Plaintiffs allege that the sellers behind these online storefronts are anonymous and difficult to identify, and they disguise their counterfeit textbooks in various ways, including by labeling them as in "used" condition. (*Id.* ¶¶ 38–40.) According to Plaintiffs, the counterfeit textbooks are generally different from and often inferior to Plaintiffs' authentic textbooks. (*Id.* ¶¶ 36–37, 48.) They nonetheless bear sufficient resemblance to Plaintiffs' textbooks, in part because they use Plaintiffs' trademarks, that consumers would likely confuse the counterfeits with authentic textbooks. (*Id.* ¶ 48) Plaintiffs allege that Defendants knew or should have known that the counterfeit textbooks infringe on Plaintiffs' copyrights and trademarks, and that they are entitled to damages and profits from the sale of the counterfeit books.

Cengage Learning, Inc. v. Doe 1, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 32 of 80   PageID 11906

## II. Temporary Restraining Order

A plaintiff seeking a temporary restraining order must demonstrate: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff's] favor," (2) "that he is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships between the plaintiff and defendant ... tips in the plaintiff's favor," and (4) that the "public interest would not be disserved" by the issuance of an injunction. *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (citations omitted). The Court must also determine whether "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

### A. Likelihood of Success on the Merits

 **\*2**  In order to prevail on a copyright infringement claim under the Copyright Act, 17 U.S.C. § 501, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Here, Plaintiffs are likely to succeed in establishing that they own the exclusive rights under copyright for each of the textbooks listed in Exhibit A of the Complaint (*see* Compl. ¶ 26), and that Defendants have distributed unauthorized copies of Plaintiffs' copyrighted works through various online storefronts, which Plaintiffs have confirmed through test purchases (*id.* ¶¶ 42–45).

As for the trademark infringement claim under Section 32 of the Lanham Act, 15 U.S.C. § 1114, Plaintiffs must show that: "(1) [they have] a valid mark that is entitled to protection under the Lanham Act; and ... (2) the defendant[s] used the mark, (3) in commerce, (4) in connection with the sale, or advertising of goods or services, (5) without the plaintiff[s'] consent." *1-800 Contacts, Inc. v. WhenU.Com*, 414 F.3d 400, 407 (2d Cir. 2005) (internal citations, quotation marks, and alterations omitted). In addition, "plaintiff[s] must show that defendant[s'] use of that mark is likely to cause confusion as to the affiliation, connection, or association of [defendants]

with [plaintiffs], or as to the origin, sponsorship, or approval of [the defendants'] goods, services, or commercial activities by [plaintiffs]." *Id.* (internal quotation marks and alterations omitted). "[C]ounterfeit marks are inherently confusing." *Fendi Adele S.R.L. v. Filene's Basment, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010). Here, Plaintiffs are likely to succeed in establishing both that they own valid and enforceable federally registered trademarks that appear on their textbooks (*see* Compl. ¶ 27), and that Defendants have used Plaintiffs' registered trademarks in an inherently confusing way in connection with the advertising, promotion, sale, and distribution of counterfeit textbooks (*id.* ¶ 48).

Accordingly, Plaintiffs have demonstrated a likelihood of success on the merits of both their copyright and trademark infringement claims.

### B. Irreparable Injury

Plaintiffs have also demonstrated that Defendants' infringement is ongoing and likely to deprive Plaintiffs of sales, cause market confusion, and damage Plaintiffs' reputation and good will – harms that are difficult to measure and adequately compensate with monetary damages. *See Broad. Music, Inc. v. Pamdh Enterprises, Inc.*, No. 13-cv-2255 (KMW), 2014 WL 2781846, at \*4 (S.D.N.Y. June 19, 2014) ("Harm can be irreparable, and adequate remedies at law lacking, where a copyright holder seeks to prevent the use of his or her work and, absent an injunction, the defendant is likely to continue infringing the copyright."); *Salinger*, 607 F.3d at 81 ("courts have tended to issue injunctions" in the consumer confusion context, since "to prove the loss of sales due to infringement is ... notoriously difficult"); *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004) ("In a trademark infringement case, proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm."). Accordingly, Plaintiffs have established that they will suffer irreparable harm in the absence of an injunction.

### C. Balance of Hardships and Public Interest

With respect to the remaining equitable considerations, the Court finds that the balance of hardships weighs in Plaintiffs' favor. *See, e.g., Estee Lauder, Inc. v. Watsky*, 323 F. Supp. 1064, 1068 (S.D.N.Y. 1970) ("To the plaintiff its name is at stake, and continued injury to its reputation and good will

Cengage Learning, Inc. v. Doe 1, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 33 of 80 PageID 11907

would be a far more serious blow to it than the curtailment of the sale by the defendants would be to them."). The Court also finds that an injunction would serve the public interest. *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work."); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107–08 (2d Cir. 2000) ("Trademark laws exist to protect the public from confusion."); *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 344 ("[T]he public has an interest in not being deceived – in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.").

D. Additional Prerequisites for *Ex Parte* Temporary Restraining Order

**\*3** Finally, as set forth earlier, the Court must also determine whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). Having reviewed the materials provided by Plaintiffs, including the declarations of Dan Seymour and Kerry Mustico, which detail Defendants' unknown identities and alleged use of multiple different storefronts to operate their allegedly infringing enterprise, the Court finds that Plaintiffs have identified specific facts that satisfy this requirement. Accordingly, the Court finds that a temporary restraining order is warranted here.

III. Temporary Asset Restraining Order

The Court next turns to Plaintiff's motion to impose an *ex parte* temporary asset restraining order. "While a court may not freeze assets solely to secure a future money judgment, ... 'where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets.' " *Balenciaga Am., Inc. v. Dollinger*, No. 10-cv-2912 (LTS), 2010 WL 3952850, at \*7 (S.D.N.Y. Oct. 8, 2010) (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 329–33 (1999), and quoting *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00-cv-8051 (JSM), 2000 WL 1610790, at \*1 (S.D.N.Y. Oct. 27, 2000) ). Both the Copyright Act and the Lanham Act entitle a plaintiff who establishes a violation of his rights

in connection with a registered copyright or trademark to recover a defendant's profits. *See* 17 U.S.C. § 504(b) ("The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."); 15 U.S.C. § 1117(a) (allowing plaintiff "subject to the principles of equity, to recover ... defendant's profits"). District courts therefore have authority to freeze a defendant's assets insofar as those could be used to satisfy an award of profits under either statute. *See Gucci Am., Inc. v. Weixing Li*, No. 10-cv-4974 (RJS), 2011 WL 6156936, at \*4 (S.D.N.Y. Aug. 23, 2011), *aff'd in relevant part and vacated on other grounds*, 768 F.3d 122 (2d Cir. 2014) (trademark); *Lions Gate Films Inc. v. Does*, No. 14-cv-06033 (MMM), 2014 WL 3895240, at \*7 (C.D. Cal. Aug. 8, 2014) (copyright); *see also Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12-cv-6283 (AJN), 2012 WL 4901407, at \*2 (S.D.N.Y. Oct. 11, 2012) ("Courts in this district have exercised their equitable powers in Lanham Act cases to restrain assets to preserve the return of profits derived from the sale of counterfeit goods and to insure counterfeiting [p]laintiffs the accounting to which they are entitled.") (collecting cases); Fed. R. Civ. P. 64(a) (with respect to provisional remedies, "a federal statute governs to the extent it applies"). The "purpose of freezing assets is to preserve security for plaintiff's future recovery on an accounting of the counterfeiter's profits." *See N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05-cv-9083 (RMB), 2006 WL 838993, at \*3 (S.D.N.Y. Mar. 30, 2006) (internal quotation marks omitted).

Here, in addition to seeking money damages and a permanent injunction, Plaintiffs seek an accounting and disgorgement of the profits made by Defendants as a result of their counterfeiting operation. (*See* Compl. at 19 (requesting "[a]n accounting and disgorgement of Defendants' profits, gains, and advantages realized from their unlawful conduct").) "An accounting of profits is equitable relief that authorizes a district court to freeze a party's assets." *Gucci*, 2011 WL 6156936, at \*4. Furthermore, the asset freeze imposed in this Order limits itself to assets that are proceeds of Defendants' counterfeiting operations. *See Gucci*, 2011 WL 6156936, at \*4 (issuing injunction that "freezes assets in accounts that have been specifically connected to Defendants' counterfeiting operation") (citing *Grupo Mexicano*, 527 U.S. 308); *see also Balenciaga*, 2010 WL 3952850, at \*7 (noting that "the burden is on the party seeking relief" from asset freeze order to " 'present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.' ")

Cengage Learning, Inc. v. Doe 1, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 34 of 80   PageID 11908

(quoting *Cartier Int'l B.V. v. Liu*, No. 02-cv-7936 (TPG), 2003 WL 1900852, at *1 (S.D.N.Y. Apr. 17, 2003) ). Accordingly, the Court concludes that a temporary asset freeze is appropriate in order to determine the amount by which Defendants profited from their counterfeiting activities and to preserve security for Plaintiffs' future recovery.

**\*4** In addition, the Court finds that the requirements of Federal Rule of Civil Procedure 65(b) are satisfied and that an *ex parte* order is warranted. Defendants have hidden their identities and locations (Seymour Decl. ¶¶ 12–14) and "have both incentive and capacity to hide their assets." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005). Thus, the Court agrees that Plaintiffs would suffer irreparable harm if denied the proposed *ex parte* asset restraint and that such injury would outweigh any harm to Defendants' legitimate interests from granting such an order.[1]

## IV. Expedited Discovery

"A party may seek expedited discovery before the Federal Rules of Civil Procedure Rule 26(f) conference when authorized by a court order." *Next Phase Distrib., Inc. v. John Does 1-27*, 284 F.R.D. 165, 171 (S.D.N.Y. 2012) (citing Fed. R. Civ. P. 26(d)(1) ). Courts in this District "use a 'flexible standard of reasonableness and good cause' when considering whether to grant such an order." *Id.* (citation omitted). Additionally, "[c]ourts in this District have found 'good cause' for expedited discovery to determine the identity of John Doe defendants where the plaintiff has stated a prima facie case and is unable to identify the defendants without a court-ordered subpoena." *AdMarketplace, Inc. v. Tee Support, Inc.*, No. 13-cv-5635 (LGS), 2013 WL 4838854, at *2 (S.D.N.Y. Sept. 11, 2013) (collecting cases). Here, the Court finds that Plaintiffs have shown good cause for expedited discovery to identify Defendants and the accounts used by Defendants in furtherance of their alleged infringement of Plaintiffs' copyrights and trademarks. The Court further finds that the scope of the expedited discovery, as set forth in the Order below, is reasonable.

## V. Service by Email

Regardless of whether Defendants reside in the United States or in a foreign country, the Court finds that service via Defendants' email addresses is appropriate and satisfies due process. If Defendants reside in the United States, Federal Rule of Civil Procedure 4(e) applies, which permits service that "follow[s] state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located," Fed. R. Civ. P. 4(e)(1) – here, New York State. According to Rule 308(5) of the New York Civil Practice Law and Rules, service is permitted "in such manner as the court, upon motion without notice, directs, if service is impracticable under paragraphs one, two and four of this section." N.Y.C.P.L.R. § 308(5). Paragraphs one, two, and four provide for: "(1) personal service; (2) delivering the summons to a person of suitable age and discretion at the individual's actual place of business, dwelling place or usual place of abode, and mailing it; (3) serving the individual's agent; or (4) affixing the summons to the individual's actual place of business, dwelling place, or usual place of abode, and mailing it." *Sec. Exch. Comm'n v. Nnebe*, No. 01-cv-5247 (KMW) (KNF), 2003 WL 402377, at *3 (S.D.N.Y. Feb. 21, 2003).

As Plaintiffs explain, "[n]o information is listed on the Online Storefronts' pages revealing any true legal names or physical addresses for Defendants or their Online Storefronts." (Seymour Decl. ¶ 12.) Because Defendants appear to have concealed their true identities and contact information, apart from the email addresses Plaintiffs have identified, and because Defendants communicate with customers primarily (or even exclusively) through email, the Court finds that the modes of service contemplated by N.Y.C.P.L.R. § 308(1), (2), and (4) are impracticable, and that service by email is appropriate and satisfies due process here. *See Alfred E. Mann Living Trust v. ETIRC Aviation S.a.r.l.*, 78 A.D.3d 137, 141 (1st Dep't 2010) (collecting cases) ("[B]oth New York courts and federal courts have, upon application by plaintiffs, authorized e-mail service of process as an appropriate alternative method when the statutory methods have proven ineffective.").

**\*5** With respect to Defendants residing in a foreign country, Federal Rule of Civil Procedure 4(f) applies. "Under Federal Rule of Civil Procedure 4(f)(3), 'a Court may fashion means of service on an individual in a foreign country, so long as the ordered means of service (1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process.' " *Fed. Trade Comm'n v. PCCare247 Inc.*, No. 12-cv-7189 (PAE), 2013 WL 841037, at *2 (S.D.N.Y. Mar. 7, 2013) (citation omitted). " 'Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant.' " *Id.* (citation omitted). Thus,

Cengage Learning, Inc. v. Doe 1, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O  Document 104-2  Filed 06/24/21  Page 35 of 80  PageID 11909

" '[t]he decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court.' ' " *Id.* (citation omitted). Even if Defendants reside in a country that is a signatory to the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"), the Hague Convention does not apply where, as here, "the address of the person to be served with the document is not known." Hague Convention art. 1, Nov. 15, 1965, 20 U.S.T. 361. In addition, the Court finds that service by email here comports with due process for the reasons stated above. *See, e.g., Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 330–31 (S.D.N.Y. 2015) (finding that service to defendant's email address "comport[ed] with constitutional notions of due process" where "[t]he email address in question [was] listed prominently on [defendant's] Internet homepage" and defendant "presumably relie[d] at least partially on contact through [that email address] to conduct overseas business"); *Philip Morris USA Inc. v. Veles Ltd.*, No. 06-cv-2988 (GBD), 2007 WL 725412, at *3 (S.D.N.Y. Mar. 12, 2007) (finding that "the alternative means of service by email and fax ... was reasonably calculated to apprise defendants of the pendency of this action" where plaintiffs "showed that defendants conduct business extensively, if not exclusively, through their Internet websites and correspond regularly with customers via email"). Accordingly, the Court finds that service of Defendants by email is appropriate in this matter.

## VI. Relief

For the reasons set forth above, in accordance with Rule 65 of the Federal Rules of Civil Procedure, the Copyright Act (17 U.S.C. § 502(a) ), the Lanham Act (15 U.S.C. § 1116), and the Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, and no prior application having been granted, IT IS HEREBY ORDERED THAT:

1. Defendants, their officers, directors, agents, servants, representatives, employees, successors, and assigns, and all those acting in concert or in participation with any of them, are enjoined from:

    a) Directly or indirectly infringing any copyrighted work that is owned or controlled by any of Plaintiffs ("Plaintiffs' Works"), *i.e.*, any copyrighted work published under any of the imprints identified on Appendix A (the "Imprints");

    b) Directly or indirectly infringing any trademark that is owned or exclusively controlled by any of Plaintiffs, including the trademarks associated witht eh Imprints in Appendix A ("Plaintiffs' Marks");

    c) Directly or indirectly manufacturing, importing, distributing (including returning goods purchased from another), offering for sale, and/or selling counterfeits of Plaintiffs' Works;

    d) Enabling, facilitating, permitting, assisting, soliciting, encouraging or inducing others to directly or indirectly infringe Plaintiffs' Works, Plaintiffs' Marks, and/or manufacture, import, distribute, offer for sale and/or sell counterfeits of Plaintiffs' Works; and

2. Defendants, their officers, directors, agents, servants, representatives, employees, successors, and assigns, and all those acting in concert or in participation with any of them who receive actual notice of this Temporary Retraining Order must immediately locate all accounts holding or receiving money or other assets owned, connected to, associated with, or utilized or held by any of Defendants' Online Storefronts ("Defendants' Accounts"), immediately cease transferring, withdrawing, or otherwise disposing of any money or other assets in Defendants' Accounts, and stop allowing such money or other assets in Defendants' Accounts to be transferred, withdrawn, or otherwise disposed of pending further order of this Court. For purposes of this Temporary Restraining Order, Defendants' Accounts includes but is not limited to: (a) Defendants' Accounts with eBay.com or other Online Marketplaces; and (b) Defendants' accounts with banks, financial institutions, and credit card or other payment processing companies that have received money or other assets from Defendants' Accounts or otherwise received sales proceeds from Defendants' Storefronts ("Financial Institutions").

 **\*6** 3. Defendants, their officers, directors, agents, servants, representatives, employees, successors, and assigns, and all those acting in concert or in participation with any of them, must, upon receiving notice of this Temporary Restraining Order, immediately locate all physical copies of Plaintiffs' Works that are within their possession, custody or control, or held in inventory on behalf of any Defendant, and immediately cease selling, distributing, transferring, or disposing of Plaintiffs' Works pending an inspection by Plaintiffs as provided in the Expedited Discovery Order below. Any copies of Plaintiffs' Works determined by

Cengage Learning, Inc. v. Doe 1, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 36 of 80   PageID 11910

Plaintiffs during the inspection to be not counterfeit shall, upon Plaintiffs' notice of such determination, be exempt from this Temporary Restraining Order.

IT IS FURTHER ORDERED THAT this Temporary Restraining Order shall remain in effect until March 5, 2018, the date of the show cause hearing, or such further date as set by the Court.

IT IS FURTHER ORDERED THAT Plaintiffs shall post security in the amount of $2,500, by corporate surety bond, cash, credit card, or a certified or attorney's check.

IT IS FURTHER ORDERED THAT upon two (2) business days' written notice to the Court and Plaintiffs' counsel, any Defendant or restrained third party may appear and move for the dissolution or modification of the provisions of this Temporary Restraining Order upon an appropriate evidentiary showing.

IT IS FURTHER ORDERED THAT Plaintiffs' motion for leave to take expedited discovery, prior to a Rule 26(f) conference, is GRANTED. IT IS FURTHER ORDERED THAT, within three (3) days of service of this Ex Parte Order, each Defendant, their officers, agents, servants, employees, and attorneys, and all those in active concert or participation with any of them, including the Online Marketplaces and Financial Institutions, shall serve upon Plaintiffs' counsel, by email at kerry@oandzlaw.com, written disclosure of the following information, regardless whether such information physically resides in the United States or abroad: (1) Defendants' respective true names and physical addresses; (2) any and all storefront or seller names through which Defendants have sold any of Plaintiffs' Works, along with the names of the associated online marketplace platforms or websites, and the associated seller identification numbers or URLs; and (3) the account details for any and all of Defendants' Accounts with the Online Marketplaces and/or Financial Institutions, including account numbers, current account balances, and accountholders' or account signatories' true names and physical addresses.

IT IS FURTHER ORDERED THAT, within five (5) days of service of this Ex Parte Order, each Defendant, their officers, agents, servants, employees, and attorneys, and all those in active concert or participation with any of them, including the Online Marketplaces and Financial Institutions, shall serve upon Plaintiffs' counsel, by email at kerry@oandzlaw.com, written disclosure of the following information, regardless

whether such information physically resides in the United States or abroad: each Defendants' sales of Plaintiffs' Works from January 1, 2017 to the present, including number of units sold, price per unit, total gross revenues received, and the dates thereof.

IT IS FURTHER ORDERED THAT Plaintiffs may issue discovery requests to Defendants seeking to conduct an inspection of some or all of Plaintiffs' Works held in inventory by or on behalf of a Defendant. Plaintiffs and such subpoena recipients shall work cooperatively to coordinate the prompt inspection of Plaintiffs' Works. Any Works that Plaintiffs confirm to be counterfeit during the inspection shall be turned over to and/or held by Plaintiffs until this matter is concluded as to the respective Defendant. Plaintiffs shall provide notice of their determination to the respective Defendant promptly after completing the inspection. Plaintiffs shall promptly return any Works that they determine to be not counterfeit, and such Works are immediately exempt from the Temporary Restraining Order.

 **7** IT IS FURTHER ORDERED THAT service of process may be made on, and shall be deemed effective as to, Defendants by the following means: (1) by electronic mail to Defendants' email addresses identified by the Storefronts' Online Marketplaces as associated with or utilized by Defendants to conduct the business of Defendants' Storefronts; or (2) if a Defendant's email address is unknown or determined inoperable, by delivery of an electronic message to Defendants through the system for communication between consumers and the Storefronts established by the Online Marketplaces on their respective platforms.

IT IS FURTHER ORDERED THAT Plaintiffs shall effect alternate service by electronic mail as ordered herein by providing Defendants with a link to a secure website (such as Dropbox.com or other File Transfer Protocol ("FTP") site) PDF copies of: (1) this Ex Parte Order; (2) the Summons and Complaint; and (3) all papers filed in support of Plaintiffs' Application. IT IS FURTHER ORDERED THAT the alternative service by electronic mail ordered herein shall be made within five (5) days of the Online Marketplaces' identification of Defendants' Accounts with Financial Institutions as provided above, but in any event, no later than ten (10) days from the date of this Ex Parte Order. Plaintiffs shall properly file proof of such service on the docket.

IT IS FURTHER ORDERED THAT Defendants shall appear on March 5, 2018 at 10:00 a.m., or as soon thereafter as counsel can be heard, in Courtroom 905 of the Thurgood Marshall United States District Court for the Southern District of New York, 40 Foley Square, New York, New York 10007, to show cause why an order should not be entered pursuant to Federal Rules of Civil Procedure 64 and 65, the Copyright Act (17 U.S.C. § 502(a) ), the Lanham Act (15 U.S.C. § 1116), and the Court's equitable authority, granting Plaintiffs a preliminary injunction enjoining Defendants, their officers, directors, agents, servants, representatives, employees, successors, and assigns, and all those acting in concert or in participation with any of them, in a manner substantially similar to the relief provided in the Temporary Restraining Order above, pending resolution of this case or further order of this Court.

Defendants are hereby given notice that failure to attend the hearing scheduled by this Order may result in confirmation of the restraints authorized herein, immediate issuance of the prayed-for Preliminary Injunction to take effect immediately upon expiration or dissolution of the within Temporary Restraining Order, and shall otherwise extend relief for the pendency of this litigation upon the same or similar terms and conditions as comprise this Temporary Restraining Order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2244461

Footnotes

1    Because the Court concludes that Plaintiffs are entitled to an asset freeze under the Copyright Act and Lanham Act, the Court declines to address the merits of Plaintiffs' alternative arguments for similar relief under Rule 64 and N.Y. C.P.L.R. § 6201.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Datetach Enterprises LLC v. FF Magnat Ltd., Not Reported in F.Supp.2d (2012)
Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 38 of 80 PageID 11912
2012 Copr.L.Dec. P 30,318

2012 WL 4068624
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

DATATECH ENTERPRISES LLC, Plaintiff,
v.
FF MAGNAT LIMITED et al., Defendants.

No. C 12–04500 CRB.
|
Sept. 14, 2012.

**Attorneys and Law Firms**

D. Gill Sperlein, The Law Office of D. Gill Sperlein, San
Francisco, CA, for Plaintiff.

**MEMORANDUM AND ORDER**

CHARLES R. BREYER, District Judge.

## I. BACKGROUND

**\*1** Plaintiff Datatech Enterprises LLC ("Datatech"), a
United States company and producer of pornography, sued
FF Magnat Ltd. ("Magnat"), a Hong Kong company
and operator of a file-sharing website, alleging copyright
infringement. Dkt 1. The gist of Datatech's complaint is that
Magnat's website ("Oron.com") encouraged users to infringe
Datatech's copyrights by uploading and distributing copies
of Datatech's work through Oron.com without licenses.
According to Datatech, Magnat paid file uploaders either (1) a
percentage of subscription fees that other users paid to access
those files, or (2) a flat rate on a per-download basis, knowing
that copyrighted files were what attracted subscribers and
downloads. Magnat counters that it is a legitimate cloud-
based file storage service that made good faith efforts to
combat the alleged illegal activities of a few of its users.

Datatech applied for *ex parte,* and the Court already granted,
a temporary restraining order freezing Magnat's assets. Dkt.
9. Datatech argued that in a prior suit functionally identical
to this one, *Liberty Media Holdings, LLC v. FF Magnat, Ltd.,*
No. 12–CV–01057–GMN–RJJ (D. Nev. filed June 20, 2012),
Magnat moved its domain name registration and a substantial
amount of money overseas shortly after being served with the
complaint, suggesting an attempt to dissipate its assets and

limit the ability of a United States court to afford the plaintiff
meaningful relief. The court in the Nevada case granted a
similar asset freeze injunction, which expired the day before
Datatech sought relief in this Court.

Magnat subsequently argued that the transfers were routine,
legitimate business transactions, and moved for limited relief
from the TRO to access funds necessary to pay legal fees in
connection with this suit. The Court granted Magnat's request,
and released $125,000 to a trust account to be used only in
connection with defending this lawsuit. *See* Order (dkt.24).
Datatech now seeks a preliminary injunction extending the
terms of the asset-freeze TRO through trial.

## II. LEGAL STANDARD

### A. Preliminary Injunction

To prevail on its motion for a preliminary injunction, Datatech
must establish that (1) it is likely to succeed on the merits;
(2) it faces irreparable harm in the absence of preliminary
relief; (3) the balance of equities tips in its favor; and (4) an
injunction is in the public interest. *See Winter v. N.R.D.C.,* 555
U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

The Ninth Circuit uses a "sliding scale" approach, such that
"the elements of the preliminary injunction test are balanced,
so that a stronger showing of one element may offset a weaker
showing of another." *Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127, 1131, 1134 (9th Cir.2011). Under the so-called
"serious questions" test, an injunction "is appropriate when
a plaintiff demonstrates that serious questions going to the
merits were raised and the balance of hardships tips sharply
in the plaintiff's favor," so long as the plaintiff also shows
that there is a likelihood of irreparable injury and that the
injunction is in the public interest. *Id.* at 1134–35. Preliminary
injunctions "should not be granted unless the movant, by a
clear showing, carries the burden of persuasion." *Towery v.
Brewer,* 672 F.3d 650, 657 (9th Cir.2012).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

#### 1. Personal jurisdiction

**\*2** As a threshold matter, "[w]here a challenge to jurisdiction
is interposed on an application for a preliminary injunction,
the plaintiff is required to adequately establish that there is
at least a reasonable probability of success upon the question
of [personal] jurisdiction when the action is tried on the

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 Copr.L.Dec. P 30,318

merits." *Zango, Inc. v. PC Tools Pty Ltd.,* 494 F.Supp.2d 1189, 1194 (E.D.Wash.2007) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 471 (5th Cir.1985).

Datatech argues jurisdiction is proper under Federal Rule of Civil Procedure 4(k)(2), which provides jurisdiction where (1) the claim against the defendant arises under federal law, (2) the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction, and (3) the federal court's exercise of jurisdiction comports with due process. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.,* 485 F.3d 450, 461 (9th Cir.2007). The first requirement is met in a copyright infringement case, and where, as here, the defendant does not identify a different state where suit would be proper, the second requirement is also met. *Id.* Under Rule 4(k)(2), the third element asks whether Magnat's contacts with the United Sates as a whole—not just California—would satisfy due process. *Holland Am. Line Inc.,* 485 F.3d at 462.

Due process requires that the defendant have minimum contacts with the forum such that exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. *E.g., Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 801 (9th Cir.2004). Whether a party has minimum contacts with a forum sufficient to warrant the exercise of specific personal jurisdiction turns on a three-prong test: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum—related activities; and (3) the exercise of jurisdiction must be reasonable. *Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124, 1128 (9th Cir.2010).

Copyright infringement suits are "often characterized as a tort" best suited to analysis under the "purposeful direction" prong of the first element. *Brayton Purcell,* 606 F.3d at 1128. Purposeful direction, in turn, involves a separate three-pronged test: the defendant must have (1) committed an intentional act, (2) expressly aimed at the forum state, and (3) caused harm that the defendant knows is likely to be suffered in the forum state. *Id.* (citing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)).

The intentional act element is broadly construed, and can be met by the mere operation of a website, *id.,* which Magnat has done here. The third element is also met here, as Magnat was repeatedly notified by a U.S. company that users were uploading and distributing materials protected by U.S. copyrights. Stanislav Decl. ¶ 12 and Ex. B; Phinney Decl. ¶¶ 7–12.

**\*3** The conceptually cloudier "express aiming" element is meant to require "something more than mere foreseeability" of contact with the forum. *See Brayton Purcell,* 606 F.3d at 1129. For example, the Ninth Circuit found express aiming where a website actually or constructively knew that it received "a substantial number of hits" from a forum; the website's revenue was tied to the frequency of hits; and the content of the website had a relationship with the forum. *See Mavrix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218, 1230 (9th Cir.2011). The court explained that to hold otherwise "would allow corporations whose websites exploit a national market to defeat jurisdiction in states where those websites generate substantial profits from local consumers." *Id.* at 1231.

In Datatech's view, Magnat had abundant U.S. contacts:

- About 12%[1] of Magnat's website traffic came from the United States, and according to a website that analyzes web traffic, the United States was the country with the largest share of Magnat's traffic, Sperlein Decl. ¶ 2

- Magnat registered a copyright agent with the U.S. Copyright Office, Stanislav dECL. ¶ 12.

  - Magnat used PayPal, a U.S. company providing web-payment services, to process transactions with customers, Phinney Decl. ¶ 2

  - Magnat permitted Porn Guardian, a U.S. company, to have some access its servers to protect U.S. copyright holders from illegal uses of Magnat's website, and Porn Guardian notified Magnat over 40,000 times of files that violated Datatech's copyrights, Phinney Decl. ¶¶ 7–12; Stanislav Decl. ¶ 15

  - Magnat registered its domain name with a U.S. domain registrar for some time, Sperlein Decl. ¶ 3

The maintenance of a website accessible to U.S. visitors, and the use of U.S.-based web services like PayPal, may not

Datatech Enterprises LLC v. FF Magnat Ltd., Not Reported in F.Supp.2d (2012)
2012 Copr.L.Dec. P 30,318

themselves provide contacts sufficient to satisfy due process. Here, however, Magnat received a "substantial number of hits" from the United States and directly profited from those hits in the form of subscription fees from U.S. users. See Hare Decl. ¶¶ 2–6. In addition, several features of the website's operation and Terms of Service demonstrated an awareness that the website exploited (and threatened) U.S. copyright interests, and this suit arises out of the activities from the U.S. web traffic. There is "at least a reasonable probability" that it would not violate due process to hold Magnat answerable in the United States for the contents of a website whose economic value turned, in significant measure, on its appeal to United States users generating over 30,000 daily hits, and the receipt of subscriptions from users infringing copyrighted U.S. materials.

### 2. Copyright claims

Magnat says Datatech cannot show a likelihood of success on its copyright claims because (1) Magnat complied with the Digital Millenium Copyright Act's ("DMCA") safeharbor provisions, and (2) Datatech's allegations do not make out a claim for direct, contributory, or vicarious infringement.

**\*4** Though the parties debate whether any of the elements of a DMCA safe-harbor defense have been met, the Court need address only two. First, it is undisputed that Magnat had not, prior to June 15, 2011, designated through the Copyright Office an agent to receive notice of violations. Stanislav Decl. ¶ 12. Magnat cites no cases suggesting that the defense is available for the alleged infringing uses prior to that date, nor does the language of the statute permit such a defense. *See* 17 U.S.C. § 512(c)(2) ("The limitations on liability established in this subsection apply to a service provider *only if* the service provider has designated an agent ....") (emphasis added). Thus, as to some 12,000+ alleged violations prior to that date, *see* Phinney Decl. ¶ 11 (dkt.29–7), Datatech's likelihood of overcoming a DMCA safe-harbor defense is quite high.

Second, Datatech has made an adequate showing— notwithstanding Magnat's conclusory claims of formal policy to the contrary—that in practice Magnat failed to enforce a "repeat infringer" policy as required for the safe harbor defense to apply under 17 U.S.C. § 512(i). *See* Phinney Decl. ¶¶ 13–19 (dkt.29–7).

As for stating a copyright claim, Datatech has established a likelihood of proving the threshold requirement of ownership of the relevant copyrights. *See* Blundell Decl. (dkt.29–18).

While interesting questions of law surround Datatech's direct copying theory, its allegations that Magnat

- had notice of a substantial amount of infringing user activity, Phinney Decl. ¶ 7 (dkt.29–7); Ward Decl. ¶ 10 ("the majority of materials available for download ... were copies of adult films");

- created financial incentives for users to upload those infringing materials on to Magnat's servers, see Phinney Decl. ¶¶ 8–13 (dkt.4); and

- demonstrated lackluster efforts to address the problem, *see* Phinney Decl. ¶¶ 13–32 (dkt.29–7)

together establish a likelihood of succeeding on a claim of contributory or vicarious liability. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 794–804 (9th Cir.2007) (contributory infringement where defendant (1) has knowledge of third-party infringing activity, and (2) induces, causes, or materially contributes to the infringing conduct).

### B. Irreparable Harm

An asset-freeze injunction is improper if used solely to preserve assets for use in satisfying a claim for money damages. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 330–33, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). However, where an equitable remedy is available, the district court "has the power to issue a preliminary injunction to preserve the status quo in order to protect the possibility of that equitable remedy." *F.T.C. v. H.N. Singer, Inc.,* 668 F.2d 1107, 1112 (9th Cir.1982); *see also Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 n. 4 (9th Cir.2003); *Ellipso, Inc. v. Mann,* 480 F.3d 1153, 1160 (D.C.Cir.2007).

**\*5** A plaintiff suing for copyright infringement may seek disgorgement of profits attributable to the infringement, *see* 17 U.S.C. § 504(b), which is a classic equitable remedy, *e.g., Chauffeurs Local No. 391 v. Terry,* 494 U.S. 558, 570, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990). That the statute explicitly provides for such a remedy does not strip it of its equitable character. *See Newby v. Enron Corp.,* 188 F.Supp.2d 684, 700 (S.D.Tex.2002); *cf. Tull v. United States,* 481 U.S. 412, 425, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

Asset-freeze injunctions require a showing by the Plaintiff of "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not

granted." *Johnson v. Couturier,* 572 F.3d 1067, 1085 (9th Cir.2009).

Datatech's dissipation argument rests on filings from the *Liberty Media Holdings* litigation indicating that, shortly after receiving a draft copy of the complaint, Magnat transferred its domain name registration overseas and moved over $100,000 from its PayPal account to a Hong Kong bank, where money was converted into foreign currencies. See Ex. A to Datatech Request for Judicial Notice (dkt.2–1); Sperlein Decl. ¶¶ 2, 4 (dkt.3). Also, a user of Magnat's website says that in January 2012 Magnat switched its payment processing services from PayPal, a U.S. company, to Alertpay, which (according to Datatech's counsel) is a Canadian company. See Hare Decl. ¶ 7 (dkt.29–1). Finally, Datatech argues that because Magnat's website has ceased operating after the *Liberty Media Holdings* litigation, Stanislav Decl. ¶ 3, once funds are moved it is unlikely they will be replenished.

Magnat, through a declaration of its owner Stanislav, does not deny any of these allegations; rather, he says they were routine business transactions, see Stanislav Decl. ¶ 20 (dkt 21–1). But Neither he nor Magnat has offered any supporting documentation showing, for example, that transfers of that amount and timing were normal. Without such a showing, Magnat's efforts to move its instrumentalities and profits overseas shortly after learning of impending copyright litigation establishes a likelihood of asset dissipation and irreparable harm.

Magnat separately argues that even if Datatech is entitled to freeze some amount of money that might ultimately be subject to disgorgement, the requested injunction effectively freezes all of Magnat's assets, which Magnat implies exceeds what Datatech could possibly be entitled to recover.

Once a plaintiff has made a showing of profits attributable to infringement earned by the defendant, the burden shifts to the defendant to show what, if any, portion of the defendant's gross revenue is attributable to factors other than infringement. *See* 17 U.S.C. § 504(b). At trial the plaintiff has the burden of establishing the defendant's total revenue, but at this early stage in the litigation it would be impossible for the plaintiff to make such a showing. Accordingly, the Court will not reduce the scope of the asset freeze until Magnat makes some showing regarding what, if any, portion of the frozen assets could not ultimately be subject to the equitable relief sought by Datatech.

### C. Balance of Hardships & Public Interest

**\*6** That Magnat can no longer operate its allegedly infringing website or access funds allegedly derived from illegal activities weighs little, if at all, in the balance of equities. *See, e.g., Cadence Design Sys. v. Avant! Corp.,* 125 F.3d at 824, 829–30 (9th Cir.1997). Upholding copyright protections is in the public interest. E.g., *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3d Cir.1983). Absent the requested equitable relief, Datatech may well be entirely denied effective remedy for Magnat's alleged infringements.

### III. CONCLUSION

Accordingly, the Court GRANTS the preliminary injunction.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 4068624, 2012 Copr.L.Dec. P 30,318

---

Footnotes

1    Datatech also offered evidence that Magnat's website had at least 260,000 daily visitors, meaning that the absolute volume of U.S. daily traffic exceeded 30,000 hits. *See* Phinney Decl. ¶ 6.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 12314399
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

DECKERS OUTDOOR
CORPORATION, Plaintiff,
v.
The PARTNERSHIPS
AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED
ON SCHEDULE A, Defendants.

No. 13 C 07621
|
Signed 10/31/2013

**Attorneys and Law Firms**

Justin R. Gaudio, Kevin W. Guynn, Amy Crout Ziegler,
Greer, Burns & Crain, Ltd., Chicago, IL, for Plaintiff.

**Temporary Restraining Order**

Honorable Edmond E. Chang, United States District Judge

 *1  Plaintiff Deckers Outdoor Corporation makes and sells
high-end boots and other apparel under the trademark
"UGG." Deckers has brought this trademark, false
designation of origin, anti-cybersquatting, and Illinois
Deceptive Practices Act lawsuit against partnerships and
unincorporated entities that are identified in Schedule A and
using the domain names and online marketplace accounts
identified in Schedule A (all attached to this Order and to the
complaint; the attachment is under seal for reasons explained
below). Generally stated, Deckers alleges that the defendants
offer to sell, and do sell, counterfeit Deckers products by
advertising the boots on websites. None of the defendants
are authorized to use Deckers's various trademarks (including
the name Deckers itself), yet the defendants market the boots
under Deckers's trademarks and some of the defendants even
incorporate Deckers's trademarked name into the names of the
websites on which the defendants offer the counterfeit boots.

Deckers moves for a temporary restraining order against the
defendants. Deckers filed the motion *ex parte* and identified

the defendants only under seal because its primary objective
is to secure a pre-judgment restraint on any of Defendants'
assets that might be within the Court's authority to freeze.
At the hearing, the Court did find that Deckers has a
strong likelihood of success on *liability* on its trademark
infringement and other claims. The facts recited above
are supported by the declarations of Deckers's Manager
of Brand Protection, Christopher Knowles, as well as the
exhibits offered in support of the declaration and motion
documenting the defendants' trademark violations (*e.g.*,
screen-shots of the websites offering (counterfeit) boots for
sale under Deckers's trademarks). Furthermore, based on the
Declaration's representations that the defendants' websites
offered shipping of the counterfeit boots to the United States,
including Illinois, personal jurisdiction obstacle is sufficiently
met at this very early stage of the litigation.

The Court does express, however, its concerns over whether
Deckers has adequately shown that pre-judgment restraint of
all of the defendants' assets is warranted. The general test for
obtaining a temporary restraining order starts with requiring
the plaintiff to show that it will suffer immediate irreparable
harm, has no adequate remedy at law, and its claims have a
likelihood of success. Fed. R. Civ. P. 65(b)(1)(A); *Girl Scouts
of Manitou Council v. Girl Scouts of USA*, 549 F.3d 1079,
1086-87 (7th Cir. 2008) (preliminary injunction factors).
To win an *ex parte* TRO, the plaintiff must show that the
immediate irreparable injury "will result to the movant before
the adverse party can be heard in opposition" and that notice
to the defendant should not be required. Fed. R. Civ. P. 65(b)
(1)(A), (B). If the plaintiff can meet those requirements, then
before issuing a TRO, the Court would still have to balance,
on a sliding scale, the nature and degree of the plaintiff's
injury, the likelihood of prevailing, the possible injury to the
defendants if the TRO is granted, and the public interest.
*Id.* Here, the factors do weigh in favor of granting the TRO
as to stopping the ongoing trademark infringement, because
such infringement, as well as labeling a false designation of
origin, generally are presumed to cause irreparable harm. *AM
General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 832
(7th Cir. 2002). And it is in the public interest to prevent
the further duping of customers who believe they are buying
genuine Deckers products.

 *2  But restraining *assets* before judgment is another
matter, because federal district court's authority to do so
is circumscribed: district courts generally do *not* have the
authority to preliminarily restrain assets where a plaintiff
seeks a money judgment. *Grupo Mexicano de Desarrollo v.*

*Alliance Bond Fund*, 527 U.S. 308, 331 (1999). The Supreme Court explained that courts sitting in equity traditionally did not have that expansive power, and allowing creditors to pursue prejudgment restraints would disrupt the long-standing law governing creditors and debtors:

> More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws-including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a "race to the courthouse" in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor.

527 U.S. at 331; *see also Klipsch Group, Inc. v. Big Box Store, Ltd.*, 2012 WL 5265727, at *5-6 (S.D.N.Y. Oct. 24, 2012). To be sure, there is an exception to the general ban on prejudgment asset restraint where an equitable remedy is sought. *Grupo Mexicano*, 527 U.S. at 325 (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287-88 (1940) (approving preliminary restraint where rescission and restitution sought)). And Deckers does seek an accounting of profits (that is, disgorgement of profits) under 15 U.S.C. § 1117(a). But an accounting of profits is not automatically awarded in lieu of actual damages, *Fuller Products Co. v. Fuller Brush Co.*, 299 F.2d 772, 777 (7th Cir. 1962), and even where equitable relief is sought, the appropriate scope of prejudgment restraint must be limited only to what is reasonably necessary to secure the (future) equitable relief. For example, where (as here) a litigant seeks the equitable remedy of an accounting of profits, then if the amount of the profits is known, then the asset freeze should apply on to that specific amount, and no more. At this very early point in the litigation (indeed, the defendants do not yet even have notice of the suit), it is not known what will comprise the eventual equitable remedy. In other words, the asset-restraint order must be limited *only* to the extent that is needed to secure the equitable remedy; the scope of the exception (to the general ban on prejudgment restraint) is limited by the scope of the exception's rationale.

In light of that potential limit on the scope of the restraint, the Court remains concerned that relying on an accounting of profits to freeze assets is potentially illusory in that it is much more likely that statutory damages will be pursued and will be the basis for a judgment instead of an accounting of profits; it might be that most defendants will never file

appearances in this case, let alone produce sales figures in discovery. But even if statutory damages will be, practically speaking, the more likely remedy, the fact remains that if the defendants were to file appearances and subject themselves to discovery, it is very likely that Deckers would win an accounting of profits. Indeed, trademark owners need only "prove defendant's sales only; defendant must prove all elements of costs or deduction claimed." 15 U.S.C. § 1117(a). So if Deckers can prove sales numbers either through discovery against the defendants or discovery on third-parties (for example, by serving third-party payment hosting services (such as PayPal) or financial institutions), then an accounting of profits would be appropriate. To the extent that the restraint might be too broad, the defendants may file challenges to the scope of the TRO by submitting evidence that some or all of the money has other sources. The balance of factors tips in favor of Deckers being able to freeze the assets of the defendants listed on Schedule A, which is filed under seal in order to allow Deckers time to serve financial institutions and payment hosting services with the TRO without advance warning to the defendants, who likely would seek to transfer the money elsewhere. Defendants are free to file appearances and litigate the issue.

**\*3** Accordingly, having read and heard the evidence presented by the plaintiff, the Court orders that:

1. Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily enjoined and restrained from:

   a. using Deckers's UGG trademark or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers UGG branded product or not authorized by Deckers to be sold in connection with Deckers's UGG trademark;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Deckers UGG branded product or any other product produced by Deckers, that is not Deckers's or not produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers's UGG trademark;

   c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or

are sponsored or approved by, or otherwise connected with Deckers;

d. further infringing Deckers's UGG trademark and damaging Deckers's goodwill;

e. shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any Deckers UGG trademark or any reproductions, counterfeit copies or colorable imitations thereof;

f. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names identified on Schedule A or any other domain name that is being used to sell counterfeit Deckers products; and

g. operating and/or hosting websites at the Defendant Domain Names identified on Schedule A and any other domain name registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product bearing Deckers's UGG trademark or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine Deckers branded product or not authorized by Deckers to be sold in connection with Deckers's UGG trademark.

2. The domain name registries for the Defendant Domain Names identified in Schedule A, namely the registries VeriSign, Inc., Neustar, Inc., Afilias Limited, and the Public Interest Registry, within two (2) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Deckers's selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to a registrar of Deckers's selection until further ordered by this Court.

3. Those in privity with Defendants and those with notice of this Order, including any online marketplace such as iOffer, social media platforms such as Facebook, YouTube, LinkedIn and Twitter, Internet search engines, web hosts, domain name registrars and domain name registries, shall immediately

**\*4**   a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit and infringing goods using the Deckers UGG trademark;

b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the UGG Trademark; and

c. Take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index.

4. Early discovery is also authorized, in light of the need to subpoena and engage in discovery methods that are necessary to identify the defendants. Deckers may continue by providing actual notice, pursuant to subpoena, e-mail or otherwise, of this Order to any of the following:

a. Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them;

b. any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, or other merchant account providers, payment providers, third party payment processors, credit card associations (e.g., MasterCard and VISA), which receive payments or hold assets on Defendants' behalf; or

c. any third party service providers, including, without limitation, the online B2B selling platforms, including iOffer, Internet service providers, backend service providers, web designers, sponsored search engine or ad-word providers, shippers, domain name registrars, and domain name registries who have provided services for Defendants.

5. Any third-party providing services in connection with any of the Defendants, Defendants' websites at the Defendant Domain Names or other websites operated by Defendants, including, without limitation, Internet Service Providers (ISP), back-end service providers, web designers, sponsored search engine or ad-word providers, banks, merchant account providers including PayPal, third party processors and other payment processing service providers, shippers, domain name registrars, and domain name registries (collectively, "Third-Party Providers"), shall, within 2 business days after receipt of such notice, provide to Deckers copies of all documents and records in such person's or entity's possession or control relating to:

a. The identities and addresses of the Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them and the locations and identities of Defendants' operations, including, without limitation, identifying information associated with Defendants' Websites, the Defendant Domain Names and financial accounts;

b. Defendants' websites;

c. The Defendant Domain Names or any domain name registered by Defendants; and

d. Any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Western Union, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

 **5** 6. Defendants and any persons in active concert or participation with them shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7. Any banks, savings and loan associations, payment processors, PayPal, or other financial institutions, for any Defendant or any of Defendants' websites shall within 2 business days:

a. Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the email addresses listed in Schedule A hereto; and

b. Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

8. Deckers may provide notice of these TRO and the anticipated preliminary injunction proceedings to Defendants, as well as service of process of the complaint, by electronically publishing a link to the Complaint, this Order and other relevant documents on a website to which the Defendant Domain Names which are transferred to Deckers's control will redirect, and by sending an e-mail to the e-mail addresses identified in Schedule A that includes a link to said website.

9. Schedule A to the Complaint and Exhibits 22 and 23 to the Declaration of Christopher Knowles shall remain sealed until further ordered by this Court.

10. Deckers shall deposit with the Court $10,000 as security, to be paid from Deckers or Deckers's counsel's Interest on Lawyers Trust Account (IOLTA), which amount was determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

11. Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Deckers or on shorter notice as set by this Court.

12. This Temporary Restraining Order shall remain in effect for 14 days from its issuance, which was in court on October 30, 2013; thus, the Order remains in effect through November 13, 2013.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12314399

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Easterling v. Rice, Not Reported in Fed. Supp. (2019)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 46 of 80   PageID 11920

2019 WL 1338712
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Eastern Division,
at Columbus.

Warren EASTERLING, Plaintiff,

v.

Chief Judge Walter
RICE, et al., Defendants.

Civil No. 2: 19-469-JMH
|
Signed 03/25/2019

**Attorneys and Law Firms**

R. Warren Easterling, Dayton, OH, pro se.

J. Andrew Fraser, Zachery Paul Keller, Ohio Attorney General's Office Constitutional Offices Section, Columbus, OH, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Joseph M. Hood, Senior U.S. District Judge

**\*1** On March 12, 2019, the Court entered a Memorandum Opinion and Order directing plaintiff Warren Easterling to address apparent defects in service of process upon the defendants and to establish legally sufficient grounds why his complaint should not be dismissed. [R. 20] Easterling has now filed his Response to that Order [R. 21] along with Proof of Service forms for each of the 15 defendants in this case. [R. 22]

With respect to service of process, Easterling originally filed only certified mail receipts into the record [R. 10, 11, 12, 13, 15, 16, 17], but Federal Rule of Civil Procedure 4(l)(1) requires that proof of service be established by a server's affidavit of the kind that was given to the plaintiff at the outset of the case [R. 3]. Easterling has now filed the provided Proof of Service forms indicating that he served the defendants by either certified or regular mail. [R. 22]

But as the Court advised Easterling in its last Order, a party to the case cannot serve process himself. Fed. R. Civ. P. 4(c)

(2) ("Any person who is at least 18 years old **and not a party** may serve a summons and complaint.") (emphasis added); Constien v. United States, 628 F. 3d 1207, 1213-15 (10th Cir. 2010) ("Even when service is effected by use of the mail, only a nonparty can place the summons and complaint in the mail."). Further, many of the defendants are officers or employees of the United States, but Easterling failed to comply with the additional service requirements set forth in Rule 4(i)(1)(A)(i),(ii); 4(i)(1)(B); 4(i)(3). Easterling has therefore not properly served the defendants with process.

When he filed his complaint in this case Easterling also filed a motion requesting injunctive relief. [R. 5] But his failure to properly serve the defendants with process requires that motion to be denied. Because none of the defendants had been properly served with process, the Court lacks personal jurisdiction over them and cannot grant the injunctive relief he seeks. Cf. R.M.S. Titanic, Inc. v. Haver, 171 F. 3d 943, 958 (4th Cir. 1999) (preliminary injunction issued against defendant company was unenforceable because district court did not obtain personal jurisdiction over company through valid service of process); Schuh v. Michigan Dep't of Corrections, No. 1:09cv982, 2010 WL 3648876, at *2 (W.D. Mich. July 26, 2010) ("When a preliminary injunction is sought under Rule 65(a), service of the summons and the complaint is required."); Carty v. R.I. Dept. of Corrections, 198 F.R.D. 18, 20 (D.R.I. 2000) (same).

Even if Easterling had properly served the summons and complaint, his motion would still have to be denied because he does not actually seek injunctive relief. Instead, he asks the Court to alter or vacate orders entered in other civil cases he previously filed in this Court, or to "remove" judges from the cases to which they have been assigned because he disagrees with the orders they entered. At bottom, Easterling attempts to collaterally attack orders and judgments entered in other civil cases he filed in this Court. Easterling has been advised in earlier cases he filed in this Court that this is not permissible; instead, he must file a notice of appeal or a motion for reconsideration in the same civil case in which he seeks relief. Easterling's motion seeking injunctive relief will therefore also be denied because he has failed to demonstrate any likelihood of success on the merits. Gonzales v. National Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000).

**\*2** With respect to the claims asserted in the complaint, Easterling's Response to the Court's Order consists primarily of various objections to the Court's requirement that he respond to it at all. He appears to contend that: (1) the

Easterling v. Rice, Not Reported in Fed. Supp. (2019)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 47 of 80   PageID 11921

defendants must be allowed 21 days to respond to his claims; (2) there is no "case or controversy" until the defendants respond; (3) *sua sponte* dismissal of his claims would indicate the undersigned's bias or participation in a conspiracy against him; and (4) the Court may not declare him to be a vexatious litigator. His only response apparently directed to the substantive legal deficiencies previously identified by the Court is Easterling's continued assertion that 28 U.S.C. § 1331 permits him to challenge allegedly-fraudulent judgments entered in earlier cases simply by filing a new complaint. [R. 21]

None of Easterling's contentions have merit. As previously indicated, the Court is authorized to alter or extend the time for any defendant to file a response to the complaint. Federal Rule of Civil Procedure Rule 6(b)(1)(A). And when the Court *sua sponte* questions whether the plaintiff's complaint states viable claims for relief, the defendants need not be directed to respond. *Neitzke v. Williams*, 490 U.S. 319, 324 (1989); *Morrison v. Tomano*, 755 F.2d 515, 516-17 (6th Cir. 1985). Easterling's "case or controversy" argument is wholly misplaced; whether a party to a case has filed a response to a particular claim or issue has no bearing upon whether an actual controversy exists between the parties regarding the lawfulness of a party's conduct in the first instance. See *Allen v. Wright*, 468 U.S. 737, 751 (1984) (the "core component" of the case or controversy requirement is that the plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief"). And if Easterling were correct that no case or controversy exists, the Court would be obligated to dismiss the entire case for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). His other objections fare no better. See *United States v. Campbell*, 59 F. App'x 50, 52 (6th Cir. 2003) (holding that prior adverse rulings by a judge "will almost never serve as a valid basis for recusal and are most often simply grounds for appeal.") (*citing Liteky v. United States*, 510 U.S. 540, 555 (1994)); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (holding that district court has inherent authority to sanction parties whose actions are vexatious, frivolous, or undertaken in bad faith).

Having reviewed Easterling's Response, the Court concludes that he has not set forth grounds to sustain any of the claims asserted in his complaint, and it must therefore be dismissed.

First, Easterling's claims against United States District Judges Walter H. Rice, Thomas R. Rose, Edmund A Sargus, Jr.,

Timothy S. Black, and Algenon L. Marbley, as well as United States Magistrate Judges Michael J. Newman and Sharon L. Ovington are based solely upon their rulings or orders entered in cases over which they presided. It is well established that "a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Stump v. Sparkman*, 435 U.S. 349, 355 (1978) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 350 (1872)). Accordingly, a judge is entitled to absolute immunity against a claim based upon an action taken by a judge in his or her judicial capacity, unless that action is taken in the absence of any jurisdiction. *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). All of the acts complained were taken in the course of proceedings over which the judge presided, and the immunity applies to bar the claims asserted. *Mireles v. Waco*, 502 U.S. 9 (1991); *Forrester v. White*, 484 U.S. 219, 225 (1988) (judicial immunity "insulat[es] judges from vexatious actions prosecuted by disgruntled litigants.").

**\*3** Second, Easterling invokes 42 U.S.C. § 1985 as the basis for his claims, but his allegations are insufficient to properly invoke that provision against any of the defendants. A claim that persons conspired to deprive the plaintiff of civil rights under 42 U.S.C. § 1985 must be plead with particularity, requiring the plaintiff to allege specific acts showing that the defendants acted in concert and coordination with one another. Further, the plaintiff must allege facts which indicate that the defendants' actions were prompted by a "class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Webb v. United States*, 789 F. 3d 647, 670 (6th Cir. 2015). Easterling makes no such allegations in his complaint with respect to any of the defendants, and his complaint therefore fails to state a claim under Section 1985.

Third, a civil rights claim based upon events occurring in Ohio must be asserted within two years. Ohio Rev. Code § 2305.10. Accordingly, Easterling's claims are barred by the applicable statute of limitations with respect to his allegations against Judge Rice for conduct occurring in 2014 [R. 1 at Page ID #7]; Judge Marbley for conduct occuring in 2016 [R. 1 at Page ID #17-18]; Asst. U.S. Attorney William C. King, II. for conduct occurring in 2015 [R. 1 at Page ID #17-18]; Magistrate Judge Ovington for conduct occurring in 2015 [R. 1 at Page ID #19-20]; and attorney Brian Spiess for conduct occurring in 2014 [R. 1 at Page ID #19-20]. *Zappone v. United States*, 870 F. 3d 551, 559 (6th Cir. 2017) (citing *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989)).

Easterling v. Rice, Not Reported in Fed. Supp. (2019)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 48 of 80   PageID 11922

Fourth, a complaint must set forth claims in a clear and concise manner, and must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hill v. Lappin*, 630 F.3d 468, 470 (6th Cir. 2010). Easterling identifies Linda L. Woeber as a defendant, but makes no allegations at all against her in the complaint. The plaintiff also names President Donald J. Trump as a defendant, but includes only an unexplained reference to his responsibility "in regards to the Department of Justice to enforce the law ..." At this stage, "[w]hile the allegations of the complaint are construed favorably to the plaintiff, the court will not read causes of action into the complaint which are not alleged." *Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.), Inc.*, 263 F. Supp. 2d 140, 148 (D. Mass. 2003). The plaintiff having failed to identify colorable claims against either of these defendants, the claims against them will be dismissed.

Because the plaintiff's complaint fails to set forth a viable claim against any of the defendants, the Court will dismiss this action, with prejudice.

The Court adds a final cautionary note. As stated in the Court's prior Memorandum Opinion, Easterling has filed more than two dozen civil actions in this Court, all of which have been dismissed and many of which were legally frivolous and potentially filed for abusive purposes. Four years ago, this Court imposed a limited sanction against Easterling by barring him from proceeding *in forma pauperis* in this Court without prior permission. *Easterling v. Crawford*, No. 3:13-CV-430-WHR (S.D. Ohio 2013). Regrettably, that sanction has failed to fully deter Easterling's abusive litigation conduct: since that date, he has filed nine more civil cases, nearly all of which have been dismissed for failure to state a claim and/or as repetitive of prior failed litigation.

Easterling is advised that the Court possesses the authority to impose additional restrictions upon any person who files frivolous litigation or otherwise abuses the judicial process. The Supreme Court long ago established that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821). Accordingly, a district court has inherent authority to sanction parties whose actions are vexatious, frivolous, or undertaken in bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). This authority is "governed not by rule or statute but by the control necessarily vested in courts to

manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962).

**\*4** In addition to this inherent authority, "[a] district court has the power under the All Writs Act, 28 U.S.C. § 1651, to enjoin a party from filing suits attempting to reopen or relitigate closed cases. This power extends to enjoining further filings in support of frivolous and vexatious claims." *Spencer v. Slone*, 1986 WL 16350, at \*3 (6th Cir. 1986) (upholding Eastern District of Kentucky district court's pre-filing injunction against new federal actions by plaintiff arising out of his state court prosecution for passing bad checks). Federal Rule of Civil Procedure 11(c)(3) is a separate grant of authority which permits the Court to require a party to demonstrate that their conduct does not warrant sanctions for violation of Rule 11(b). *Cf. Neuman v. United States*, No. 07-CV-362-MJR, 2009 WL 1514566, at \*2-3 (S.D. Ill. June 1, 2009) (imposing $1,000 in sanctions pursuant to Rule 11 for prisoner's repeated post-judgment filings asserting presiding judge was biased and unqualified, and cautioning of possible criminal contempt sanctions, including incarceration, should personal attacks continue).

Certainly, the Court must afford additional latitude to parties untrained in the law, *Haines v. Kerner*, 404 U.S. 519, 596 (1972), as their misguided actions may be the consequence of inexperience or lack of specialized knowledge rather than borne of a desire to harass or delay. But this forgiving approach to compliance with procedural rules has never "[been] interpreted so as to excuse mistakes by those who proceed without counsel," *McNeil v. United States*, 508 U.S. 106, 113 (1993), and the courts have never allowed "the right of self-representation [to be used as] a license to abuse the dignity of the courtroom." *Faretta v. California*, 422 U.S. 806, 835 n.46 (1975). Even a court's "special solicitude" towards *pro se* litigants "does not extend to the willful, obstinate refusal to play by the basic rules of the system upon whose very power the plaintiff is calling to vindicate his rights." *Pandozy v. Segan*, 518 F. Supp. 2d 550, 558 (S.D.N.Y. 2007) (imposing pre-filing restrictions against a litigant "unwilling[ ] to accept unfavorable rulings on her claims. Each time her claims are dismissed, she repackages them with new labels, against new defendants, and in new courts, as part of an 'ever-broadening conspiracy theory.' ")

Any person proceeding *pro se* who repeatedly files frivolous lawsuits or motions abuses the right to represent himself without counsel and the privilege of proceeding without

Easterling v. Rice, Not Reported in Fed. Supp. (2019)

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 49 of 80 PageID 11923

payment of the filing fee, and imposes a heavy burden upon the resources of the court at the expense of other litigants with potentially meritorious claims. The Court may therefore impose sanctions necessary and appropriate to deter such conduct. *Chambers*, 501 U.S. at 45-46. The Court may deny the plaintiff *pauper* status, *Reneer v. Sewell*, 975 F.2d 258, 260-61 (6th Cir. 1992), or for more quarrelsome conduct, may require him to pay another party's attorneys fees, *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511-12 (6th Cir. 2002). For the most obstinate litigant, the court may require prior permission from the Court before *any* new lawsuit or motion may be filed. *Filipas v. Lemons*, 835 F. 2d 1145, 1146 (6th Cir. 1987); *Maxberry v. S.E.C.*, 879 F. 3d 222, 224 (6th Cir. 1989).

Easterling has repeatedly filed meritless and duplicative lawsuits and post-judgment motions, conduct that serves no legitimate purpose and places a tremendous burden on this Court's limited resources while depriving other litigants with plausible claims of the speedy resolution of their cases. This conduct evidences his bad faith and constitutes an abuse of the judicial process. While the Court will not, at this time, impose either monetary sanctions or require Easterling to obtain the Court's permission before filing any new civil case (or a new motion in any existing case), the Court retains the authority to do so even after closing this case should his conduct warrant such sanctions. The plaintiff is so advised.

**\*5** Accordingly, it is **ORDERED** as follows:

1. Easterling's complaint [R. 1] is **DISMISSED WITH PREJUDICE.**

2. Easterling's motion seeking injunctive relief [R. 5] is **DENIED.**

3. Defendant Ann Yackshaw's motion to dismiss [R. 18] is **DENIED AS MOOT.**

4. This matter is **STRICKEN** from the docket.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1338712

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 4

GDS International, LLC v. CalgaRIG Corporation, Not Reported in Fed. Supp. (2017)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 50 of 80   PageID 11924

2017 WL 5127221
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

GDS INTERNATIONAL, LLC, Plaintiff,

v.

CALGARIG CORPORATION, Defendant.

CIVIL ACTION NO. H-17-0162
|
Signed 01/26/2017

**Attorneys and Law Firms**

John B. Kinchen, Hughes Arrell Kinchen LLP, Houston, TX, for Plaintiff.

Christina Elise Ponig, DLA Piper LLP, Houston, TX, for Defendant.


ORDER

EWING WERLEIN, JR., UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff GDS International, LLC has filed a Request for Preliminary Injunction Hearing (Document No. 5). The party against whom Plaintiff desires a preliminary injunction is, according to Plaintiff's Complaint, a corporation duly organized under the laws of Canada, with its principal place of business in Canada. Plaintiff alleges that service may be obtained abroad upon Defendant in accordance with the Hague Convention. There is no showing that this has been accomplished and Defendant has made no appearance herein.

It would be pointless to conduct a hearing for preliminary injunction against a party over which the Court has no personal jurisdiction or power to enforce the relief that Plaintiff seeks. *See* Enter. Int'l, Inc. v.Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 470 (5th Cir. 1985).[1] The request (Document No. 5) is therefore DENIED.

It is SO ORDERED.

The Clerk will enter this Order, providing a correct copy to all parties of record.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5127221

Footnotes

1    Additionally, Plaintiff has not met the minimum procedural standards under the Federal Rules of Civil Procedure for the issuance of a preliminary injunction. *See* Fed. R. Civ. P. 65(a) and (b).

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Hightower v. Thompson, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 51 of 80   PageID 11925

2016 WL 5422061
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Northern Division at Ashland.

James HIGHTOWER, Plaintiff,

v.

Ladonna THOMPSON, et al., Defendants.

Civil No. 0:15-93-HRW
|
Signed 09/27/2016

**Attorneys and Law Firms**

James Hightower, Lagrange, KY, pro se.

Oran S. McFarlan, III, Justice & Public Safety Cabinet,
Frankfort, KY, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Henry R. Wilhoit, Jr., United States District Judge

 *1  James Hightower is a prisoner confined at the Kentucky
State Reformatory in LaGrange, Kentucky. Hightower has
filed a civil rights action pursuant 42 U.S.C. § 1983
alleging that officials with the Kentucky Department of
Corrections ("KDOC") transferred him to the Eastern
Kentucky Correctional Complex ("EKCC") on September 16,
2014 even though they were aware that inmates at EKCC had
previously threatened his life. Hightower contends that as a
result of these officials' asserted deliberate indifference to his
safety, he was attacked by another inmate shortly after his
arrival at EKCC. [D. E. No. 1]

This matter is now before the Court to address the defendants'
motion to dismiss the complaint [D. E. No. 18] which has been
fully briefed by the parties. [D. E. Nos. 20, 24] In addition,
Hightower has filed three motions to amend or supplement
his complaint [D. E. Nos. 21, 22, 26] which have also been
fully briefed. [D. E. Nos. 23, 25] Hightower has also filed a
motion seeking injunctive relief [D. E. No. 27], to which the
defendants have responded and Hightower has replied [D. E.
Nos. 28, 29]. These motions are therefore ripe for decision.

**I. Background**

Hightower's original complaint is difficult to follow in
some respects, as many of the dates he provides self-
evidently conflict with one another and are contradicted by
documentation he has attached to his complaint. However,
this much is clear: on October 25, 2014 – one month after he
was transferred to EKCC in September 2014 – another inmate
entered his cell and attacked him while he slept, resulting in
serious injury. [D. E. No. 1 at p. 2]

Hightower indicates that he was previously confined at EKCC
in 2012 and 2013, and had been threatened on three occasions
because he was a convicted sex offender. In August 2013, he
was transferred to the Kentucky State Penitentiary ("KSP"),
where he was again placed in protective custody after an
inmate attacked him in January 2014. Hightower indicates
that in July 2014 he met with KDOC official James Sweat
and several unidentified female staff members from KDOC's
central office in Frankfort, Kentucky. At that time, Hightower
states that he told these persons that he had been threatened
at EKCC. Hightower, either directly or through his mother,
also sent letters to then-KDOC Commissioner LaDonna
Thompson and KSP warden Randy White explaining these
prior incidents for consideration regarding his approaching
transfer. [D. E. No. 1 at pp. 3-4]

Hightower further alleges that while he was awaiting
transfer to EKCC, KSP Deputy Warden Joel Dunlap told
him that he was being transferred because he was filing
grievances and writing letters to KDOC administration.
In his complaint, Hightower suggests that his claims also
extend to James Erwin and Skyla Grief, although he
makes no factual allegations against either of those persons.
Hightower also alleges without explanation that EKCC
warden Gary Beckstrom and EKCC Deputy Warden Keith
Helton "misrepresented" certain unidentified facts regarding
his prior custody at EKCC, which resulted in his September
2014 transfer back to that facility. [D. E. No. 1 at p. 5]

 *2  Hightower contends that these KDOC officials
transferred him to EKCC with knowledge that he had
previously been threatened at that institution, both to retaliate
against him for filing grievances at KSP and with deliberate
indifference to his safety in violation of the First and Eighth
Amendments to the Constitution of the United States. [D.
E. No. 1 at pp. 3-6] Hightower indicates that he did not
file a grievance regarding his transfer to EKCC because he
believed that decision to constitute a "classification decision"
excepted from KDOC's grievance mechanism pursuant to
Corrections Policies and Procedures ("CPP") §§ 14.6(II)(C)

Hightower v. Thompson, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 52 of 80 PageID 11926

(5), 18.1(II)(M)(1)(2). Hightower also indicates that he made Sweat and KDOC Commissioner Thompson aware of the situation through the letters sent by himself and his mother. [D. E. No. 1 at p. 6]

Hightower has named as defendants KDOC Commissioner LaDonna Thompson, KDOC Deputy Commissioner James Erwin, KDOC Director of Classification James Sweat, KSP Warden Randy White, KSP Deputy Warden of Security Joel Dunlap, KSP Deputy Warden of Programs Skyla Grief, former EKCC Warden Gary Beckstrom, and EKCC Deputy Warden of Security Keith Helton. Hightower seeks compensatory and punitive damages against each of the defendants. [D. E. No. 1 at p. 7-8]

## II. The Defendants' Motion to Dismiss the Complaint.

The defendants' motion to dismiss the complaint is based upon two distinct grounds. The defendants contend that Hightower failed to exhaust his administrative remedies because he filed no inmate grievances regarding his transfer. They also argue that Hightower's complaint fails to state a claim upon which relief may be granted against them because he does not allege that any of them were personally involved in the decision to transfer him to EKCC.

Arguments testing the sufficiency of a plaintiff's complaint are governed by Fed. R. Civ. P. 12(b)(6). *Gardner v. Quicken Loans, Inc.*, 567 Fed.Appx. 362, 364 (6th Cir. 2014). When addressing a motion to dismiss, the Court views the complaint in the light most favorable to the plaintiff and accepts as true all 'well-pleaded facts' in the complaint. *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). Where the plaintiff is proceeding without the benefit of an attorney, the Court reads his complaint to include all fairly and reasonably inferred claims. *Davis v. Prison Health Servs.*, 679 F.3d 433, 437-38 (6th Cir. 2012). A complaint must contain allegations, either expressly stated or necessarily inferred, with respect to every material element necessary to sustain a recovery under some viable legal theory. *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013). But the complaint must be dismissed if it undoubtedly fails to allege facts sufficient to state a facially-plausible claim. *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012). A complaint may be dismissed for failure to state a claim if " 'it fails to give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Because exhaustion is an affirmative defense that the defendants have the burden of proving, *Jones v. Bock*, 549 U.S. 199 (2007), and to the extent they have attached and relied upon documents and declarations extrinsic to the pleadings in support of any aspect of their motion to dismiss, the Court treats the motion as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F. 3d 1102, 1104 (6th Cir. 2010). A motion under Rule 56 challenges the viability of the another party's claim by asserting that at least one essential element of that claim is not supported by legally-sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). A party moving for summary judgment must establish that even viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact and that she is entitled to a judgment as a matter of law. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).

**\*3** The moving party does not need her own evidence to support this assertion, but need only point to the absence of evidence to support the claim. *Turner v. City of Taylor*, 412 F. 3d 629, 638 (6th Cir. 2005). The responding party cannot rely upon allegations in the pleadings, but must point to evidence of record in affidavits, depositions, and written discovery which demonstrates that a factual question remain for trial. *Hunley v. DuPont Auto*, 341 F. 3d 491, 496 (6th Cir. 2003); *United States v. WRW Corp.*, 986 F. 2d 138, 143 (6th Cir. 1993) ("A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts.").

The court reviews all of the evidence presented by the parties in a light most favorable to the responding party, with the benefit of any reasonable factual inferences which can be drawn in his favor. *Harbin-Bey v. Rutter*, 420 F. 3d 571, 575 (6th Cir. 2005). If the responding party's allegations are so clearly contradicted by the record that no reasonable jury could adopt them, the court need not accept them when determining whether summary judgment is warranted. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The court must grant summary judgment if the evidence would not support a jury verdict for the responding party with respect to at least one essential element of his claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). If the applicable substantive law requires the responding party to meet a higher burden of proof, his evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback*, 113 F. 3d 639, 642 (6th Cir.

Hightower v. Thompson, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 53 of 80 PageID 11927

1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F. 2d 1439, 1444 (6th Cir. 1993).

A. Hightower Failed to Exhaust His Administrative Remedies.

The defendants argue that Hightower did not file any inmate grievances regarding his claims, and therefore did not exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). While acknowledging that CPP 14.6(II)(C)(5) states that classification decisions are not grievable under CPP 14.6's general grievance procedure applicable to most inmate complaints, the defendants explain that CPP 18.1(II) (M) provides a separate appeal procedure for classification decisions, one Hightower admits that he did not pursue. [D. E. No. 18-1 at pp. 5-7] In response, Hightower notes that the particular subdivision of CPP 18.1 referred to by the defendants became effective in July 2015, only after he was transferred in September 2014. [D. E. No. 20 at p. 12-13] This is true, but immaterial: the operative language found in the prior version of CPP 18.1 likewise permits – and hence § 1997e(a) requires – an appeal to the warden filed within five days after the classification decision. [D. E. No. 20-19 at p. 5]

Federal law requires inmates to fully exhaust administrative remedies available within the prison or jail prior to bringing suit with respect to prison conditions. 42 U.S.C. § 1997e(a). This requirement is mandatory, and claims that have not been exhausted cannot be asserted in any court. *Jones v. Bock*, 549 U.S. 199, 211 (2007). Further, because "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules," the inmate must strictly follow the jail's rules with respect to the timelines, form, and procedures for inmate grievances. *Woodford v. Ngo*, 548 U.S. 81, 90 (2004).

The Court has previously considered the interplay between KDOC's general grievance procedure found in CPP 14.6 and the appeal procedure applicable to formal decisions of the Classification Committee in *Sublett v. Green*, No. 0: 14-CV-32-HRW (E.D. Ky. Sept. 24, 2014), *aff'd*, No. 14-06222 (6th Cir. July 14, 2015). As noted in that decision, most inmate grievances regarding prison life must be grieved following the procedure set forth in CPP 14.6, unless they are either specifically identified as "non-grievable" matters or a provision like CPP 18.1 provides an independent appeal and review mechanism.

**\*4** Here, Hightower's First Amendment claim that KSP and KDOC officials retaliated against him for filing grievances

regarding his Kosher diet was itself a claim that he was required to exhaust by filing a "general" grievance under CPP 14.6, something he acknowledges he did not do. In addition, the September 2014 decision of the Classification Committee to transfer him to EKCC was a decision that was appealable to the warden under CPP 18.1(II)(M). Hightower having admitted that he did not do so, he failed to invoke an available administrative appeal, and his Eighth Amendment claim regarding his transfer remains unexhausted. Both of these claims must therefore be dismissed for failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a). *Jones*, 549 U.S. at 211; *Grinter v. Knight*, 532 F.3d 567, 577-78 (6th Cir. 2008).

B. Hightower's Complaint does not Allege the Personal Involvement of the Named Defendants.

In order to recover against a given defendant in a civil rights action under 42 U.S.C. § 1983, the plaintiff "must allege that the defendant [was] personally involved in the alleged deprivation of federal rights." *Nwaebo v. Hawk-Sawyer*, 83 Fed.Appx. 85, 86 (6th Cir. 2003) (*citing Rizzo v. Goode*, 423 U.S. 362, 373-77 (1976)). The requirement of personal involvement does not mean that the particular defendant actually committed the conduct complained of, but it does require a supervisory official to have "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 874 (6th Cir. 1982). The mere fact of supervisory capacity is not enough: respondeat superior is not an available theory of liability. *Polk County v. Dodson*, 454 U.S. 312, 325-26 (1981).

Relying upon this authority, the defendants argue that Hightower does not allege that any of them were personally involved in the decision to transfer him to EKCC in September 2014, and that his complaint therefore fails to state a claim against them because they cannot be held liable merely because they supervise those persons who actually did make that decision. The defendants point to a Transfer Request form dated September 11, 2014, that was issued by the Classification Committee and approved by Classification Branch Manager Donna Reed, to transfer Hightower to EKCC. [D. E. No. 18-2] Hightower did not name Reed as a defendant in his complaint, and the defendants assert that none of those persons he did name were involved in the decision to transfer him to EKCC. [D. E. No. 18-1 at pp. 2-4]

Hightower makes two, essentially factual, arguments in response. First, he contends that the actual form used

Hightower v. Thompson, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00492-O Document 104-2 Filed 06/24/21 Page 54 of 80 PageID 11928

to approve his transfer was not the September 11, 2014 Transfer Request form provided by the defendants [D. E. No. 18-2], but was instead a Department of Corrections Transfer Authorization Form recommending his transfer to the Kentucky State Reformatory ("KSR"). [D. E. No 20-8] In this event, both EKCC and Little Sandy Correctional Complex are listed as "additional," presumably alternative, destinations. Classification/Treatment Officer Marshall Peek initially filled out and signed the form, which Supervisor Adam Noles approved and signed on September 10, 2014. Classification Branch Manager Donna Reed approved and signed the form on September 11, 2014. The form contains a signature line for Skyla Griefs approval, but she did not sign it. *Id.* Hightower states that this was the form used to effect his transfer to EKCC, notwithstanding the indication on the form that he was being transferred to KSR. [D. E. No. 2 at pp. 6-7] Hightower's factual assertion in this regard suggests his belief that it was not merely Donna Reed who made the decision to transfer him, but that Marshall Peek, Adam Noles, and Skyla Grief were also involved.[1]

**\*5** Hightower also makes a second factual assertion. Hightower has previously alleged that during a classification meeting in July 2014 he was told that he was going to be transferred out of protective custody at KSP. In his original complaint, Hightower stated that when he mentioned during this meeting that he had been threatened by inmates at EKCC in the past, KDOC official James Sweat was present along with several unidentified female staff members from KDOC's Frankfort office. [D. E. No. 1 at p. 4] In his response, Hightower now alleges for the first time that Donna Reed, Skyla Grief, and Adam Noles were also present at the meeting, and were therefore aware of his concerns. [D. E. No. 20 at pp. 2-3]

In their reply, the defendants correctly note that the "Department of Corrections Transfer Authorization Form" [D. E. No 20-8] relied upon by Hightower does not evidence or suggest the personal involvement of the defendants Hightower actually named in the complaint. The three persons who signed that document – Marshall Peek, Adam Noles, and Donna Reed – are not named in the complaint and are not defendants in this proceeding. While there is a signature line for Skyla Grief (who is a named defendant), she did not sign the document nor is there any other indication that she participated in or approved Hightower's transfer. The defendants are therefore correct that the allegations Hightower actually made *in his complaint*, even when considered in conjunction with the

KDOC Transfer Authorization Form, do not demonstrate the personal involvement of any of the defendants, and this claim must be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[i]n a § 1983 suit or a Bivens action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer,")

### III. **Hightower's Amendments to his Complaint would be Futile.**

Simultaneously with the filing of his response to the defendants' motion to dismiss [D. E. No. 20], Hightower filed both a motion to supplement his complaint and a motion to amend it. [D. E. Nos. 21, 22] Both motions were filed for the same purpose: to add Marshall Peek, Adam Noles, and Donna Reed as defendants, asserting Eighth Amendment claims against them based upon their involvement in transferring him to EKCC notwithstanding their alleged prior knowledge of threats against him at that institution. [D. E. No. 21 at pp. 1-2; D. E. No. 22 at pp 1-2] The defendants respond that Hightower knew or should have known the individuals who were involved in the decision to transfer him; that permitting amendment at this late juncture would be prejudicial; and that permitting amendment would be futile in light of Hightower's failure to exhaust his administrative remedies. [D. E. No. 23]

With respect to Hightower's first motion, the purpose of a motion to supplement the complaint is to "[set] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d) But the allegations Hightower wishes to add to his complaint relate to events occurring long *before* he filed his complaint in this action, not after it. A motion to supplement the complaint is therefore not proper, cf. *Chicago Reg. Council of Carpenters v. Village of Schaumburg*, 644 F. 3d 353, 356-57 (7th Cir. 2011), and the motion will be denied.

A motion to amend the complaint pursuant to Rule 15(a)(2) is the proper mechanism to include such pre-filing facts and new defendants. The defendants' concerns regarding prejudice caused by the long delay in amendment since this case was filed carry significant weight. But more fundamentally, permitting the amendment Hightower seeks would be futile. A district court should deny a requested amendment where the proposed amendment would be futile, as where the newly-added claims are subject to dismissal. *Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006). As previously noted, Hightower failed to properly exhaust his administrative remedies with respect to any of his claims, a fundamental defect that would

Hightower v. Thompson, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 55 of 80   PageID 11929

apply with equal force to the claims he seeks to include against three newly-identified defendants.

**\*6** In addition, when a new party is sought to be added to a previously-filed complaint after the applicable statute of limitations has run, the amendment must "relate back" to the original filing date by satisfying all of the requirements of Rule 15(c)(1)(C) in order to avoid the limitations bar. *Brown v. Cuyahoga Co., Ohio*, 517 Fed.Appx. 431, 433 (6th Cir. 2013); *Smith v. City of Akron*, 476 Fed.Appx. 67, 69 (6th Cir. 2012). Hightower's civil rights claims accrued either on September 14, 2014 when he was transferred to EKCC, and certainly no later than October 25, 2014, when he was attacked by another inmate at that institution. *Estate of Abdullah ex rel. Carswell v. Arena*, 601 Fed.Appx. 389, 393-94 (6th Cir. 2015) ("Once the plaintiff knows he has been hurt and who has inflicted the injury, the claim accrues.") (internal quotation marks omitted) (citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979)). He was therefore required to file suit upon his civil rights claims within one year, no later than October 25, 2015. *Hornback v. Lexington-Fayette Urban Co. Gov't*, 543 Fed.Appx. 499, 501 (6th Cir. 2013); *Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003). Hightower signed his complaint on September 28, 2015, although it was not mailed until October 20, 2015, and received by the Court two days later. Assuming that Hightower's complaint was initially filed within the limitations period, that period expired shortly thereafter, and the amended complaint he proposes in his May 2016 motion will certainly be deemed filed beyond the limitations period absent relation back.

By its terms, Rule 15 permits an amendment which "changes the party or the naming of the party against whom a claim is asserted" to relate back only when three conditions are met: the amendment must (1) assert a claim arising out of the same conduct or events set forth in the original complaint, (2) the new party to be added must have previously received notice of the action within 120 days after it was filed so that it is not prejudiced in defending the merits of the claims, and (3) the new party knew or should have known that, but for plaintiff's mistake in identifying the proper defendant, the plaintiff would have asserted the claim against it. Fed. R. Civ. P. 15(c)(1)(C); *Coons v. Indus. Knife Co., Inc.*, 620 F. 3d 38, 43 (1st Cir. 2010).

The Sixth Circuit and the other courts of appeal have consistently held that "an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." *Asher v.*

*Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010). This rule does not apply where the plaintiff merely changes the attribution of conduct to a party already named as a defendant rather than adding a new defendant, *Ham v. Sterling Emer. Servs. Of the Midwest, Inc.*, 575 Fed.Appx. 610, 615-16 (6th Cir. 2014), but a plaintiff's failure to find out the identity of the correct party until after the suit is filed does not constitute the sort of mistake in identity to permit an amendment to relate back. *Id.* at 617 (citing *Brown v. Cuyahoga County, Ohio*, 517 Fed.Appx. 431, 433-34 (6th Cir. 2013) ("We have previously held that an absence of knowledge is not a mistake as required by Rule 15(c)(1)(C)(ii).")); see also *Smith v. City of Akron*, 476 Fed.Appx. 67, 69 (6th Cir. 2012) ("Smith did not make a mistake about the identity of the parties he intended to sue; he did not know who they were and apparently did not find out within the two-year limitations period. The relation-back protections of Rule 15(c) were not designed to correct that kind of problem.").

These cases establish that Hightower's failure to discover until long after the limitations period had expired that Marshall Peek, Adam Noles, and Donna Reed are the persons he now believes responsible for his transfer is not a problem for which Rule 15(c) provides a remedy. Because any claims against the defendants Hightower seeks to add by amendment would not relate back to the filing of the original complaint, they are time-barred, and the Court will deny as futile his motion to amend his complaint to include them.

### IV. Hightower's Motion for Injunctive Relief

**\*7** Finally, Hightower has recently filed a motion seeking injunctive relief, stating that officials at KSR where he is now confined have recently advised inmates that approximately one half of the prisoners at that facility will be transferred elsewhere. Hightower states that he is "afraid that he will be transferred to an institution where he has unknown enemies, and the Plaintiff has no way of knowing who all the people are." He therefore requests an order compelling KDOC officials not to transfer him away from KSR. [D. E. No. 27] The defendants respond primarily that Hightower's fear that he may be transferred is speculative. [D. E. No. 28]

A plaintiff must establish his entitlement to a preliminary injunction. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)

Hightower v. Thompson, Not Reported in Fed. Supp. (2016)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 56 of 80   PageID 11930

("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.").

In determining whether to grant injunctive relief, the Court considers (1) whether the moving party has shown a substantial likelihood that she will succeed on the merits; (2) whether the moving party would suffer irreparable harm if the injunction is not granted; (3) whether granting the injunction will cause substantial harm to others; and (4) whether the public would be served by the injunction. *Rock & Roll Hall of Fame v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998). These elements are factors to be considered and balanced in each case, not rigid requirements. *In re Eagle-Pitcher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). While "no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

The Court must deny the requested injunction for three reasons. First, the factual basis for the relief requested – KSR's recent indication that it may transfer some prisoners, including Hightower, to a new facility – is wholly unrelated to this lawsuit. Hightower's claims in this action relate to a classification decision made by KSP officials in 2014, not a recent decision by separate officials at a separate prison in 2016.

Second, transfer decisions are made by the Classification Committee members at each prison, and the KSR officials who may in the future decide to transfer Hightower are not defendants in this action. Nor may the Court compel a person to take or not take any action before it possesses personal jurisdiction over them, a condition that cannot be satisfied until they are properly served with process. *Cf R.M.S. Titanic, Inc. v. Haver*, 171 F. 3d 943, 958 (4th Cir. 1999) (preliminary injunction issued against defendant company was unenforceable because district court did not obtain personal jurisdiction over company through valid service of process); *Schuh v. Michigan Dep't of Corrections*, No. 1:09cv982, 2010 WL 3648876, at *2 (W.D. Mich. July 26, 2010) ("When a preliminary injunction is sought under

Rule 65(a), service of the summons and the complaint is required."); *Carty v. R.I. Dept. of Corrections*, 198 F.R.D. 18, 20 (D.R.I. 2000) (same). The Court therefore lacks personal jurisdiction over the persons necessary to grant the relief requested.

Finally, the Court agrees that Hightower's concerns are, at this juncture, wholly speculative. There is no evidence in the record at this point indicating that he will be transferred at all, let alone to a prison that houses his enemies, whom he admits are unknown to him. There is therefore no basis to grant the injunctive relief requested.

**\*8** Accordingly, **IT IS ORDERED** that:

1. Hightower's motion to supplement the complaint [D. E. No. 21] is **DENIED**.

2. Hightower's motion to amend the complaint [D. E. No. 22] is **DENIED**.

3. Hightower's motion to supplement the complaint [D. E. No. 26] is **DENIED**.

4. Defendants' motion to dismiss the complaint [D. E. No. 18] is **GRANTED**.

5. Hightower's motion for emergency injunctive relief [D. E. No. 27] is **DENIED**.

6. Plaintiff James Hightower's complaint [D. E. No. 1] is **DISMISSED WITH PREJUDICE**.

7. The Court will enter an appropriate judgment.

8. This matter is **STRICKEN** from the active docket.

This 27th day of September, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5422061

---

Footnotes

1    Two months after the briefing on the defendants' motion to dismiss was completed, Hightower filed a second motion to supplement his complaint. In that motion, Hightower explains that as a result of open records requests he obtained a copy of a "Request for Release from Protective Custody" form dated July 29, 2014 which he suggests KSP staff used to seek his consent for the purpose of transferring him to KSR, but which he refused to sign. [D. E. No. 26, 26-9] Supplementing

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 57 of 80   PageID 11931

the complaint pursuant to Rule 15(d) is neither necessary or appropriate, as Hightower seeks to rely upon the document to further respond to the defendants' dispositive motion. The Court will therefore deny the motion to supplement the complaint, but has considered that newly-obtained document as part of its evaluation of the defendants' motion to dismiss.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 4901407
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

KLIPSCH GROUP, INC., Plaintiff,

v.

BIG BOX STORE LTD. d/
b/a BigBoxStore.com and
BigBoxSave.com, et al ., Defendants.

No. 12 Civ. 6283(AJN).
|
Oct. 11, 2012.

MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge.

**\*1** For the reasons that follow, the Court GRANTS Defendant DealExtreme.com's ("DealExtreme") requests to reduce the amount of its assets that are frozen and to halt expedited discovery, and DENIES DealExtreme's request for reconsideration of the Court's finding that Plaintiff, Klipsch Group, Inc. ("Klipsch"), has established a likelihood of success on the merits.

## I. PROCEDURAL BACKGROUND

On August 16, 2012, the Court imposed a Temporary Restraining Order against 20 defendants in this action, including DealExtreme, barring them from selling counterfeit versions of Plaintiff's products. (Docket # 48). As part of that Order, the Court, in accordance with 15 U.S.C. § 1116(a) and its inherent equitable power, restrained payment processors, including PayPal, from allowing DealExtreme to transfer or withdraw funds in its accounts. (*Id.*).

Pursuant to that Order, Plaintiff obtained a freeze on $2 million in money belonging to DealExtreme. (Chow 9/7/12 Decl. ¶ 25). Plaintiff represented to the Court that there was actually more money flowing through DealExtreme's accounts, but that Plaintiff agreed to hold aside only $2 million. (9/14/12 Tr. at 16:23–17:19).

Following a hearing held on September 14, 2012, the Court converted the Temporary Restraining Order against DealExtreme into a Preliminary Injunction. (Docket # 48). In light of documentary evidence presented by DealExtreme indicating that it generated gross revenues of only $6,346.40 from global sales of Klipsch-branded goods, and that it generated only $691.70 of that from sales into the United States, the Court expressed wariness about maintaining a freeze on $2 million of DealExtreme's assets. (9/14/12 Tr. at 49:16–51:1, 55:13–22).

As a result, the Court, consistent with the approach taken by Judge Berman in *North Face Apparel Corp. v. TC Fashions, Inc.,* 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006), granted DealExtreme one week to present additional evidence to establish that the assets seized are not the proceeds of counterfeiting activity.

On September 21, 2012, DealExtreme submitted a supplemental Declaration from Daniel Chow, the CEO of ePRO, DealExtreme's parent company, (Docket # 54), as well as a supplemental opposition brief. (Docket # 55). Plaintiff submitted a response on September 26, 2012, (Docket # 's 57–60), and the parties exchanged letters through September 28, 2012. (Docket # 's 63–65).

As discussed below, because Courts in this district have confined asset freezes to sums related to potential equitable remedies and to those assets related to counterfeiting activity, and because the Court, for purposes of this decision, is satisfied with DealExtreme's showing that it earned less than $1,000 in profits from the sale of Klipsch-branded goods, the Court finds that the present $2 million asset freeze is well in excess of what is appropriate.

## II. DISCUSSION

A. *Assets May be Restrained To Preserve Equitable Remedies*

**\*2** Courts in this district have exercised their equitable powers in Lanham Act cases to restrain assets to preserve the return of profits derived from the sale of counterfeit goods and to insure counterfeiting Plaintiffs the accounting to which they are entitled. *See, e.g., Gucci Am. v. Weixing Li,* 2011 WL 6156936, at *4 (S.D .N.Y. Aug. 23, 2011) ("an asset freeze is appropriate in order to determine the amount by which Defendants profited from their counterfeiting activities."); *Belenciaga Am. v. Dollinger,* 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010) ("[t]he court ... has authority to freeze

the Individual Defendants' assets insofar as they could be used to satisfy an award of their profits pursuant to Plaintiffs' Lanham Act claims"); *North Face Apparel,* 2006 WL 838993, at *3 ("District courts have the authority to freeze those assets which could be used to satisfy an equitable award of profits.").

Plaintiff has asked the Court to exercise its equitable powers to restrain assets not only sufficient to satisfy an award of counterfeiting profits, but also to ensure that sufficient funds are available to satisfy a judgment for statutory damages. (9/26 Supp. Br. at 8–10). Plaintiff asserts that "no case has ever specifically excluded damages as a basis for the asset restraint." § *Id.* at 8). But courts in this district have focused on freezing assets to preserve the equitable remedies of a return of lost profits and an accounting, not statutory damages. *See, e.g., Gucci Am.,* 2011 WL 6156936, at *4; *Belenciaga Am.,* 2010 WL 3952850 at *7; *North Face Apparel,* 2006 WL 838993, at *3. And freezing assets exclusively for the purpose of preserving funds that may later be awarded as money damages would appear contrary to the Supreme Court's holding in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333 (1999) (district court "had no authority to issue a preliminary injunction preventing [a party] from disposing of [its] assets pending adjudication of [a] contract claim for money damages."); *see also Gucci Am.,* 2011 WL 6156936, at *4.[1] This Court therefore will confine the asset freeze to that money which may be used to satisfy an equitable remedy.

## B. *DealExtreme has Met its Burden of Showing that the Vast Majority of Assets Restrained are Unrelated to the Sale of Counterfeit Klipsch Goods*

In addition to confining the asset freeze to money that could be used to satisfy an award of profits, "the Court may exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity." *North Face Apparel,* 2006 WL 838993, at *3 (alteration in original) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995)). "The burden is on the party seeking relief to 'present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.' " *Id.* (alteration in original) (quoting *Cartier Int'l B.V. v. Liu,* 2003 WL 1900852, at *1 (S.D.N.Y. Apr. 17, 2003)).

**\*3**  DealExtreme has presented to the Court documentary evidence indicating that it only earned $5,744.40 in gross sale of Klipsch-branded products globally. (Docket # 54 ¶

13).[2] DealExtreme's records indicate that it has generated only $124.40 in profits from all of its sales into the United States and $866.98 in profits from its worldwide sales of Klipsch-branded goods. (Docket # 54 ¶¶ 15–16).

The CEO of DealExtreme's parent, ePRO, a publicly-traded Hong Kong company, has submitted two sworn declarations testifying to the veracity of financial records reflecting these sales. (Docket # 's 32, 54). The records produced by DealExtreme include the zip codes of all of its customers in the United States who purchased Klipsch-branded products, the amount billed, the shipping dates, and any refunds for returned products. (Docket # 54–1). DealExtreme also provided a list of each one of its worldwide sales of Klipsch-branded goods. (Docket # 54–1). DealExtreme further provided information regarding the amounts that it paid its suppliers for Klipsch-branded goods and the names of the suppliers. (Docket # 54). The Court finds this showing to be persuasive.

Plaintiff seeks to undermine the credibility of DealExtreme's showing by calling the Court's attention to certain aspects of the documents. (Docket # 57 at 6). For example, Plaintiff argues that the computer-generated records of Klipsh-branded sales is unsatisfactory because it was put together for the purpose of this litigation. (*Id.*). But Defendant has provided a plausible explanation as to how it conducted a search, and that paper records are not ordinarily maintained in the course of its computer-centered business. (Docket # 65 at 2). The credibility of Mr. Chow's sworn statement and the exhibits attached thereto are not undermined by the fact that the financial records were generated specifically for purposes of this litigation. This is especially true since many of these documents were generated following the Court's request for such documentation at the September 14, 2012 hearing.

Thus far, Plaintiff has only documented a single sale of a counterfeit Klipsch-branded product sold through DealExtreme's website, a transaction that occurred over six months before this lawsuit was commenced. (Docket # 20 Ex. F). DealExtreme's records indicate that it has generated less than $1,000 in net profits from $5,744.40 in global sales of Klipsch-branded goods. (Docket # 54). The Court recognizes that there may be some dispute as to DealExtreme's profit margin on the sale of Klipsch-branded goods and the volume of such sales. Yet given that Plaintiff, to obtain its *ex parte* Temporary Restraining Order, produced evidence that only a single counterfeit Klipsch-branded product was sold through DealExtreme's website, and that DealExtreme subsequently

voluntarily disclosed that $5,744.40 worth of such counterfeit products were sold through its website, the Court does not see any indication that a freeze greater than $20,000 is necessary to preserve Plaintiffs right to an accounting and to the return of profits from the sale of counterfeit goods through Defendant's website. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 71–72 (2d Cir.1998) ("A district court faced with a Lanham Act violation possesses some degree of discretion in shaping [the] relief according to the principles of equity and the individual circumstances of each case" within the parameters of allowing an accounting for profits) (internal quotation marks omitted).

### C. *Expedited Discovery*

**\*4** DealExtreme also objects to the order of expedited discovery contained in the Preliminary Injunction. (*See* Docket # 48). Recent cases in this district have applied a flexible "good cause" standard in determining whether expedited discovery is appropriate. *Digital Sin, Inc. v. Does 1–176,* 279 F.R.D. 239, 241 (S.D.N.Y.2012). Plaintiff argues that it is entitled to expedited discovery because it has demonstrated a likelihood of success on the merits, irreparable harm, and some connection between expedited discovery and continued infringement. However, DealExtreme is enjoined from selling counterfeit Klipsch-branded goods (Docket # 48) and has voluntarily produced the names of its suppliers of previously-sold counterfeit goods. (Docket # 54). There therefore exists little evidence that any additional injury to Plaintiff will result from DealExtreme's conduct absent expedited discovery. DealExtreme has already provided Plaintiff with the information necessary to limit further irreparable harm.

An initial pretrial conference has been scheduled for December 7, 2012. The Court intends to place this case on a fair and efficient schedule. Indeed, the vast majority of cases before this Court are expected to complete fact discovery within 120 days, and no reason has yet been shown to the Court why this case will require a fact discovery period in excess of that length. Under these circumstances, Plaintiff has not demonstrated a need for additional expedited discovery.

### D. *The Court is Not Persuaded to Alter its Conclusion that Plaintiff has Demonstrated a Likelihood of Success*

DealExtreme, not contesting that counterfeit Klipsch goods were sold through its website, argues that it has presented additional evidence regarding its operations that cast doubts on Plaintiff's ability to succeed on the merits in this action. (Docket # 65). DealExtreme may present this evidence at trial. In the interim, the Court has not been provided with a sufficient basis to reconsider its preliminary determination.

### CONCLUSION

The amount of the assets presently frozen shall be reduced to $20,000. DealExtreme's request that the Court reconsider its ruling on likelihood of success is DENIED. DealExtreme's request to stop any expedited discovery is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4901407

### Footnotes

1   Plaintiff relies on the Ninth Circuit's decision in *Reebok v. Marnatech,* 970 F.2d 552, 559 (9th Cir.1992), which predates the Supreme Court's decision in *Grupo Mexicano.*

2   DealExtreme initially reported to the Court that it generated $6,346.40 in gross profits on its worldwide sale of Klipsch-branded goods (Docket # 32), but later revised down that number to $5,744.40 after taking into account returned goods. For the same reason, DealExtreme revised down its total gross revenue from the sale of Klipsch-branded goods into the United States from $691.70 to $661.80. (Docket # 54 ¶ 5).

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3895240
Only the Westlaw citation is currently available.
United States District Court,
C.D. California,
Western Division.

LIONS GATE FILMS INC., Plaintiff,

v.

John DOES 1–10 inclusive, d/
b/a, <limetorrents.com>, <
billionuploads.com>, <hulkfile.eu>
<played.to>, <swankshare.com> and
< dotsemper.com>, et al., Defendants.

No. 2:14–cv–06033–MMM–AGRx.
|
Signed Aug. 8, 2014.

**Attorneys and Law Firms**

Christopher Theodore Varas, Dennis L. Wilson, Larry W. McFarland, Kilpatrick Townsend and Stockton LLP, Beverly Hills, CA, for Plaintiff.

**FINDINGS OF FACT, CONCLUSIONS OF LAW**

MARGARET M. MORROW, District Judge.

 **\*1** This matter came on before the Court on August 8, 2014 at 4 p.m. on the motion for a preliminary injunction filed by plaintiff Lions Gate Films Inc. ("Lions Gate"). The Court ordered that any opposition to Lions Gate's motion be filed and served on all parties no later than August 6, 2014 at 12 p.m. No oppositions were timely filed, nor has any been filed since that time. Having reviewed Lions Gate's motion and supporting documents, the Court makes the following findings of fact and conclusions of law:

*FINDINGS OF FACT*

1. The Film at issue in this case is "The Expendables 3," which is the forthcoming third installment in the "The Expendables" motion picture franchise. The Film is scheduled for theatrical release in North America on August 15, 2014, and has

not been released to date. (Declaration of Robert Wenokur ("Wenokur Decl."), ¶ 6.)

2. The cast of the Film includes many famous actors, including Sylvester Stallone, Jason Statham, Arnold Schwarzenegger, Mel Gibson, Harrison Ford, Wesley Snipes, Dolph Lundgren and Antonio Banderas, among others. (Wenokur Decl., ¶ 6.) The first two films in this franchise, "The Expendables" and "The Expendables 2" generated worldwide box office revenues in excess of $575 million. (*Id.,* ¶ 7.)

3. Lions Gate has obtained the sole and exclusive right to distribute and exploit the Film in the United States and throughout North America. (Wenokur Decl., ¶ 8.) Lions Gate's exclusive rights in the Film pursuant to this exclusive license include but are not limited to all rights in the United States and throughout North America to exploit the Film by means of direct exhibition in theaters, by means of the Internet and in all home video media. (*Id.,* ¶ 8, Exh. A (Agreement, ¶ 3).)

4. The Film is the subject of Copyright Registration No. Pau003734299 (Supplemental Declaration of Christopher Varas, Exhibit A.) In addition, the screenplay for the Film is the subject of United States Copyright Registration No. PAu003704583, issued on July 10, 2013, which is valid, subsisting and in full force and effect. (Wenokur Decl., Exhibit B.)

5. Given the success of the first two films, Lions Gate anticipates that the Film will be highly successful as well. (Wenokur Decl., ¶ 11.) Accordingly, Lions Gate has invested millions of dollars to acquire distribution rights to the Film and millions more in connection with marketing and promoting the Film's release. (*Id.*)

6. Lions Gate has planned and has already begun to execute an extensive marketing and publicity campaign for the Film including television, radio and print advertising and promotion. (Wenokur Decl., ¶ 12.)

7. Lions Gate has not authorized anyone to distribute the Film within the United States or North America on the Internet or anywhere else prior to the planned release date. (Wenokur Decl., ¶ 13.)

8. As part of Lions Gate's customary anti-piracy efforts, the company retained outside vendors, including MarkMonitor,

to identify and address as appropriate any potential or actual piracy relating to the Film. (Wenokur Decl., ¶ 14.)

**\*2** 9. On or about July 24, 2014, Lions Gate learned that a digital file containing a high quality reproduction of the Film had been uploaded to the Internet without its authorization or consent. (Wenokur Decl., ¶ 15.)

10. Although investigations are ongoing, Lions Gate has concluded that an individual unlawfully obtained a copy of the Film through fraudulent or otherwise unlawful means. (Wenokur Decl., ¶ 15.)

11. Lions Gate understands that only a single digital file containing the Film was stolen, and that every copy of the Film alleged in its complaint (and every copy available anywhere on the Internet) originated from and is a reproduction of that single original digital file (the "Stolen Film"). (Wenokur Decl., ¶ 16 .)

12. Even a single unauthorized leak of a film property such as the one at issue in this action can have immediate and severe adverse consequences to film distribution companies such as Lions Gate. (Wenokur Decl., ¶ 17.) This is because digital technology enables exact duplication of copyrighted content at the press of a computer keypad or mouse. (Wenokur Decl., ¶ 17.) Accordingly, from a single digital copy of a work thousands of near exact copies of the work can quickly be made and proliferate. (*Id.*)

13. Within days after Lions Gate detected the theft of a copy of the Film, copies of the Stolen Film in its entirety were available on hundreds of websites. (Wenokur Decl., ¶ 17.) As of July 31, 2014, the Stolen Film had been downloaded more than 2.1 million times worldwide on peer-to-peer networks, including approximately 247,000 downloads in the United States. (Declaration of Edward Cho ("Cho Decl."), ¶¶ 6, 7.)

14. As of July 31, 2014, of peer-to-peer downloads in the United States, approximately 21,000 (or 8.5%) were to individuals in the Los Angeles metropolitan area. (Cho Decl., ¶ 7.)

15. The Stolen Film is also available on the Internet for downloading and streaming through websites that do not constitute peer-to-peer networks. (Cho Decl., ¶ 6.) Lions Gate estimates that the Film has been downloaded and/or streamed hundreds of thousands, if not millions, of times worldwide outside peer-to-peer networks. (*Id.*)

16. After Lions Gate learned of the theft, it instructed MarkMonitor to devote substantial resources to cataloging all websites and online services offering pirated copies of the Stolen Film. (Wenokur Decl., ¶ 18.) Further, Lions Gate instructed MarkMonitor to follow up with take-down requests to the operators of the sites in question. (*Id.*)

17. As of July 31, 2014, MarkMonitor had sent approximately 2,770 take-down requests covering, cumulatively, 10,846 unique host URLs (since a single website often has multiple URLs hosting the Stolen Film, MarkMonitor can and does request that the operator of a single website remove multiple unique host URLs). (Cho Decl., ¶ 9.)

18. In the vast majority of instances the recipients responded by taking down the Stolen Film and otherwise taking steps to avoid the piracy of the Stolen Film. (Cho Decl., ¶ 9.)

**\*3** 19. While many of the sites in question complied with take-down requests, certain sites, including those which are the subject of this action, did not. (Wenokur Decl., ¶ 18.)

20. In particular, Defendants in this case, who operate websites at the domain names <limetorrents.com>, <billionuploads.com>, <hulkfile.eu>, <played.to>, < swankshare.com>, and <dotsemper.com>, failed to respond to the demands that MarkMonitor has sent on Lions Gate's behalf. (Cho Decl., ¶¶ 10–18.)

21. On July 25, 2014, MarkMonitor first became aware that the < limetorrents.com> website was disseminating the Stolen Film using the peer-to-peer file-sharing "BitTorrent" protocol. (Cho Decl., ¶ 11.)

22. Websites that use the BitTorrent protocol, including <limetorrents.com> host small files called "torrent" files. (Cho Decl., ¶ 11.) Each torrent file contains an instruction set including a unique "hash value" that allows the end user's client program to locate and connect to a group of other users (called a "swarm") who are all simultaneously sharing copies of, in the case of < limetorrents.com>, the Stolen Film with one another. (*Id.*)

23. By downloading one of these torrent files associated with the Stolen Film from <limetorrents.com>, users join a "swarm" where they download parts of the Stolen Film from many different users and also upload to other users parts of the Stolen Film they have already received, until eventually

they have reproduced the entire Stolen Film on their own hard drives and, in most cases, have also uploaded all or a substantial part of the Stolen Film to others. (Cho Decl., ¶ 11.)

24. MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <limetorrents.com> website on July 26, 30, and 31, but received no response. (Cho Decl., ¶¶ 17, 18; Ex. G.)

25. On July 25, 2014, MarkMonitor first became aware that the < billionuploads.com> website was hosting copies of the Stolen Film in one or more directories where users could download copies of the Stolen Film directly to their computers. (Cho Decl., ¶ 12.)

26. MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <billionuploads.com> website on July 25, 26, 27, 28, 29, 30 and 31, but received no response prior to Lions Gate filing its motion. (Cho Decl., ¶¶ 17, 18; Ex. G.)

27. On July 25, 2014, MarkMonitor first became aware that the <swankshare.com> website was hosting copies of the Stolen Film in one or more directories where users could download copies of the Stolen Film directly to their computers. (Cho Decl., ¶ 13.)

28. MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <swankshare.com> website on July 26, 30 and 31, but received no response. (Cho Decl., ¶¶ 17, 18; Ex. G.)

29. On July 25, 2014, MarkMonitor first became aware that the <hulkfile.eu> website was hosting copies of the Stolen Film in one or more directories where users who signed up for the website's service could download copies of the Stolen Film directly to their computers. (Cho Decl., ¶ 14.)

 *4  30. MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <hulkfile.eu> website on July 26, 27, 28, 29, 30, and 31 but received no response. (Cho Decl., ¶¶ 17, 18; Ex. G.)

31. On July 25, 2014, MarkMonitor first became aware that the <played.to> website was hosting copies of the Stolen Film in one or more directories and displaying an embedded viewing window in which users could stream copies of the Stolen Film directly to their screens. (Cho Decl., ¶ 15.)

32. MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <played.to> website on July 25, 26, 27, 28, 29, 30 and 31, but received no response prior to Lions Gate filing its motion. (Cho Decl., ¶¶ 17, 18; Ex. G.)

33. On July 25, 2014, MarkMonitor first became aware that the <dotsemper.com> website was hosting copies of the Stolen Film in one or more directories where users can download copies of the Stolen Film directly to their computers and displaying an embedded viewing window in which users could stream copies of the Stolen Film directly to their screens. (Cho Decl., ¶ 16.)

34. MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <dotsemper.com> website on July 26, 27, 28, 29, 30, and 31, but received no response. (Cho Decl., ¶¶ 17, 18; Ex. G.)

35. Defendants' unlawful distributions impair the marketability of the Film because they provide consumers with an opportunity to view the Film in its entirety for free before its theatrical release. (Wenokur Decl., ¶ 20.)

36. Individuals who view the Film in this manner may not pay for tickets at the box office when the Film is released later this month. (Wenokur Decl., ¶ 20.)

37. Similarly, such individuals may not purchase or rent copies of the Film when it is released to the home entertainment market after its theatrical run. (Wenokur Decl., ¶ 20.)

38. Further, the pre-release unlawful distributions impair Lions Gate's ability to control the publicity surrounding the Film. (Wenokur Decl., ¶ 21.)

39. Lions Gate planned for discussions concerning the Film to coincide with the theatrical release of the Film on August 15, 2014. (Wenokur Decl., ¶ 21.) Now, many news articles are reporting on the Film weeks before the release and are doing so with reference to the unauthorized copies available on the Internet rather than the content of the Film. (*Id.,* Ex. D.)

40. The pre-release unlawful distributions impair Lions Gate's relationships with its licensees including theater operators. (Wenokur Decl., ¶ 22.) Specifically, Lions Gate has negotiated licenses with theater operators to exhibit the Film in theaters. (*Id.*) Lions Gate relies on royalties from these

licenses to stay in business, just as its licensees rely on ticket sales to stay in business. (*Id.*)

41. The leak of the Film at this time threatens irreparable harm to Lions Gate's relationships with its licensees and with potential customers. (Wenokur Decl., ¶ 23.)

**\*5** 42. Those relationships depend on Lions Gate's ability to control when, where and under what conditions the Film is distributed and yet Defendants, through their unlawful conduct, are determining when and how the Film is distributed. (Wenokur Decl., ¶ 23.)

### CONCLUSIONS OF LAW

1. This Court has the authority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

2. A preliminary injunction requires the plaintiff to establish: "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest." *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.,* 907 F.Supp.2d 1086, 1092 (N.D.Cal.2012) (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,* 240 F.3d 832, 839 n. 7 (9th Cir.2001), and *Lockheed Missile & Space Co. v. Hughes Aircraft,* 887 F.Supp. 1320, 1323 (N.D.Cal.1995)). All four requirements are satisfied in this case.

3. Lions Gate is likely to prevail on its claim for direct infringement. To prevail on this claim, Lions Gate must prove: 1) that it is the legal or beneficial owner of a valid copyright; and 2) that the defendant violated at least one of the exclusive rights owned by the plaintiff as the legal or beneficial copyright holder. *See* 15 U.S.C. § 501(b); see also *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir.2001); *D.C. Comics v. Towle,* 989 F.Supp.2d 948, 961 (C.D.Cal.2013).

4. Lions Gate is likely to establish that the Film is the subject of valid copyright protection and that it has standing to bring this action because it is the exclusive licensee of those rights. Motion pictures such as the Film are such quintessentially

protectable creative works that the Copyright Act specifically references them in the section specifying the exclusive rights granted to copyright owners. *See* 17 U.S.C. § 106. Moreover, the copyright for the Film issued by the United States Copyright Office is prima facie evidence that the copyright in the Film is valid. *See Triad Sys. Corp. v. Se. Exp. Co.,* 64 F.3d 1330, 1335 (9th Cir.1995) (granting preliminary injunction), superseded by statute on other grounds as stated in *Apple Inc. v. Psystar Corp.,* 658 F.3d 1150, 1158 (9th Cir.2011).

5. The license agreement grants Lions Gate the exclusive license to distribute and otherwise exploit the Film within the United States and North America in theaters, on the Internet and over home video media (among other rights). Lions Gate is therefore likely to establish it has standing to bring this action. *Righthaven LLC v. Hoehn,* 716 F.3d 1166, 1170 (9th Cir.2013) ("[I]f a copyright owner grants an exclusive license of particular rights, only the exclusive licensee and not the original owner can sue for infringement of those rights"); *see also* 17 U.S.C. § 501(b).

**\*6** 6. Lions Gate is likely to establish the second element of its claim for direct infringement because it has adduced evidence that Defendants are distributing and/or publicly performing the Film in its entirety. *See A & M Records, Inc.,* 239 F.3d at 1014 (users who make digital copies of copyrighted works available for others to download violate the exclusive distribution right); see also *Warner Bros. Entm't v. WTV Systems, Inc.,* 824 F.Supp.2d 1003, 1008–1012 (C.D.Cal.2011) (provider of unauthorized on-demand movie streaming service violated the performance right of copyright owners).

7. Defendants' conduct in distributing the Film before its theatrical release has impaired Lions Gate's exclusive control over one of its most valuable intellectual property assets —its right of first publication—and disrupted Lions Gate's marketing and publicity campaign for the Film.

8. In so doing, Defendants have also interfered with Lions Gate's relationships with its business partners, damaged Lions Gate's goodwill among consumers by preventing Lions Gate from exercising control over the presentation of the Film, and deprived both Lions Gate and many others of revenue that will be impossible to calculate because there is no way of knowing how many people would have paid to see the Film but for Defendants' infringement.

9. The harm that Defendants are causing is irreparable and justifies the imposition of preliminary injunctive relief. *Warner Bros.,* 824 F.Supp.2d at 1012–14; see also *Grokster,* 518 F.Supp .2d at 1217.

10. Defendants' infringement also causes irreparable harm to Lions Gate because their unchecked dissemination renders the Film "vulnerable to continuing infringement on an enormous scale" that cannot be redressed with money damages. *Grokster,* 518 F.Supp.2d at 1217.

11. The balance of equities also tips sharply in Lions Gate's favor. The Ninth Circuit has long held that a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities. 'Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration[.]' " *Triad Sys. Corp.,* 64 F.3d 1330 at 1338 (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir.1988)* (final, internal quotation marks omitted)).

12. An injunction is in the public interest. " '[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work.' " *Warner Bros.,* 824 F.Supp.2d at 1015 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3rd Cir.1983)). Any interest the public may have "in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works." *Grokster,* 518 F.Supp.2d at 1222.

**\*7** 13. It is appropriate to dispense with the filing of a bond. It is well established in the Ninth Circuit that "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any.* ' " *Jorgensen v. Cassidy,* 320 F.3d 906, 919 (9th Cir.2003) (quoting and adding emphasis to *Barahona—Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir.1999)). In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen,* 320 F.3d at 919. The Court finds no realistic likelihood that a preliminary injunction will harm Defendants.

14. An order preventing the transfer of Defendants' assets is appropriate. Such a preliminary asset freeze is "authorized by the district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir.1992); see also *Federal Trade Commission v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1433–1434 (11th Cir.1984) (District Court may exercise its full range of equitable powers, including a preliminary asset freeze, to ensure that permanent relief will be possible). Where profits are available as a final remedy—as they are under 17 U.S.C. § 504—a preliminary asset freeze is an appropriate provisional remedy. See, e.g., *Datatech Enters. LLC v. FF Magnat Ltd.,* 2012 WL 4068624, at \*4–5 (N.D.Cal. Sept.14, 2012) (granting a preliminary injunction including an asset freeze in a lawsuit for copyright infringement).

15. Such an asset freeze is appropriate in this case to preserve Lions Gate's right to such recovery against Defendants, who are trafficking in the Stolen Film and may secret assets to insulate them from judgment.

Based on these findings of fact and conclusions of law, the Court grants Lions Gate's motion for preliminary injunction.

### All Citations

Not Reported in F.Supp.2d, 2014 WL 3895240

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3818622
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

LUXOTTICA USA LLC, Plaintiff,

v.

THE PARTNERSHIPS

AND UNINCORPORATED

ASSOCIATIONS IDENTIFIED

ON SCHEDULE "A", Defendants.

Case No. 14 c 9061
|
Signed June 18, 2015

**Attorneys and Law Firms**

Kevin W. Guynn, Amy Crout Ziegler, Jessica Lea Bloodgood, Paul G. Juettner, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL, for Plaintiff.

Lingzhi Zhao, Zhao & Associates, P.C., Michael J. Robins, Robins & Associates LLC, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

Harry D. Leinenweber, Judge, United States District Court

 **\*1**  This case arises from the unauthorized sale of counterfeit Ray–Ban eyewear through various online seller accounts. Default judgment has been entered against most Defendants, while others have been voluntarily dismissed. A single Defendant ("Defendant"), who has been identified by two eBay seller IDs, remains.

Before the Court is Plaintiff Luxottica USA LLC's ("Luxottica") Motion for Summary Judgment, Statutory Damages of $450,000, Permanent Injunction, and Attorneys' Fees and Costs [ECF No. 77]. For the reasons stated herein, Luxottica's Motion is granted, except that the Court awards statutory damages in the amount of $150,000.

# I. *BACKGROUND*

Luxottica is the exclusive wholesale distributor of genuine Ray-Ban products in the United States and holds the exclusive right to enforce RAY–BAN trademarks within the United States. (Joint Stmt. of Stipulated Facts, ECF No. 75, ¶ 1.) RAY–BAN marks have been used continuously and exclusively by Luxottica and its predecessors since as early as 1937. (*Id.* ¶ 3.) Luxottica has protected the value of the Ray–Band brand by registering the following trademarks with the United States Patent and Trademark Office: Reg. No. 1,080,886, Reg. No. 1,320,460, Reg. No. 3,522,603. (*Id.* ¶ 1.)

Defendant stipulates that up until November 2014, it sold and offered for sale knockoff products featuring counterfeit RAY–BAN trademarks via online marketplace accounts associated with the eBay seller IDs "g7178a" and "qhgypchyh2." (*Id.* ¶¶ 5– 8.) (The introductory paragraph of the parties' joint statement of stipulated facts refers to the seller IDs as "g7178" and "qhgypchyh.") Defendant has stipulated to owning the online marketplace accounts associated with these seller IDs, as well as seven PayPal accounts associated with various email addresses. (*Id.* ¶ 4.) Defendant sold at least 106 counterfeit Ray–Ban products at prices ranging from $6.29 to $6.99 each. (*Id.* ¶ 5.)

# II. *ANALYSIS*

Luxottica requests that this Court (1) enter summary judgment in its favor on the two claims asserted against Defendant, (2) award statutory damages of $450,000 pursuant to 15 U.S.C. § 1117(c), (3) enter a permanent injunction against Defendant and transfer to Luxottica all assets currently restrained in PayPal accounts that are connected to Defendant, and (4) award attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a)–(b).

## A. Summary Judgment

Luxottica argues that it is entitled to summary judgment on its claims for false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), and violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq.* Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant has already admitted liability on the above-mentioned counts in a Joint Statement of Stipulated Facts filed with the Court on April 7, 2015. (ECF No. 75 ¶¶ 6–

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   1

8 ("Defendant knowingly and willfully offered for sale and sold at least one hundred six (106) Counterfeit Ray–Ban Products.... Defendant admits liability for false designation of origin using counterfeit trademarks and violation of the Illinois Uniform Deceptive Trade Practices Act.").) Summary judgment is therefore entered in favor of Luxottica.

**B. Statutory Damages**

 **\*2**  Luxottica seeks a total damages award of $450,000 — $150,000 for each of the three trademarks that Defendant used on the counterfeit products. Defendant argues that statutory damages of no more than $7,440 are appropriate because it generated only $800 in total revenue from the sale of the counterfeit goods, and only a fraction of that amount within the United States.

Under 15 U.S.C. § 1117(c), a plaintiff in a case involving the use of a counterfeit mark may elect to recover an award of statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed" or, in the case of willful infringement, "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." Although the Lanham Act permits a plaintiff to choose either actual or statutory damages, statutory damages are "most appropriate" when an infringer's nondisclosure makes actual damages uncertain. *Sara Lee Corp. v. Bags of N.Y., Inc.,* 36 F.Supp.2d 161, 165 (S.D.N.Y.1999).

Though § 1117(c) places a dollar range on possible statutory damages awards, the statute provides no guidance on how to select a figure within that range. *Lorillard Tobacco Co. v. S & M Cent. Serv. Corp.,* No. 03 C 4986, 2004 WL 2534378, at \*4 (N.D.Ill. Nov. 8, 2004). Accordingly, "[c]ourts interpreting section 1117(c) have looked by analogy to case law applying the statutory damage provision of the Copyright Act contained in 17 U.S.C. § 504(c)." *Id.*

The Seventh Circuit's standard for the award of statutory damages in copyright infringement cases is set forth in *Chi–Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1229 (7th Cir.1991). Under *Chi–Boy,* "district courts enjoy wide discretion in awarding fees and may consider various factors such as [1] the difficulty or impossibility of proving actual damages, [2] the circumstances of the infringement, and [3] the efficacy of the damages as a deterrent to future copyright infringement." *Id.* at 1229–30 (citation and internal

quotations omitted). Courts have also considered the value of a plaintiff's brand, "and the efforts taken to protect, promote, and enhance that brand." *Lorillard,* 2004 WL 2534378, at \*6. Ultimately, § 1117(c) looks to both "compensatory considerations" such as "actual losses and trademark value," as well as "punitive considerations" such as "deterrence of other infringers and redress of wrongful defense conduct." *Sara Lee,* 36 F.Supp.2d at 165; *see also, Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1347 (7th Cir.1994) (noting that statutory damages under § 1117(c) are not merely remedial but serve an important public interest), *modified on reh'g in part,* 44 F.3d 579 (7th Cir.1995).

The Court turns first to compensatory considerations. Although there is "no necessary mathematical relationship between the size of [a statutory damages award] and the extent or profitability of the defendant's wrongful activities," *Sara Lee,* 36 F.Supp.2d at 165, statutory damages must "bear some relation" to actual damages, *Coach, Inc. v. Tom's Treasure Chest,* No. 2:10–CV–00243, 2011 WL 4399355, at \*3 (N.D.Ind. Sept. 21, 2011) (citation and internal quotations omitted). Courts may look to the size and scope of a defendant's operations to determine a baseline for damages. *Id.* High statutory damages may be appropriate when counterfeiting activities take place online and are capable of reaching a wide audience. *Id.*

 **\*3**  Here, Defendant argues that "the parties have a complete record of *all* the sales of the accused products"—namely, PayPal records documenting Defendant's sales, which totaled approximately $800 worldwide and $372 in the United States. (Def.'s Resp., ECF No. 82, at 11.) Plaintiff counters that Defendant's evidence—which was submitted without a declaration—is unauthenticated and contains contradictory information. For instance, the figures displayed on the webpages for Defendant's eBay storefronts indicate that Defendant sold more than 200 pairs of sunglasses, (*see,* Ex. 2 to Joint Stmt. of Stipulated Facts, ECF No. 75–2), but the PayPal figures Defendant submits show only 106 pairs of sunglasses sold. (Def.'s Resp., ECF No. 82, at 5.) While the parties dispute the exact sales figures, no evidence submitted suggests that Defendant is a large-scale counterfeiter. For instance, all seven PayPal accounts that have been "connected" to Defendant contain only $75,000. (*See, id.* at 2–3.)

On the other hand, Defendant's counterfeiting took place on the Internet, enabling Defendant to reach a "vast customer base," *Burberry Ltd. & Burberry USA v. Designers Imports,*

*Inc.,* No. 07 CIV. 3997(PAC), 2010 WL 199906, at *10 (S.D.N.Y. Jan. 19, 2010),* and making Luxottica's actual losses difficult to calculate, *Brown v. Walker,* No. 1:06–CV–218, 2010 WL 2346242, at *7 (N.D.Ind. May 25, 2010), *report and recommendation adopted as modified,* No. 1:06–CV–218–TLS, 2010 WL 2346225 (N.D. Ind. June 9, 2010).* In cases involving the online sale of counterfeit goods, courts have found substantial damages awards appropriate. *See, e.g., id.* (awarding $50,000 per mark); *Burberry,* 2010 WL 199906, at *10 (awarding $100,000 per mark); *Deckers Outdoor Corp. v. Does 1–55,* No. 11 C 10, 2011 WL 4929036, at *5 (N.D.Ill. Oct. 14, 2011)* (awarding $750,000 per mark). In this case, the Court has already awarded damages of $2 million against each defaulting Defendant. (*See,* ECF No. 65 ¶ 4.)

In addition, the RAY–BAN marks are well known and highly valuable. As noted, Luxottica and its predecessors have used the RAY–BAN marks continuously and exclusively since as early as 1937, and the marks at issue in this lawsuit are all federally registered. Luxottica submits that it has expended significant resources in promoting the Ray–Ban brand, making Ray–Ban the "undisputed world leader in the field of sun and prescription eyewear." (Pl.'s Mem., ECF No. 78, at 10.) Luxottica has also filed numerous lawsuits within this District in an effort to protect the RAY–BAN marks and their associated goodwill. (*See, id.* at 11 n.6.)

The Court now turns to punitive considerations. "[P]art of the purpose of statutory damages is to deter the current violator and other potential future violators." *Lorillard,* 2004 WL 2534378, at *6.* Damages awards limited to lost profits are typically ineffective deterrents because "[a] counterfeiter must fear more than just having to turn over his ill-gotten gains to the rightful owners." *Id.* Here, Defendant has stipulated that it engaged in willful infringement. However, Defendant has also mitigated the degree of willfulness by ceasing the sale of the counterfeit products immediately, retaining an attorney, and voluntarily providing information to Luxottica.

Because this is not a case of default, and based on the mitigating factors identified above, the Court finds it appropriate to reduce the statutory damages Luxottica seeks by two-thirds. Pursuant to 15 U.S.C. § 1117(c), the Court awards Luxottica statutory damages in the amount of $50,000 per mark, for a total award of $150,000.

## C. Permanent Injunction

Luxottica seeks permanent injunctive relief pursuant to 15 U.S.C. § 1116(a), which enables district courts to grant injunctions, "according to the principles of equity and upon such terms as the court may deem reasonable." A plaintiff seeking a permanent injunction must demonstrate the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

**\*4** *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006); *accord e360 Insight v. The Spamhaus Project,* 500 F.3d 594, 604 (7th Cir.2007).

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook,* 272 F.3d 424, 432 (7th Cir.2001). As this Court recognized in granting Luxottica's Motion for a Temporary Restraining Order and Preliminary Injunction, counterfeiting has eroded consumer goodwill in the RAY–BAN trademarks and constitutes irreparable harm for which there is no adequate remedy at law. Further, because Defendant's conduct was willful, the balance of hardships favors Luxottica. *See, Bulgari, S.p.A. v. Partnerships & Unincorporated Associations Identified On Schedule "A",* No. 14–CV–4819, 2014 WL 3749132, at *6 (N.D.Ill. July 18, 2014), *report and recommendation adopted,* No. 14 CV 4819, 2014 WL 3765854 (N.D.Ill. July 29, 2014). The public interest also favors Luxottica, because "enforcement of the trademark laws prevents consumer confusion," *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir.2000), and consumers have a legitimate "interest in knowing with whom they do business." *Re/Max N. Cent.,* 272 F.3d at 433.

As part of the injunction, Luxottica seeks the immediate transfer of "all assets in financial accounts operated by PayPal, Inc. and linked to Defendant, as well as any newly discovered assets, to Luxottica." (Pl.'s Mem., ECF No. 78, at 12.) In granting Luxottica's Motion for Preliminary Injunction, the Court previously froze assets held in accounts

"connected" to Defendant on the basis that Luxottica sought an accounting of profits as an alternative to statutory damages. *See, CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002) (upholding asset freeze where plaintiff sought accounting in the alternative to statutory damages). Now, relying on the PayPal records, Defendant argues that the asset freeze is too broad, sweeping up accounts "wholly unrelated to the accused products." (Def.'s Resp., ECF No. 82, at 8.) Defendant urges the Court to scale back the asset freeze to $7,440, an amount it contends is "more than adequate to satisfy the Court's interests in preserving any equitable accounting of profits." (*Id.* at 10.)

In arguing that the asset restraint should be modified, Defendant relies on *Klipsch.* In *Klipsch,* after a preliminary injunction hearing in which a defendant submitted evidence that it had only sold a few thousand dollars' worth of counterfeit goods, a court reduced a prejudgment asset restraint from $2 million to $20,000. *Klipsch Grp., Inc. v. Big Box Store Ltd.,* No. 12 CIV. 6283 AJN, 2012 WL 5265727, at *3 (S.D.N.Y. Oct. 24, 2012). The court held that, under the Supreme Court's ruling in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999), asset freezes are limited to preserving the equitable remedy of an accounting for profits. *Klipsch,* 2012 WL 5265727, at *3.

 **\*5** To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *N. Face Apparel Corp. v. TC Fashions, Inc.,* No. 05 CIV. 9083(RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006) (citation and internal quotations omitted). Defendant claims that only two of Defendant's seven PayPal accounts contain any profits related to the sale of counterfeit Ray–Ban goods. In support of this argument, Defendant has submitted a spreadsheet of transactions associated with one of Defendant's email addresses, as well as an untranslated Chinese email. (*See,* Exs. K & L to Def.'s Resp., ECF No. 82–1.) To rule out the five remaining accounts, Defendant has submitted PayPal account summaries it claims show no connection to the eBay Seller IDs "g7178a" and "qhgypchyh2." (*See,* Exs. C–I to Def.'s Resp., ECF No. 82–1.) Defendant has also provided several hundred pages of eBay feedback ratings associated with the two seller IDs, showing that it sold a variety of products in addition to sunglasses. (*See,* Ex. N to Def.'s Resp., ECF No. 82–1.)

Luxottica, however, disputes the authenticity and validity of this evidence. For instance, Luxottica notes that the

evidence was not accompanied by a declaration, that the transaction spreadsheet does not identify the quantity of glasses sold, and that Defendant's sales figures contradict information displayed on the eBay storefronts. Despite Defendant's contention that it is unconnected to five of the seven PayPal accounts, Defendant has admitted to owning the PayPal accounts associated with the email addresses shown in the account summaries. (Joint Stmt. of Stipulated Facts, ECF No. 75, ¶ 5.) Luxottica submits that the restraint on these accounts "was based on PayPal, Inc.'s ... determination through PayPal's proprietary methods, which have not been disclosed to Luxottica or Luxottica's counsel." (Gaudio Decl, Ex. 1 to Pl.'s Reply, ECF No. 84–1, ¶ 2.)

The Court cannot conclude, based on the evidence before it, that Defendant has met its burden in showing that the asset restraint should be limited to only a portion of two of the seven PayPal accounts and declines to modify the asset restraint on this basis.

### D. Attorneys' Fees and Costs

Finally, Luxottica seeks an award of attorneys' fees and costs. As the prevailing party, Luxottica is entitled to costs under Federal Rule of Civil Procedure 54(d)(1). Under 15 U.S.C. § 1117(a), which addresses recovery in terms of profits and actual damages, a court may, "in exceptional cases ... award reasonable attorney fees to the prevailing party." Exceptional cases include those in which a defendant's conduct is willful. *BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1099 (7th Cir.1994). In assessing damages under § 1117(a), courts "shall" award attorneys' fees, absent extenuating circumstances, in cases involving the intentional use of a counterfeit mark. 15 U.S.C. § 1117(b). An award of attorneys' fees is available where, as here, a plaintiff "opt[s] to receive statutory damages under section 1117(c)." *Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 111 (2d Cir.2012); *accord Coach, Inc. v. Treasure Box, Inc.,* No. 3:11CV468–PPS, 2014 WL 888902, at *5 (N.D.Ind. Mar. 6, 2014). Accordingly, and in light of Defendant's willful counterfeiting, Luxottica is awarded reasonable attorneys' fees and costs in an amount to be determined by the Court.

### III. *CONCLUSION*

For the reasons stated herein, Luxottica's Motion for Summary Judgment and Statutory Damages is granted in part and denied in part.

The Court enters summary judgment in favor of Luxottica and against Defendant. Pursuant to 15 U.S.C. § 1117(c), the Court awards Luxottica $150,000 in statutory damages. The Court also awards Luxottica reasonable attorneys' fees and costs, and will enter a permanent injunction prohibiting Defendant from violating Luxottica's rights in the RAY–BAN marks.

Within seven (7) days of the entry of this order, Luxottica shall submit a revised Final Judgment Order consistent with this opinion. The parties are to attempt to reach an agreement on the issue of attorneys' fees in accordance with Local Rule 54.3. If an agreement cannot be reached, Luxottica is to file a Motion for Attorneys' Fees within thirty (30) days of the entry of this Order.

**\*6  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 3818622

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 32341772
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

SCANVEC AMIABLE
LIMITED, et al. Plaintiffs,

v.

Jim CHANG, et al. Defendants.

No. Civ.A. 02-6950.
|
Nov. 1, 2002.

**Attorneys and Law Firms**

Jonathan Sturz, Michael W. Mctigue, Jr., Michael F. Snyder, Drinker, Biddle & Reath Llp, Philadelphia, PA, for Plaintiffs.

James D. Cashel, Montgomery, Mccracken, Walker & Rhoads, Llp, Leonard A. Busby, Philadelphia, PA, for Defendant.

*MEMORANDUM AND ORDER*

TUCKER, J.

**\*1** On September 30, 2002, this Court issued an Order (Doc. 41) enjoining Defendants from certain acts, granting in part and denying in part Plaintiffs' Motion for a Preliminary Injunction (Doc. 3), filed by Plaintiffs on August 27, 2002. Paragraph 6 of that Order instructed the parties to submit to the Court "recommendations as to the Amount in Security Plaintiffs shall Post in accordance with Fed.R.Civ.P. 65(c)," to maintain the injunction. Upon consideration of the parties submissions,[1] and the record of these proceedings, the Court orders the immediate deposit of a security bond in the amount $390,000 by Plaintiffs with the Clerk of the Court in accordance with Rule 65(c).

**I.** *BACKGROUND*

A. Procedural History & Temporary Restraining Order
On August 27, 2002, Plaintiffs filed a motion for a temporary restraining order ("TRO") and preliminary injunction against Defendants, alleging, *inter alia,* misappropriation of trade

secrets, trademark infringement, breach of contract, and civil conspiracy. The case was first heard before Judge Berle M. Schiller, sitting as the emergency judge. Judge Schiller granted the requested TRO on August 27, 2002 (Doc. 13), and scheduled the preliminary injunction hearing for September 9, 2002. Judge Schiller crossed out the space on the order reserved for the bond amount and did not require Plaintiffs to post a security to maintain the TRO. *Id.*

On September 3, 2002, this Court re-assumed the case. The initial statutory period for the TRO was set to expire by operation of law on September 6, 2002.[2] This Court issued an order rescheduling the preliminary injunction hearing to begin on September 6. *See* Doc. 18 (Order of September 3, 2002). Counsel for Amica Defendants entered an appearance with the Court on September 5, 2002, and was present, along with Defendant Jim Chang, when the proceedings commenced the following day. The preliminary injunction hearing in this case lasted six days. With the consent of counsel for both parties, the Court ordered that the TRO signed by Judge Schiller remained in effect upon recessing the proceedings each day and pending the Court's ruling.[3] Amica Defendants did not object to the extension of the temporary restraining order.

B. Preliminary Injunction Order
On September 30, 2002, this Court issued a memorandum and order granting in part and denying in part Plaintiffs' request for a preliminary injunction. *See* Doc. 41. Defendants' were enjoined from using the "AMIABLE," "AMICA," and "PHOTOPRINT" marks, using or otherwise disclosing Plaintiffs' trade secrets or proprietary information, and trading on Plaintiffs' goodwill. Defendants' were further ordered to deposit with the Court the source code for all versions, to include derivatives, of the ColorPRINT software, and Defendant Yuan Chang was ordered to comply with the terms of his non-compete agreement with Plaintiff Scanvec Amiable, Inc.

To comply with the requirements of Fed.R.Civ.P. 65(c), the Court ordered the parties to submit recommendations as to the amount in security Plaintiffs should be required to post to maintain the injunction. Plaintiffs recommended a "nominal" bond of $10,000 arguing that "[t]he acts enjoined should create no hardship on defendants and are already required under the law." (Pls. Letter of October 3, 2002.) Amica Defendants responded on October 7, 2002, suggesting that a $1.0 million bond would be more appropriate. Specifically,

Amica Defendants identified three categories of losses arising from the preliminary injunction:

**\*2** (1) future losses due to name change costs and resulting additional delay; (2) specific past losses due to the restraint in place from August 27, 2000 through October 3, 2002; and, (3) estimated additional losses due to Amica's inability to participate in the four leading annual industry trade shows and to market and promote itself generally.

(Amica Defs. Letter of October 7, 2002.) Amica Defendants state $10,000 would be sufficient to cover expenses arising from purchasing new stationary and marketing materials, but claim an estimated $200,000 in additional losses arising from "five extra weeks of delay in delivery of Amica's product to Roland that will result in the name change." *Id.* Amica Defendants assert that Amica must obtain licensing approval and recertification of its software product from Adobe Acrobat, as required by its client Roland DG Corporation ("Roland"), to comply with the preliminary injunction. *Id.* Amica Defendants also claim an additional $30,000 in sales losses to other unidentified customers, bringing the estimated category 1 losses to $240,000.

Category 2 damages consist of "the potential loss of approximately $325,000 in sales to Roland for the approximately 500 new model printers sold by Roland during the restrained period." *Id.* Amica Defendants further claim a loss of $75,000 in estimated sales to "direct customers and other OEM customers," an amount of $70,000 paid in salaries during the TRO period, and $3000 in costs resulting from cancelled travel reservations to trade shows, for an additional $148,000 in category 2 losses. *Id.* As for category 3, Amica Defendants' request $287,000 in security to cover 12 months in estimated lost business due to Amica's non-participation in four industry trade shows during the temporary restraint period. *Id.*

## II. *DISCUSSION*

*Fed.R.Civ.P. 65(c)* provides that a movant who successfully obtains a preliminary injunction must post a security bond "in such sum as the court deems proper, for payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The Third Circuit has "strictly interpreted the bond requirement of *Rule 65(c)* and ha[s] recognized that such a bond 'provides a fund to use to compensate incorrectly enjoined defendants.' " *Elliott v. Kiesewetter, 98 F.3d 47, 59*

*(3d Cir.1996)* (quoting *Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 210 (3d Cir.1990)).* "A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond," *W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 770, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)* (citing *Russell v. Farley, 105 U.S. 433, 437, 26 L.Ed. 1060 (1882); Buddy Systems, Inc. v. Exer-Genie, Inc., 545 F.2d 1164, 1167-1168 (9th Cir.1976)),* or a showing of bad faith or malicious prosecution. Therefore, "[t]he bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction." *Edgar v. MITE Corp., 457 U.S. 624, 649, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)* (Stevens, J., concurring). However, the determination of the bond amount is left to the discretion of the district court. *Frank's GMC Truck Center, Inc., 847 F.2d 100, 103 (3d Cir.1988).*

### A. The Bond Period

**\*3** Plaintiffs' challenge Amica Defendants' request for security to cover category 2 and 3 losses on grounds that "a bond only provides potential recourse for damages that might occur after the bond is posted, and therefore may not be based on any alleged injury the might have occurred prior to its posting." (Pls. Letter of October 9, 2002.) Amica Defendants respond by arguing that because a bond was not required for the temporary restraining order issued by Judge Schiller and this Court has not, prior to issuing this ruling, made findings on the question of a bond, any bond amount set by this Court should cover the entire TRO period or, alternatively, at least date back to September 23, 2002, the date Amica Defendants contend the TRO would have expired by operation of law absent their consent, which they claim was not given.[4] (Amica Defs. Letter of October 18, 2002.)

The defense's arguments are unavailing. First, a bond determination was made in this case by Judge Schiller. Judge Schiller set the bond amount at zero. *See* Part I.A. *supra.* Moreover, notwithstanding the absence of a bond, Amica Defendants consented to this Court's extension of the TRO and did not object to either the extension or the lack of a bond. Second, even assuming error in the bond determination on the TRO, that error cannot *now* be remedied by ordering Plaintiffs to post a bond to cover both the original TRO and the preliminary injunction. A temporary restraining order "expires by its own terms, or by court order when a preliminary injunction is entered." *Id.* at 1153. Pursuant to *Rule 65(c),* the issuing court must make independent bond determinations for each injunctive period. *See, e.g.,*

*Steinberg v. American Bantam Car Co.,* 173 F.2d 179 (3d Cir.1949) (holding "a bond given pursuant to a temporary restraining order cannot be carried over to cover possible liability under a preliminary injunction"), *cited in Coyne-Delany Co. v. Capital Dev. Bd.,* 717 F.2d 385, 389 (7th Cir.1983) (same); *Merck & Co. v. Lyon,* 941 F.Supp. 1443, 1464 (M.D.N.C.1996) (ruling an incorrectly enjoined party may only recover for damages incurred during "the time period specified in the bond, which presumably would not include any time prior to the entry of th[e] preliminary injunction.") (citation omitted). The proper remedy where an enjoined party ceases to consent to the extension of a TRO or otherwise challenges the court's order is to motion the court for appropriate relief or seek interlocutory appeal at the time the consent is withdrawn.[5] *In re Arthur Treacher's Franchise Litigation,* 689 F.2d at *supra.*

B. The Bond Determination

In determining an appropriate bond to maintain the preliminary injunction granted in this case, this Court agrees that in commercial actions, "[w]hen setting the amount of security, district courts should err on the high side." *Mead*

*Johnson & Co. v. Abbott Lab.,* 201 F.3d 883, 888 (7th Cir.2000). Accordingly, the Court will require $240,000 in security for the potential category 1 expenses identified by Amica Defendants. Further, the Court recognizes that in going forward, Amica risks significant additional losses as a direct result of delays and other difficulties it may experience complying with the Court's injunctive order, to include losses to direct and OEM customers other than Roland. Accordingly, the Court, in its discretion, will require an additional $150,000 in security.

III. *CONCLUSION*

**\*4** Plaintiffs shall immediately deposit with the Clerk of the Court, in accordance with Fed.R.Civ.P. 65(c), security in the amount of $390,000 to maintain the preliminary injunction issued in this case. An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 32341772

Footnotes

1    *See* Pls. Letters of October 3, 8, and 9, 2002; Amica Defs. Letters of October 3, 7, 14, and 18, 2002.

2    Fed.R.Civ.P. 65(b), which governs the issuance of TROs, provides: "Every temporary restraining order granted without notice ... shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period."

3    *See* Hearing Trans., September 6, 2002, at p. 177 (Tucker, J.) ("The order that was in effect, signed by Judge Schiller will continue until [next] Monday"); Hearing Trans., September 9, 2002, at p. 188 (Tucker, J.) ("All the injunctions that are in effect will remain in effect until that time [the following day]."); Hearing Trans., September 10, 2002, at p. 237 (Tucker, J.) ("The order that is in effect will remain in effect."); Hearing Trans., September 13, 2002, at p. 36 (Tucker, J.) ("In the interim, the TRO that was issued previously will remain in effect[.]").

4    Amica Defendants claim they were "not aware of Your Honor having entered any 'express' order extending the TRO beyond 20 days as contemplated by the law, and never knowingly consented to any such order," notwithstanding the fact that defense counsel, Mr. Busby, participated in the preliminary injunction hearing and daily consented to the Court's order extending the TRO on the record during the hearing. *See* note 3 *supra.* In any case, counsel did not object to the extension. As our Circuit has held, the point at which Amica Defendants elected to withdraw their consent to or otherwise contested the continuation of the TRO during the pendency of the Court's preliminary injunction ruling, the proper remedial course was to (1) motion this Court to either dissolve the TRO or reconsider the bond determination, or (2) file an interlocutory appeal seeking appropriate relief. *See In re Arthur Treacher's Franchise Litigation,* 689 F.2d 1150, 1153 (3d Cir.1982). No such motions or appeals were filed in this case. Thus, counsel's claim that "Defendants reasonably and properly relied on the absence of any ... findings ... establishing conclusively that the issue of a TRO bond had not yet been decided" is, in fact, unreasonable. (Amica Defs. Letter of October 18, 2002.)

5    *See also* note 4 *supra.* The Court further notes that Amica Defendants own conduct in this case contributed to the extension the original restraint period. The preliminary injunction hearing lasted six days. Plaintiffs' case was heard in one day, with a brief rebuttal witness; the defense presentation took four days. Amica Defendants also missed the Court's deadline for filing their proposed findings of fact and conclusions of law (September 16, 2002), filed a brief memorandum

instead and did not submit the defense's annotated and indexed proposed findings of fact and conclusions of law until two days later. *See* Doc. 26. Further, Amica Defendants were unprepared to respond promptly to the Court's request for recommendations on the bond amount upon issuing the preliminary injunction. Plaintiffs' recommendation was submitted on October 3, 2002. Amica Defendants' did not respond until October 7, 2002. Amica Defendants notified the Court of their intention to respond to Plaintiffs' objections to the category 2 and 3 expenses, (Pls. Letter of October 9, 2002), but did not respond until October 18, 2002.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3648876
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
W.D. Michigan,
Southern Division.

Jeremy Daniel SCHUH, Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al., Defendants.

No. 1:09–cv–982.
|
July 26, 2010.

**Attorneys and Law Firms**

Jeremy Daniel Schuh, Baraga, MI, pro se.

Christine M. Campbell, MI Dept. Attorney General, Lansing, MI, for Defendants.

**REPORT AND RECOMMENDATION**

HUGH W. BRENNEMAN, JR., United States Magistrate Judge.

**\*1**  Plaintiff has filed a § 1983 civil rights action against defendants. This matter is now before the court on plaintiff's *ex parte* "motion for preliminary injunction and/or temporary restraining order" (docket no. 7) and his "motion to inquire into disposition of motions for preliminary injunction and T.R.O. filed" (docket no. 30).

**I. Plaintiff's claim**

In his motion for a preliminary injunction, plaintiff asks the court to order the Michigan Department of Corrections (MDOC) to immediately place him on a Kosher Diet and to order the MDOC not to transfer him to Ionia Maximum Correctional Facility and/or place SPONS in his prisoner file against the defendants named in this action.[1]

**A. Temporary restraining order**

Fed.R.Civ.P. 65(b)(1) provides for the issuance of a TRO as follows:

The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

In reviewing requests for injunctive relief, the court considers (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the preliminary injunction will cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Rock & Roll Hall of Fame v. Gentile Productions,* 134 F.3d 749, 753 (6th Cir.1998). Where a prison inmate seeks an order enjoining state prison officials, this court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Kendrick v. Bland,* 740 F.2d 432, 438, n. 3 (6th Cir.1984). Courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Ward v. Dyke,* 58 F.3d 271, 273 (6th Cir.1995). Correctional officials are professional experts in matters of security and discipline; as such they are better suited to make decisions about security and discipline than are the courts. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Moreover, "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548. For these reasons, a plaintiff attacking administrative decisions about issues of security and discipline must meet a heavy burden.

Plaintiff is not entitled to a TRO because he has failed to present an affidavit or verified complaint containing "specific facts that clearly show that immediate and irreparable injury, loss, or damage will result to [him] before the adverse

party can be heard in opposition." Fed.R.Civ.P. 65(b)(1)(A). Plaintiff's amended complaint, while referring to 28 U.S.C. § 1746 (i.e., "This document is executed pursuant to 28 U.S.C. 1746, and these are my statements!"), does not contain the certification required by that statute. *See Walton v. Wheatly Company,* No. 92–3379, 1993 WL 43934 at *2–*3 (6th Cir. Feb.19, 1993) (a so-called affidavit of poverty seeking *in forma pauperis* status which contained statements that litigant "acknowledged as the truth" was insufficient to comply with the requirement of § 1746 that the statements be acknowledged as true "under penalty of perjury"); *Savage v. Stickman,* No. CIVA 06–269J, 2007 WL 550268 at *1 (W.D.Pa. Feb.16, 2007) (court found plaintiff's so-called affidavit to be insufficient "because at the end of it Plaintiff merely states, 'I declare that the foregoing is true and correct' without stating, as required, 'under penalty of perjury' "). In summary, the statements set forth in the amended complaint do not contain legally sufficient evidence to support plaintiff's claim that he suffers from "immediate and irreparable injury."

 **\*2**  Furthermore, even if the court construed his amended complaint as verified, plaintiff has not alleged facts sufficient to support the issuance of a temporary restraining order. "An ex parte temporary restraining order is an extraordinary remedy which will not be granted unless the movant clearly shows that such relief is warranted." *Fort Wayne Women's Health Organization v. Brane,* 734 F.Supp. 849, 850 (N.D.Ind.1990). Plaintiff asks this court to prevent his transfer to the Ionia Maximum Correctional Facility and to prevent the issuance of SPONs with respect to certain MDOC employees. Plaintiff does not suggest that either of these events will occur in the immediate future. Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time in the future." *State of Connecticut v. Commonwealth of Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602 (1931). In addition, plaintiff's desire to be placed on a Kosher Diet does not present the type "immediate and irreparable injury, loss, or damage" that merits a TRO. *See, e.g., Daly v. Lappin,* No. *05–276–DH, 2006 WL 468723 at *1 (S.D.Ill. Feb.27, 2006) (in denying a prisoner's request to prevent his removal from a Kosher diet, court noted that the prisoner's allegations did not demonstrate the likelihood of immediate and irreparable harm necessary to obtain a TRO *"before Defendants can be heard,"* and that "federal courts must exercise equitable restraint ... when asked to take over administration of a prisoner, something that is best left to

correctional officials and their staff") (emphasis in original). Accordingly, plaintiff's request for a TRO should be denied.

### B. Preliminary injunction

Finally, to the extent plaintiff seeks an ex parte preliminary injunction, such a request is procedurally improper. Fed. Rules Civ. Proc. 65(a)(1) provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." *See Phillips v. Chas. Schreiner Bank,* 894 F.2d 127, 130–31 (5th Cir.1990) ("[t]he courts consistently have treated rule 65(a)(1) as mandatory and have not hesitated to dissolve preliminary injunctions issued without notice or the opportunity for a hearing on disputed questions of fact and law"); *Consolidation Coal Co. v. Disabled Miners of Southern W. Va.,* 442 F.2d 1261, 1269 (4th Cir.1971) (court's issuance of an ex parte preliminary injunction "was manifestly error, because Rule 65(a)(1) is explicit that 'no preliminary injunction shall be issued without notice to the adverse party' "). When a preliminary injunction is sought under Rule 65(a), service of the summons and the complaint is required. *Carty v. Rhode Island Department of Corrections,* 198 F.R.D. 18, 20 (D.R.I.2000). *See also, Clement Martin, Inc. v. Dick Corp.,* 97 F.Supp. 961, 963 (W.D.Pa.1951) ("[s]ince an injunction is sought personal service is required"). It is well settled that without service of process, a court has no jurisdiction over defendants named in a lawsuit. *Carty,* 198 F.R.D. at 20. Plaintiff's status as a pro se litigant does not excuse him from these procedural requirements. A pro se litigant is not entitled to special consideration with respect to straightforward procedural requirements that a lay person can comprehend as easily as a lawyer. *Jourdan v. Jabe,* 951 F.2d 108, 109–10 (6th Cir.1991). Accordingly, plaintiff's motion for the issuance of an *ex parte* preliminary injunction should be denied.

### II. Recommendation

 **\*3**  For these reasons, I respectfully recommend that plaintiff's ex parte "Motion for a preliminary injunction and/or Temporary Restraining Order" (docket no. 7) and his "motion to inquire" (docket no. 30) be **DENIED.**

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3648876

Footnotes

1    A "SPON" is a Special Problem Offender Notice. "Issuance of a SPON is nothing more than a security classification used by the prison. *See* MICH. DEP'T OF CORR., Policy Directive 03.03.110(E)." *Seaton v. Brinkman,* No. 1:08–cv–524, 2010 WL 431688 at *5 (W.D.Mich. Jan.25, 2010).

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Singer v. Balzorah El, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-00492-O   Document 104-2   Filed 06/24/21   Page 78 of 80   PageID 11952

2018 WL 6737676
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Arturo SINGER,

v.

Abiyah BALZORAH EL,

Civil Action No. 3:18-cv-02937-M
|
Signed 11/16/2018

**Attorneys and Law Firms**

Abiyah Balzorah El, Dallas, TX, pro se.

**ORDER**

BARBARA M. G. LYNN, CHIEF JUDGE

**\*1** Before the Court is Abiyah Balzorah El's Emergency Motion for Restraining Order. The Motion is **DENIED**.

### I. Legal Standard

A temporary restraining order is intended to preserve the status quo and prevent irreparable harm. *Granny Goose Foods v. Brd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). To be entitled to a temporary restraining order, a party must demonstrate that it meets a four-prong test. The party must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of immediate and irreparable harm for which there is no adequate remedy at law; (3) that greater injury will result from denying the temporary restraining order than from its being granted; and, (4) that a temporary restraining order will not disserve the public interest. *Clark v. Pritchard*, 812 F.2d 991, 993 (5th Cir. 1987).

### II. Analysis

The Court finds that Movant has failed to establish that this Court has jurisdiction over this controversy or to issue the requested order and, further, has submitted insufficient evidence in connection with his or her request for a temporary restraining order to meet any of the elements above. Movant's request for a temporary restraining order is therefore **DENIED**.

First, it is unclear that the Court has jurisdiction over this controversy. Because Rule 65 confers no jurisdiction, a district court must have both subject matter jurisdiction and personal jurisdiction over the party against whom the injunction runs before it enters a temporary restraining order. *Enterprise Intern., Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470 (5th Cir. 1985). The "notice of removal" filed in this case pleads no facts, does not identify which court the case was removed from, and nakedly asserts that the "suit involves a federal question." [ECF No. 3]. This is insufficient for the Court to assure itself of its jurisdiction to issue the requested order.

Further, the movant has submitted insufficient evidence in connection with the request for relief to carry the burden necessary for a temporary restraining order to be issued. Movant seeks to enjoin an eviction, but Movant's pleading does not specifically plead facts which describe Movant's interest in the property at issue. Nor does the pleading specifically outline why any serious harm is imminent. The "notice of removal" filed to initiate the action is not verified and alleges no facts to indicate why Movant should be immediately entitled to the extraordinary remedy of a temporary restraining order. Absent specific facts and without a more detailed description of why Movant is entitled to immediate injunctive relief, the Court cannot find a substantial likelihood of success on the merits, a substantial threat of immediate harm, or weigh the balance of harm and consider the public interest.

For the foregoing reasons, the Court **DENIES** Movant's Emergency Motion for Restraining Order.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6737676

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WEIFANG TENGYI JEWELRY TRADING CO., LTD., | ) | |
| | ) | |
| | ) | 18 C 4651 |
| Plaintiff, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| INTUII LLC, JENS SORENSEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Motion hearing held.  For the reasons set forth below, Defendant Intuii and Jens Sorensen's motion to lift TRO [30] is granted in part and entered and continued in part.  The TRO is lifted immediately as to Defendant Intuii LLC, doing business as diaperdisco, Jens Sorensen, and chocochipcupcake.  The TRO shall have no force or effect on any non-parties, including PayPal, in privity with Intuii LLC, Jens Sorensen, or with the eBay and Bonanza stores under which they operate.  Defendants' request for damages is entered and continued.  By noon on 8/22/2018, Plaintiff shall file a memorandum explaining what pre-filing research it performed into the location of Defendants Intuii LLC and Jens Sorenson and into whether they sold counterfeit ULOVEIDO products.  Status hearing set for 8/23/2018 at 9:45 a.m.

**STATEMENT**

Plaintiff Weifang Tengyi Jewelry Trading Co., Ltd. obtained a TRO in this trademark case.  Doc 16.  The court granted the TRO based on Weifang's representation that Defendants are foreign Internet businesses that have sold counterfeit ULOVEIDO products.  Doc. 13 at 2-3, 7-8.  That representation was doubly incorrect as to Defendants Intuii LLC and Jens Sorenson (together, "Intuii"), who sell genuine ULOVEIDO products from their Internet business in California.  Docs. 32-33.  So, at least as to Intuii, the TRO was obtained under incorrect pretenses.

Weifang does not deny that Intuii is based on California and sells genuine ULOVEIDO products.  Doc. 39.  But Weifang opposes lifting the TRO on the ground that Intuii offers ULOVEIDO products for sale before it actually acquires those products.  There are two flaws with that argument.  First, it is not the legal and factual basis on which Weifang obtained the TRO.  Second, as Weifang's counsel admitted at the 8/17/2018 hearing, Weifang has no legal authority for the proposition that a reseller violates the trademark laws by offering a trademarked product for sale before acquiring that product.  Thus, Weifang has no authority to support its view that what Intuii has actually done (which is far different from what Weifang initially alleged that Intuii did) is actually illegal.

1

Given this, Weifang has not established the requisite likelihood of succeeding on the merits to support a TRO against Intuii.  And given Intuii's commitment not to sell ULOVEIDO products, the balance of harms tips against a TRO as well.


August 17, 2018                                    /s/ Gary Feinerman
                                                   United States District Judge